No. 25-20132

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

Clifford F. Tuttle, Jr., as Representative of the Estate of Dennis W. Tuttle, Deceased; Robert Tuttle; Ryan Tuttle; Jo Ann Nicholas; John Nicholas,

**Plaintiffs-Appellees**,

v.

Felipe Gallegos,

**Defendant-Appellant.**

_____

Jo Ann Nicholas, individually and as an heir of the Estate of Rhogena Nicholas; John Nicholas, as temporary administrator of the Estate of Rhogena Nicholas,

**Plaintiffs-Appellees**,

v.

Felipe Gallegos,

**Defendant-Appellant**.

_____

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Honorable Alfred H. Bennett, District Judge
Nos. 4:21-cv-270 and 4:21-cv-272

_____

**BRIEF OF APPELLANT FELIPE GALLEGOS**

_____

RUSSELL HARDIN, JR.
JOHN MACVANE
RUSTY HARDIN & ASSOCIATES, L.L.P.
5 Houston Center
  1401 McKinney Street, Suite 2250
  Houston, Texas 77010
(713) 652-9000 Phone
RHardin@RustyHardin.com
JMacVane@RustyHardin.com

*Counsel for Defendant-Appellant*

## <u>Certificate of Interested Persons Pursuant to 5TH CIR. R. 28.2.1</u>
## No. 25-20132

CLIFFORD F. TUTTLE, JR., as Representative of the Estate of DENNIS W. TUTTLE, Deceased; ROBERT TUTTLE; RYAN TUTTLE; JO ANN NICHOLAS; JOHN NICHOLAS,

v.

FELIPE GALLEGOS

_____

JO ANN NICHOLAS, individually and as an heir of the Estate of RHOGENA NICHOLAS; JOHN NICHOLAS, as temporary administrator of the ESTATE OF RHOGENA NICHOLAS

v.

FELIPE GALLEGOS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Defendant-Appellant** | **Defendant-Appellant's Counsel** |
|---|---|
| Felipe Gallegos | Rusty Hardin & Associates, LLP |
| |    (trial / appellate counsel) |
| | Russell Hardin, Jr. (trial / appellate counsel) |
| | John MacVane (trial / appellate counsel) |
| | Quinones & Associates, PLLC (trial counsel) |
| | Letitia D Quinones-Hollins (trial counsel) |
| | Murphy & McKinney Law Firm, P.C. |
| |    (trial counsel) |
| | Marshall Douglas Murphy (trial counsel) |
| | Jennifer Brevorka (trial counsel) |
| | Armstead Lewis (trial counsel) |
| | Rachel Lewis (trial counsel) |
| | Naomi Howard (trial counsel) |
| | Aisha Dennis (trial counsel) |

[*Certificate continued on following page . . . .*]

ii

| Plaintiff-Appellees | Plaintiff-Appellees' Counsel |
|---|---|
| Clifford F. Tuttle, Jr.,<br>    as Representative of the Estate<br>    of Dennis W. Tuttle, Deceased | Boyd Smith (Tuttle plaintiffs' counsel)<br>Gallagher Law Firm<br>    (Tuttle plaintiffs' counsel) |
| Robert Tuttle | Michael Gallagher (Tuttle plaintiffs' counsel) |
| Ryan Tuttle | Pamela McLemore (Tuttle plaintiffs' counsel) |
| Dennis Tuttle (plaintiffs' decedent) | |
| | |
| Jo Ann Nicholas,<br>    individually, and as an heir of the<br>    Estate of Rhogena Nicholas | Doyle Dennis LLP<br>    (Nicholas plaintiffs' counsel) |
| John Nicholas,<br>    individually, and as temporary<br>    administrator of the Estate of<br>    Rhogena Nicholas | Michael Doyle (Nicholas plaintiffs' counsel)<br>Jeffrey Avery (Nicholas plaintiffs' counsel)<br>Charles Bourque, Jr.<br>    (Nicholas plaintiffs' counsel) |
| Rhogena Nicholas<br>    (plaintiffs' decedent) | |

## Additional parties in the trial court

| Party | Counsel |
|---|---|
| Gerald Goines | Dwayne Day |
| Steven Bryant | David Nachtigall |
| Eric Sepolio | Melissa Azadeh (City of Houston Legal Department)<br>Carolyn Martin(City of Houston Legal Department) |
| Manuel Salazar | Kelly Ann Dempsey (City of Houston Legal Department)<br>Geoffrey Hoover (City of Houston Legal Department)<br>Melissa Azadeh (City of Houston Legal Department)<br>Carolyn Martin(City of Houston Legal Department) |
| Nadeem Ashraf | Bradley Morefield (City of Houston Legal Department)<br>Michelle Taylor (City of Houston Legal Department) |
| Robert Gonzalez | Bradley Morefield (City of Houston Legal Department)<br>Christy Martin (City of Houston Legal Department) |
| Thomas Wood | Bradley Morefield (City of Houston Legal Department)<br>Alexander Garcia (City of Houston Legal Department) |
| Oscar Pardo | Melissa Azadeh (City of Houston Legal Department) |
| Clemente Reyna | Bradley Morefield (City of Houston Legal Department)<br>Alexander Garcia(City of Houston Legal Department) |

*[Certificate continued on following page . . . .]*

## Additional parties in the trial court (continued)

| Party | Counsel |
|---|---|
| Frank Medina | Christy Martin (City of Houston Legal Department) |
| Marsha Todd | Kelly Ann Dempsey (City of Houston Legal Department) |
| Cedell Lovings | Melissa Azadeh (City of Houston Legal Department) |
| Harris County District Attorney's Office | Elizabeth Lee Stevens (Harris County District Attorney's Office) |
| Art Acevado | Beck Redden, LLP |
| | Alistair Dawson |
| | Garrett Brawley |
| | Lena Silva |
| | Harold Al Odom, III |
| | Arturo Michel (Houston City Attorney) |
| | Christy Martin (City of Houston Legal Department) |
| City of Houston, TX | Beck Redden, LLP |
| | Alistair Dawson |
| | Garrett Brawley |
| | Lena Silva |
| | Harold Al Odom, III |
| | Arturo Michel (Houston City Attorney) |
| | Kelly Ann Dempsey (City of Houston Legal Department) |

*/s/ John MacVane*
John MacVane

### Statement Regarding Oral Argument Pursuant to 5TH CIR. R. 28.2.3

Oral argument need not be permitted in this case. Pursuant to Fifth Circuit Rule 28.2.3, Gallegos waives oral argument unless the Court determines that argument would be helpful, in which case, Gallegos requests to participate.

# Table of Contents

**Contents**                                                                 **Page(s)**

Certificate of Interested Persons ................................................................. ii

Statement Regarding Oral Argument ............................................................ v

Table of Contents ...................................................................................... vi

Table of Authorities ................................................................................... vii

Jurisdictional Statement .............................................................................. 1

Statement of The Issues ............................................................................. 2

Statement of The Case ............................................................................... 5

Summary of The Argument .......................................................................... 16

Argument ................................................................................................... 18

I.    Standard of Review & Applicable Law ................................................. 17

II.   Officer Gallegos did not violate the clearly established
      constitutional rights of either Ms. Nicholas or Mr. Tuttle. ................... 19

      A.    The district court erred in denying Officer Gallegos's
            motion for summary judgment against Ms. Nicholas's
            claims. ...................................................................................... 19

            1.    The Plaintiffs' *ipse dixit* argument that Medina had
                  escaped the house when Gallegos shot Nicholas is
                  blatantly contradicted by the very video upon which the
                  Plaintiffs rely (in addition to all the other evidence in the
                  case) and therefore cannot create an issue of fact for
                  purposes of summary judgment. .......................................... 20

a. The Plaintiffs' *ipse dixit* argument that Medina had escaped the house when Gallegos shot Nicholas is blatantly contradicted by the record because (i) the video the Plaintiffs rely upon does not depict any of Gallegos's sleeve of tattoos and also (ii) the theory contradicts all testimony and analysis of the physical evidence by both fact and expert witnesses. .................................... 24

2. Even adopting the Plaintiffs' summary judgment version of events, the district court erred in denying summary judgment because (a) the Plaintiffs' account is completely implausible and (b) the district court's identified fact dispute is immaterial because, under the Plaintiffs' theory, any violation of Ms. Nicholas's constitutional rights would hinge entirely—and impermissibly—upon Gallegos's subjective intent rather than the required objective analysis of his use of force. ..................................................... 31

a. The Plaintiffs' theory that Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle is too implausible to support summary judgment—and impossible when viewing the summary judgment evidence upon which the Plaintiffs rely as a whole. ................................................................ 36

b. The Plaintiffs' theory that Gallegos intentionally shot Nicholas by shooting through (and grazing) Mr. Tuttle relies entirely on Gallegos's intent—*i.e.*, who Gallegos intended to hit when he shot—which is impermissible in the excessive force analysis. ........................................... 40

3. The Plaintiffs also failed to establish that Officer Gallegos was not entitled to qualified immunity. ................................. 44

B. The district court erred in denying Officer Gallegos's motion for summary judgment against Mr. Tuttle's claims. ...................................... 49

1. Even under the Plaintiffs' version of events, Officer Gallegos's use of force did not violate Mr. Tuttle's constitutional rights. ................................................................ 49

2.  Officer Gallegos is entitled to qualified immunity because the Plaintiffs failed to establish that he violated clearly established law. ............................................................... 56

Conclusion ....................................................................................58

Certificate of Service ...................................................................59

Certificate of Compliance............................................................60

# Table of Authorities

Cases…………………………………………………………………Pages(s)

*Amador v. Vasquez,*
961 F.3d 721 (5th Cir. 2020) ................................................... 17

*Anderson v. Creighton,*
483 U.S. 635 (1987) ............................................................... 44

*Cooper v. Brown,*
844 F.3d 517 (5th Cir. 2016) ............................................ 45, 56

*Estate of Baker by & through Baker v. Castro,*
No. CV H-15-3495, 2018 WL 4762984 (S.D. Tex.
Aug. 31, 2018) ................................................................. 44, 46

*Freeman v. Gore,*
483 F.3d 404 (5th Cir. 2007) ........................................... 18, 31

*Graham v. Connor,*
490 U.S. 386, 396 (1989) ................................................ 18, 40

*Graves v. Zachary,*
277 Fed. App'x 344 (5th Cir. 2008) ...................................... 56

*Hampton v. Oktibbeha Cty. Sheriff Dep't,*
480 F.3d 358 (5th Cir. 2007) ................................................. 17

*Jimerson v. Lewis,*
94 F.4th 423 (5th Cir. 2024) ................................................. 31

*Joseph on behalf of Estate of Joseph v. Bartlett,*
981 F.3d 319 (5th Cir. 2020) ................................................. 44

*Lusk v. Foxmeyer Health Corp.,*
129 F.3d 773 (5th Cir. 1997) ........................................... 36, 38

*Lytle v. Bexar Cnty., Tex.,*
560 F.3d 404 (5th Cir. 2009) ................................................. 56

*Mace v. City of Palestine,*
    333 F.3d 621 (5th Cir.2003) .................................................................. 18

M*albrough v. Stelly,*
    814 Fed. App'x 798 (5th Cir. 2020) ...................................................... 42

*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................................ 44

*Mason v. Lafayette City-Par. Consol. Gov't,*
    806 F.3d 268 (5th Cir. 2015) ............................................................... 56

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ............................................................................. 1

*Ontiveros v. City of Rosenberg, Tex.,*
    564 F.3d 379, n.1 (5th Cir. 2009) ............................................. 3, 40, 44, 47

*Plumhoff v. Rickard,*
    572 U.S. 765 (2014) ..................................................................... *passim*

*Poole v. City of Shreveport,*
    13 F.4th 420 (5th Cir. 2021) ......................................................... 31, 47

*Poole v. City of Shreveport,*
    691 F.3d 624 (5th Cir. 2012) ............................................................... 18

*Releford v. Rosemon,*
    678 Fed. App'x 267 (5th Cir. 2017) ................................................. 44, 46

*Roque v. Harvel,*
    993 F.3d 325 (5th Cir. 2021) ............................................................... 56

*Scott v. Harris,*
    550 U.S. 372 (2007) .................................................... 17, 23, 24, 32

*Stroik v. Ponseti,*
    35 F.3d 155 (5th Cir. 1994) ....................................................... 15, 39, 57

*Tarver v. City of Edna,*
    410 F.3d 745 (5th Cir. 2005) ............................................................... 18

*Tennessee v. Garner,*
    471 U.S. 1 (1985) .............................................................................. 46

*Turner v. Lieutenant Driver,*
   848 F.3d 678 (5th Cir. 2017) ....................................................... 45

*Valderas v. City of Lubbock,*
   937 F.3d 384 (5th Cir. 2019) ....................................................... 43

*Wagner v. Bay City, Tex.,*
   227 F.3d 316 (5th Cir. 2000) ................................................... 32, 48

**Statutes**
42 U.S.C. § 1983 ................................................................................. 1

## **Jurisdictional Statement**

This case is an appeal from the district court's denial of the appellant, Officer Felipe Gallegos's, motion for summary judgment on grounds of qualified immunity in an excessive force lawsuit under 42 U.S.C. § 1983.[1]

This Court therefore has jurisdiction to review aspects of the trial court's denial of summary judgment under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511 (1985).

---

[1] ROA.14172-83.

## **Statement of the Issues**

### **Issue 1 (Rhogena Nicholas)**

On an interlocutory summary judgment appeal of an order denying qualified immunity, when a Plaintiffs' version of events is blatantly contradicted by the record—particularly video evidence—such a version cannot be adopted for purposes of identifying a genuine issues of material facts. In this case, the Plaintiffs' version of facts as to Ms. Nicholas alleged that a person captured on body camera for less than 2 seconds was Officer Gallegos, even though this person lacked Gallegos's sleeve of tattoos and his location was inconsistent with all expert analyses and eyewitness accounts of the event.

Did the district court err in adopting this version of events?

### **Issue 2 (Rhogena Nicholas)**

Courts must review summary judgment evidence as a whole, not in bits and pieces, and fact issues precluding summary judgment must be plausible. In this case, the Plaintiffs combined multiple, totally contradictory accounts to create their version of events. In this version of events, a police officer shot in the direction of an armed assailant who had shot another officer seconds earlier. The Plaintiffs contend that the shooting officer aimed, not at the armed assailant, but at a woman sitting on the couch behind him—who the plaintiffs contend the officer observed to be unarmed and nondangerous.

Did the district court err in adopting this version of events?

2

**Issue 3 (Rhogena Nicholas)**

It has long been established that the constitutionality of an officer's use of force must be judged objectively, without regard to the officer's subjective intent. In this case, the Plaintiffs argued that an officer employed excessive force by firing in the direction of an armed assailant who shot another officer seconds earlier because—in firing at this assailant and grazing him with the bullet—the officer intended to hit a woman sitting on a couch behind the assailant.

Did the district court err in adopting this argument that the officer's subjective intent, rather than his objective actions, determined whether his force was excessive?

**Issue 4 (Dennis Tuttle)**

It has long been established that the constitutionality of an officer's use of force must be judged based upon the officer's perception of events, not with 20/20 hindsight. In this case, over the course of approximately 80 seconds, an officer observed an individual apparently shoot four police office (and actually, indisputably, shoot and paralyze one officer). The district court denied summary judgment because, even though the shooter never gave himself up or stopped moving, the district court determined a fact question existed as to whether the shooter was in fact incapacitated when he was fatally shot.

Did the district court err in focusing on the shooter's actual physical condition rather than the officer's perception of the danger that the shooter posed—particularly

3

given the shooter's apparent conduct of shooting multiple officers over the previous 80 seconds?

**Issue 5 (Qualified Immunity—Rhogena Nicholas and Dennis Tuttle)**

"Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity."[2] In this case, the suspect at whom the defendant officer allegedly directed "excessive" force indisputably shot one officer and appeared to have shot three others within 80 seconds of the moment that deadly force subdued him. In determining that the law clearly prohibited the officer's conduct, neither the Plaintiffs, nor the district court, identified a single case in which a suspect even discharged his weapon—to say nothing of having appeared to shoot four officers, as occurred here.

Did the district court err in finding that a case squarely on point prohibited the defendant officer's conduct and denying qualified immunity?

---

[2] *See Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 383, n.1 (5th Cir. 2009).

## Statement of the Case

This case arises from claims against a former Houston Police Officer, Felipe Gallegos, related to execution an arrest warrant at a residence on Harding Street in Houston, Texas on January 28, 2019.[3]

The warrant execution rapidly devolved into a gun fight in which four police officers suffered gunshot wounds and the two occupants of the Harding Street house were killed, as was their dog.[4]

It is undisputed that the search warrant executed on Harding Street that day was obtained through a perjured warrant affidavit provided by Houston narcotics officer Gerald Goines with the assistance of fellow officer Stephen Bryant.[5] Goines has been convicted of felony murder in connection with his actions in obtaining the warrant.[6]

It is also undisputed that Officer Gallegos knew nothing about the misconduct leading to the warrant's issuance. From Officer Gallegos's perspective, he was assisting in the execution of a lawful warrant that his fellow narcotics officers had obtained.

---

[3] *See* ROA.14155-56. This brief sometimes refers to Gallegos and others by their titles on the day of the incident at issue, *e.g.*, Officer Gallegos, even though these individuals, including Gallegos may no longer be employed by the Houston Police Department. The word "Plaintiffs" refers to all Plaintiffs in this action, *i.e.*, Clifford F. Tuttle, Jr., as Representative of the Estate of Dennis W. Tuttle, Deceased; Robert Tuttle; Ryan Tuttle; Jo Ann Nicholas, individually, and as an heir of the Estate of Rhogena Nicholas; John Nicholas, individually, and as temporary administrator of the Estate of Rhogena Nicholas. The Plaintiffs jointly responded to Officer Gallegos's motion for summary judgment, *see* ROA.9002, so their contentions are addressed collectively.

[4] *See* ROA.14155-56, ROA.14178.

[5] *See* ROA.14156-57.

[6] ROA.14157.

Prior to the warrant's execution, the officers executing the warrant were briefed.[7] Among other things, they learned that the house on Harding Street was occupied by a man known to carry a pistol and by an aggressive dog.[8]

Gallegos and several other officers in full tactical gear arrived to execute the warrant in the early evening.[9] The sun was still out.[10] The officers on the team entering the house wore dark colored tactical gear emblazoned with the word "POLICE" in yellow letters.[11]

Multiple marked police cruisers arrived at the house for the warrant's execution, accompanied by a white van carrying the tactical team that would enter the house.[12] These vehicles parked on the street in front of the house.[13] The warrant was a so-called "no-knock," and the officers planned to knock down the door, announce their presence, and enter.[14]

Officer Stephen Bryant carried a tool called a "moby," and was responsible for breaking down the door, then moving out of the way.[15] After Bryant did this, the first officer into the house, named Officer Medina, entered the house and yelled, "police."[16]

---

[7] *See* ROA.14157.
[8] ROA.14157.
[9] *See* ROA at Exhibit AC, synchronized videos of raid.
[10] *See* ROA at Exhibit AC, synchronized videos of raid.
[11] *See* ROA at Exhibit AC, synchronized videos of raid.
[12] *See* ROA at Exhibit AC, synchronized videos of raid.
[13] *See* ROA at Exhibit AC, synchronized videos of raid.
[14] *See* ROA.14156.
[15] ROA.12984.
[16] ROA.12984.

The parties disagree considerably about exactly what happened next. These disagreements are discussed in detail below in the sections of the argument to which they pertain.

It is undisputed, however, that shortly after entering the house, the dog, about which the officers had been briefed, and Officer Medina had both been shot.[17] A scene reconstructionist hired by the Plaintiffs would later conclude that Officer Gallegos shot Medina.[18] The Plaintiffs would argue on summary judgment that another officer, Officer Lovings, shot Medina.[19] The Texas Rangers would also investigate the case and would conclude that one of the home's occupants, Dennis Tuttle, shot Officer Medina.[20]

After Officer Medina was shot, it appears to be undisputed that he fell on an L-shaped couch next to the front door that he had just entered.[21] Also on the couch was the home's other occupant, a woman named Rhogena Nicholas. Officer Gallegos would later say that he saw Ms. Nicholas reaching over Officer Medina to take his weapon, so he shot her.[22]

---

[17] *See* ROA.14158.
[18] ROA.10148 ("Officer Medina was shot in the back as he was in the .223 trajectories fired by Gallegos . . . . ")
[19] ROA.9144.
[20] ROA.13029 (Texas Rangers' presentation explaining that "[a]lmost immediately after shooting the dog, Tuttle shot Medina one time").
[21] *See* ROA.10145 (report of Plaintiffs' accident reconstructionist depicting Medina on the couch next to Nicholas).
[22] *See* ROA.10145.

The Plaintiffs' reconstructionist, while agreeing that Medina was in the house when Officer Gallegos shot Ms. Nicholas, did not believe that Nicholas could have been reaching for Medina's weapon when Gallegos shot her.[23] And the Plaintiffs, in responding to summary judgment, would contend that Medina was successfully evacuated from the house before Ms. Nicholas was shot.[24]

To reach this conclusion, the Plaintiffs argued that an individual far away from the house on the street, who was captured for less than two seconds by the body camera of an officer at the scene, was Gallegos.[25] Because, according to the Plaintiffs, Gallegos was on the other side of the house at this point in the raid, the Plaintiffs contended that Gallegos could not possibly observed Medina in the house at all—let alone seen Ms. Nicholas attempting to take Medina' weapon.[26]

For his part, Gallegos denied in a sworn declaration that this individual was him.[27] As discussed below, the individual depicted in the video lacks Gallegos's tattoos, and the individual's location is inconsistent with all eyewitness and expert accounts and analyses of where Gallegos was at this point in the raid.[28]

---

[23] *See* ROA.10145.
[24] *See* ROA.9144-46.
[25] *See* ROA.9144-46.
[26] ROA.9144-46.
[27] *See* ROA.13435-36.
[28] *See* Argument, section, II.A.1.a., below.

In any event, it is undisputed that Officer Gallegos observed that Medina had been shot and that, within 18 seconds of the officers' entry, Officer Medina had escaped the house.[29]

It is also undisputed that either shortly before or shortly after the wounded Medina escaped, Officer Gallegos observed another officer, Officer Lovings, fall to the ground at the threshold of the Harding Street house.[30]

It is further undisputed that Officer Lovings, having fallen on the threshold, would never stand up again under his own power[31] because Officer Lovings had undisputedly sustained a gunshot wound that had paralyzed him for life.[32]

It is also undisputed that Mr. Tuttle fired the bullet that paralyzed Officer Lovings.[33]

From here, it suffices to proceed with the Plaintiffs' version of events—though in some cases, as discussed in the argument below, Officer Gallegos contends this version of events blatantly contradicts the summary judgment record.

After Mr. Tuttle shot Officer Lovings, the Plaintiffs contend that Mr. Tuttle came toward the house's front entry.[34] This entry was open, with Officer Bryant having

---

[29] *See* ROA.13014, ROA.13029, ROA.9145-46; *see also* ROA.14159.

[30] ROA.9146-47, ROA.14158.

[31] ROA.14158-59.

[32] *See* ROA.14158-59.

[33] ROA.10148 (report of Plaintiffs' reconstructionist explaining that "[o]ne round [fired by Mr. Tuttle] is confirmed to have struck officer Lovings . . . .").

[34] ROA.9149 (Plaintiffs' summary judgment response arguing that "[a]s Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house").

knocked down the door.[35] The Plaintiffs contend that Officer Gallegos then shot in the direction of Mr. Tuttle from the right (east) side of the door, as depicted in this drawing by a scene reconstructionist that the Plaintiffs later retained to analyze the evidence:[36]

- **Fatal Gunshot to R. Nicholas:** Trajectory from Officer Gallegos firing .223 rifle to bullet recovery point



The Plaintiffs contend that Gallegos's bullet grazed Mr. Tuttle's arm, but according to the Plaintiffs version of events, Officer Gallegos was not aiming at Mr. Tuttle, who again, had undisputedly just shot Officer Lovings.[37]

Instead, the Plaintiffs contend that, when Officer Gallegos fired this shot, instead of aiming at Mr. Tuttle, Officer Gallegos instead fired the shots to "murder" Ms. Nicholas.[38] The Plaintiffs thus contend that Gallegos, after Mr. Tuttle shot Officer Lovings, observed Ms. Nicholas to be unarmed and non-dangerous on the couch behind Mr. Tuttle and that Gallegos then knowingly and intentional fired the shot that

---

[35] *See* ROA.12984.
[36] ROA.10146.
[37] *See* ROA.9149.
[38] *See* ROA.9146-48.

10

grazed Mr. Tuttle intending to kill Ms. Nicholas.[39] The Plaintiffs pressed this theory even though their reconstructionist opined that, when Officer Gallegos fired this shot, Mr. Tuttle may have been visible to Gallegos, but Ms. Nicholas was not.[40]

Thus, according to the Plaintiffs' version of events, Gallegos intentionally shot Ms. Nicholas by shooting in Mr. Tuttle's direction and grazing his arm. The Plaintiffs contend that Gallegos then fell back behind a tree on the right (east) side of the front door.[41]

When Gallegos went behind the tree, it is undisputed that Officer Lovings still lay paralyzed on the threshold. It is also undisputed that, by this point, Mr. Tuttle (armed with a revolver and having already shot Lovings) had advanced to the front door.[42]

It is also undisputed that, while stationed behind the tree, Gallegos observed Officer Goines attempt to retrieve the paralyzed Lovings, sustain a gunshot wound to the face, and then retreat, leaving Lovings at the front door.[43]

It is also undisputed that, around this time, Officer Gallegos observed another policeman, Sargeant Reyna, attempt to retrieve Lovings, sustain a gunshot wound to the face, and then retreat.[44]

---

[39] *See* ROA.9146-49.
[40] *See* ROA.10149, ROA.10136 ("The shot [that killed Ms. Nicholas] was fired from the house and though D. Tuttle may have been partially visible to the shooter, R. Nicholas was not.").
[41] *See* ROA.9149.
[42] *See* ROA.9149.
[43] *See* ROA.9149.
[44] ROA.9149.

Gallegos also testified that, after witnessing Officer Reyna sustain a gunshot wound to the face, Gallegos saw Mr. Tuttle's hands emerge from the door and point a revolver at Officer Reyna.[45] Gallegos testified that he then shot Mr. Tuttle in the hand.[46] It is not clear whether this aspect of Officer Gallegos's account is disputed, but if true, it cannot reasonably be disputed that this shot by Officer Gallegos, by shooting Mr. Tuttle, saved Officer Reyna's life and possibly Officer Lovings's life as well.

It is disputed, however, exactly how Reyna and Goines sustained their facial gunshot wounds. Gallegos testified that Mr. Tuttle shot Reyna and Goines from the front door of the house, where Mr. Tuttle was undisputedly standing.[47] The Plaintiffs contended that shrapnel from bullets fired by Gallegos injured Reyna and Goines.[48]

That said, whoever fired the rounds, Officer Gallegos undisputedly witnessed two officers sustain gunshot wounds to the face and abandon their attempts to rescue the paralyzed Lovings from the front door at Mr. Tuttle's feet. Officer Gallegos testified that, at this point, he concluded it would be cowardly to not attempt to retrieve Lovings himself—though Gallegos testified that he did not know, at this point, whether Lovings was alive or dead.[49]

---

[45] ROA.10431, at lines 118:6-:14.
[46] ROA.10431, at lines 118:6-:14.
[47] ROA.10431, at lines 118:1-:14.
[48] *See* ROA.9149; ROA.10148.
[49] *See* ROA.10437.

It is undisputed that Officer Gallegos then emerged from behind the tree and approached the front door. It is undisputed that, at this point, Officer Gallegos had witnessed four other officers approach this door only to be shot, presumably (from Officer Gallegos's perspective), by Mr. Tuttle who Gallegos undisputedly saw shoot Officer Lovings.

Again, from here, the Plaintiffs' version of events suffices for purposes of this appeal. Prior to this point, the Plaintiffs contend that Mr. Tuttle had been shot 7 times.[50] Importantly, the Plaintiffs have never contended that any of these 7 shots (including the shot that Plaintiffs contend grazed Mr. Tuttle and killed Ms. Nicholas) constituted excessive force as to Mr. Tuttle.[51]

Nonetheless, the Plaintiffs contend that, when Officer Gallegos approached the house, Mr. Tuttle had sustained injuries making it impossible for him to hold a gun.[52] They do not dispute that, Mr. Tuttle never verbally or otherwise indicated any intent to surrender or otherwise give himself up.

As Gallegos approached the house, the Plaintiffs contend that Mr. Tuttle was inside the house, "had his back to the door[,] and [wa]s dropping to the floor."[53] Though the Plaintiffs contend Mr. Tuttle was incapacitated, they do not contend that he had

---

[50] ROA.9149-50.
[51] *See* ROA.14176.
[52] *See* ROA.9149-50.
[53] ROA.9150 (cleaned up).

stopped moving. According to the Plaintiffs, Officer Gallegos then observed Mr. Tuttle and shot him.[54]

The Plaintiffs contend that Mr. Tuttle then "put his body weigh[t] on his upper body by his elbows,"[55] or as Plaintiffs' reconstructionist described the movement, "[o]nce on the floor[,] [Mr. Tuttle] *raised his upper body by his elbows*."[56] At this time, according to the Plaintiffs, Officer Gallegos shot Mr. Tuttle and yelled, "stop moving!"[57] But Mr. Tuttle was dead.[58]

All of these events, from the officers' entry until Mr. Tuttle's death occurred over 1 minute and 20 seconds.[59]

The Plaintiffs sued Officer Gallegos and several others under section 1983, alleging that Officer Gallegos employed excessive force. Officer Gallegos moved for summary judgment arguing both that the force he used was not clearly unreasonable and that he was entitled to qualified immunity.[60]

The district Court denied Gallegos's motion for summary judgment, concluding that genuine issues of material fact existed.[61] With respect to that the claims based upon the shooting of Ms. Nicholas, the district court concluded that a fact issue precluding

---

[54] *See* ROA.9150.
[55] ROA.9150.
[56] ROA.10147 (emphasis added).
[57] ROA.9150; ROA.10147.
[58] *See* ROA.9150.
[59] ROA.13005.
[60] *See* ROA.8972-99.
[61] *See* ROA.14180-82.

summary judgement existed as to whether Ms. Nicholas was standing over Officer Medina and attempting to grab Officer Medina's weapon when Gallegos shot her.[62]

And with respect to the claims based upon Mr. Tuttle, the district court concluded that a fact issue precluding summary judgement existed as to whether Mr. Tuttle was "incapacitated" when Gallegos fired the final two shots.[63] The district court also concluded that the law was clearly established, as to the alleged constitutional violations for both Nicholas and Tuttle, and therefore the district court denied qualified immunity.[64]

Officer Gallegos timely took this appeal of the denial of his motion for summary judgment based on qualified immunity under the collateral order doctrine.[65]

---

[62] *See* ROA.14176.
[63] *See* ROA.14182.
[64] *See* ROA.14181-82.
[65] *See* ROA.3730.

## **Summary of the Argument**

It all happened in 80 seconds. And it all happened in a single place. They call the place where it happened "the fatal funnel." This is the name that law enforcement gives to the narrow openings through which they must enter during certain tactical operations. Given the undisputed facts of this case, the front door of the Harding Street house became, for the 80 seconds of the warrant execution, a fatal funnel.

Under Plaintiffs' version of events, when Officer Gallegos used deadly force against Ms. Nicholas, Gallegos had observed two officers emerge from the fatal funnel shot—one paralyzed and apparently dead. When Officer Gallegos used deadly force against Mr. Tuttle, four officers had been shot in the funnel—two of them in the face while trying to rescue their paralyzed comrade who lay prone in the mouth of the fatal funnel at Mr. Tuttle's feet.

And Officer Gallegos exercised all of the deadly force complained of in this case while standing in the mouth of this fatal funnel or inches from it.

This Court has long cautioned against "allow[ing] the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day."[66] But that is exactly what happened in the district court.

---

[66] *See Stroik v. Ponseti*, 35 F.3d 155, 158–59 (5th Cir. 1994) (cleaned up and quotation marks omitted).

The Plaintiffs used inherently inconsistent and irreconcilable evidence to cobble together a version of events that blatantly contradicted video evidence and all fact and expert witness testimony. In contravention of well-established law, they focused exclusively on Gallegos's intent, rather than the objective facts of what occurred. Indeed, when Gallegos shot in the direction of Mr. Tuttle seconds after Mr. Tuttle undisputedly shot and paralyzed Officer Lovings, the Plaintiffs accused him of intentional shooting through Mr. Tuttle, intending to "murder" Ms. Nicholas.

The facts alleged by the Plaintiffs are not only implausible, but their analysis eschewed the most basic principles of excessive force analysis—particularly viewing facts objectively from the officer viewpoint, rather than with 20/20 hindsight.

In addition, in determining that Officer Gallegos's alleged actions violated clearly established law for purposes of qualified immunity, the district court and the Plaintiffs failed to identify a single case where a suspect even discharged a weapon—to say nothing of a case in which, as here, the suspect apparently shot multiple officers.

Put simply, even under the Plaintiffs implausible and—in many respects— absurd version of events, Officer Gallegos did not violate the Constitution during the Harding Street incident. Officer Gallegos performed heroically, and he is entitled to summary judgment.

## **Argument**

The Plaintiffs failed to raise a genuine issue of material fact precluding summary judgment. As discussed in detail below, no factual dispute identified by the district court was material as to Gallegos's use of force against either Mr. Tuttle or Ms. Nicholas. In addition, in the case of both Mr. Tuttle and Ms. Nicholas, the Plaintiffs failed to identify law clearly establishing that the force Officer Gallegos employed was excessive.

## I.     **Standard of Review & Applicable Law**

In reviewing the denial of a motion for summary judgment based upon qualified immunity, this court reviews materiality and legal conclusions *de novo*. *Hampton v. Oktibbeha Cty. Sheriff Dep't*, 480 F.3d 358, 364 (5th Cir. 2007). Thus, the "scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues . . . review[ed] de novo." *Amador v. Vasquez*, 961 F.3d 721, 727 (5th Cir. 2020).

Generally speaking, on an interlocutory appeal of a summary judgment denial "[i]n qualified immunity cases, [applying summary judgment standards] means adopting . . . the plaintiff's version of the facts." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). An exception to this rule exists, however, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." *See id.* In such cases, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Finally, to prevail on their excessive force claim, the plaintiffs must establish "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman,* 483 F.3d 404, 416 (5th Cir. 2007) (quoting *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005)). Deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir.2003).

Finally, the reasonableness of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396–97 (1989). It is a question of objective reasonableness "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.*

## II.     Officer Gallegos did not violate the clearly established constitutional rights of either Ms. Nicholas or Mr. Tuttle.

Overcoming Officer Gallegos's claim of qualified immunity on their excessive force claim requires the Plaintiffs to "show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport,* 691 F.3d 624, 628 (5th Cir. 2012).

As discussed below, Officer Gallegos's heroic actions in the firefight with the Plaintiffs were neither excessive nor unreasonable with respect to Ms. Nicholas or Mr.

Tuttle, and the district court erred in denying Officer Gallegos's motion for summary judgment.

> **A.    The district court erred in denying Officer Gallegos's motion for summary judgment against Ms. Nicholas's claims.**

As an initial matter, to avoid summary judgment on the claims against Officer Gallegos, the Plaintiffs relied upon a new theory, first concocted (or, at least, first disclosed) in response to Gallegos's motion for summary judgment. As discussed below, this new theory was not only blatantly contradicted by the record, but it failed to establish a constitutional violation even if adopted in total.

> **1.    The Plaintiffs'** *ipse dixit* **argument that Medina had escaped the house when Gallegos shot Nicholas is blatantly contradicted by the very video upon which the Plaintiffs rely (in addition to all the other evidence in the case) and therefore cannot create an issue of fact for purposes of summary judgment.**

Prior to the Plaintiffs' summary judgment motion, everyone agreed that—seconds after officers made entry to the Harding Street house—Officer Medina was shot and Gallegos moved to the right (east) side of the house, as depicted in this graphic from the Texas Rangers report:



HARDING [67]

This drawing depicts Gallegos (represented by the magenta dot and arrow) moving from his initial position to the left (west) side of the front door to the right (east) side shortly after the entry.

As explained in the text of the Texas Rangers' report accompanying this image, after Mr. Tuttle shot Officer Medina, "Gallegos yelled for someone to extract Medina and Gallegos moved up to a position on the east side of the front door."[68] From this position, the Rangers concluded, Gallegos observed Nicholas near Medina and shot her.[69] The Rangers found that Medina then rolled toward the front door, where another officer helped him exit the building.[70] Based upon various video evidence taken of the

---

[67] ROA.13035.
[68] ROA.13029.
[69] ROA.13029.
[70] ROA.13029.

events, the Texas Rangers concluded that this entire sequence of events—from the officers entering the house to Medina's extraction—took approximately 18 seconds.[71]

The Plaintiffs' scene reconstructionist also believed that Ms. Nicholas was shot during this 18-second period while Officer Medina lay injured on the couch. For example, in this image from his report, the Plaintiffs' scene reconstructionist depicted the injured Medina as a red dot on the couch with Ms. Nicholas:



---

[71] ROA.13019 ("From the time the stack officers exit camera view (CH2), breach the front door, engage in the initial / primary shooting incident, Medina gets shot and gets out of the house, and Medina is then seen back on camera (CH2) being taken out to the street and treated is approximately 18 seconds" (Red font on "18 seconds" omitted.)).
[72] ROA.10145.

22

Indeed, the Plaintiffs' reconstructionist was so confident in Gallegos's position when Medina was injured, that the reconstructionist opined that *Gallegos was the one who shot Medina.*[73]

But in responding to summary judgment, the Plaintiffs' lawyers—for the first time—rejected not only their own reconstructionist's analysis, but all of the testimony in the case. Specifically, at summary judgment, the Plaintiffs relied upon less than approximately 2 seconds of body camera footage during which an individual is visible to the far left (west) side of the house apparently on or near the street, as depicted and circled in the image below.[74]



In arguing that this person was Gallegos, the Plaintiffs relied upon:

---

[73] ROA.10148 ("Officer Medina was shot in the back as he was in the .223 trajectories *fired by Gallegos* and passing through the wall of the house." (Emphasis added)).

[74] ROA at Exhibit AC, at 0:43 (video time), 5:28:14 (time stamp time).

(1) the individual appearing to wear a short sleeved shirt;

(2) the fact that, before officers made entry, Gallegos was on the left (west) side of the house (though by all accounts and evidence, Gallegos was much, much closer to the house than the person depicted and moved to the right side of the house shortly after officers made entry[75]);

(3) the individual's "mask match[ing] the mask that Gallegos was wearing that night"[76] (though Gallegos testified without contradiction that he did not wear a mask during the event itself,[77] and regardless, it really is not remotely clear whether the individual is wearing a mask); and

(4) the Plaintiffs' lawyers' contention that the person in the video had "tattoos consistent with Gallego[s's]" and that the image was consistent with Gallegos's "build and skin tone"[78] (which, as discussed below, the video flatly contradicts, rather than supporting).

\* \* \* \*

As discussed below, the Plaintiffs' made-for-summary-judgment theory that Medina had left the house when Gallegos shot Ms. Nicholas should be rejected because, under the Supreme Court's opinion in *Scott v. Harris*, 550 U.S. 372 (2007), this account

---

[75] *See, e.g.,* ROA.13019, 13029, 10145.

[76] ROA.9145, at n.55.

[77] *See, e.g.,* ROA.10396, at lines 13-16; *see also* ROA.10513-10514, at 200:17-201:16 (Gallegos testifying that he put on the mask after the event).

[78] ROA.9145-46, at n.55.

is "blatantly contradicted by the record, so that no reasonable jury could believe it," and therefore cannot serve as a basis for summary judgment.

> **a. The Plaintiffs'** *ipse dixit* **argument that Medina had escaped the house when Gallegos shot Nicholas is blatantly contradicted by the record because (i) the video the Plaintiffs rely upon does not depict any of Gallegos's sleeve of tattoos and also (ii) the theory contradicts all testimony and analysis of the physical evidence by both fact and expert witnesses.**

Though, generally speaking, "[i]n qualified immunity cases, [applying summary judgment standards] means adopting . . . the plaintiff's version of the facts," "a videotape capturing the events in question" adds a wrinkle. *Scott*, 550 U.S. at 378. Specifically, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Here, the district court erred in adopting the Plaintiffs' "Medina-had-left" version of events. This theory relied entirely upon an image that the Plaintiffs extracted from body-worn camera video:



79

Importantly, this particular image of the individual that the Plaintiffs contend is Gallegos, does not depict the individual's forearms at all. By slowing the video down and reviewing the entirety of the images taken of this individual, however, it is clear that this person does not have tattoos on the exposed right arm:[80]



These portions of the video make clear that, as Gallegos specifically testified in the trial court when the Plaintiffs first raised this theory,[81] this individual is not Gallegos.

---

[79] ROA.9146.
[80] These images are various portions of the ROA at Exhibit AC, at 0:43 (video time), 5:28:14 (time stamp time), with various levels of brightness and sharpness.
[81] *See* ROA.13435.

26

Indeed, on the date of the incident, Officer Gallegos had a full sleeve of dark tattoos covering his entire right arm.



In addition to not having Officer Gallegos's sleeve of tattoos, the individual also does not appear to be carrying the rifle that Officer Gallegos indisputably carried.[82]

Thus, contrary to the Plaintiffs' assertion in the trial court that the individual depicted in the video has "tattoos consistent with Gallegos,"[83] it appears that this individual has no tattoos at all, and certainly lacks markings on his exposed arms that remotely resemble the dark full sleeve of tattoos that Gallegos had on the day of the incident.

**Photograph depicting tattoos on Officer Gallegos's right arm on the day of the incident. ROA.9775.**

And even putting aside the absence of tattoos, the Plaintiffs—at most—offered evidence that someone in tactical gear and short sleeves was near the street when Medina was extracted. The video thus fails to provide factual support creating a genuine issue of material fact absent some *evidence*—as distinguished from the Plaintiffs' *ipse dixit*—sufficient to conclude the figure is Gallegos.

---

[82] *See, e.g.,* ROA.12991 (Texas Rangers' presentation indicating that Gallegos had a rifle).
[83] ROA.9145-45, at n.55.

In particular, the Plaintiffs offer no basis to conclude that this individual is Gallegos, rather than Officer Stephen Bryant. The Plaintiffs conceded that Officer



**Photograph depicting Officer Bryant exiting the van on the day of the incident. ROA at Exhibit AC, at 0:12 (video time), 5:27:44 (time stamp time).**

Bryant wore "short sleeves" on the day of the incident.[84] And, while the individual's position is nowhere near where—by all accounts—Gallegos would have been at this point in the incident, the individual is *exactly* where Officer Bryant went.[85]

In particular, it appears to be undisputed that Bryant "[b]reached [the] door w[ith] 1 hit then moved out of [the] way."[86] Thus, the position of the individual identified by the Plaintiffs is consistent with all accounts of Bryant's location during this part of the incident—away from the house after breaching the door.

In addition to contradicting the video, the Plaintiffs' repositioning of Gallegos contradicts all of the other evidence in the case. Indeed, the Plaintiffs' own scene reconstructionist opined that Gallegos—not Mr. Tuttle—was the one who shot Officer Medina.[87] Of course, this would be completely impossible if Gallegos were on the other

---

[84] *See* ROA.9159, at n.146.

[85] Stephen Bryant is pictured exiting the van in arms exposed carrying the "moby" breaching tool that he used to access the house. ROA at Exhibit AC, at 0:12 (video time), 5:27:44 (time stamp time); *see also* ROA.13000 (Texas Rangers presentation noting that Bryant rode in the front seat of the van). ROA.10936-94.

[86] *See* ROA.12984 (Texas Rangers' report); *see also* ROA.9517 ("Once the front door was hit by Officer Bryant . . . he moved out of the way . . . ."). Though Bryant was deposed, he did not respond substantively to questions and instead asserted his Fifth Amendment privilege based upon his complicity with Goines.

[87] ROA.10148 ("Officer Medina was shot in the back as he was in the .223 trajectories *fired by Gallegos* and passing through the wall of the house." (Emphasis added)).

side of the house by the street when Medina was shot, as the Plaintiffs' lawyers argued for the first time on summary judgment.[88]

Thus, for the jury to believe that this individual—who lacks Gallegos's tattoos and rifle—is Gallegos, it would need to reject the testimony of every witness in the case, and the analyses of both the Texas Rangers and the Plaintiffs' reconstructionist.

Indeed, consistent with Officer Gallegos's testimony, Oscar Pardo testified that shortly before Pardo exited the house, Pardo observed Ms. Nicholas "[s]creaming, standing over [Medina]," describing her as "[r]eal close to [Medina], inches [away]."[89] In fact, based upon Ms. Nicholas's demeanor and her proximity to the injured Officer Medina, Officer Pardo thought that Ms. Nicholas had shot Medina.[90] Officer Pardo testified that he was about to raise his weapon and shoot Ms. Nicholas himself at that moment, when he felt something pull him from the house.[91]

Officer Gallegos testified that Officer Pardo then fell out of the front door and off the porch.[92] "The very next thing" Gallegos observed was "[Officer] Lovings drop in the doorway of Harding Street."[93] It is undisputed that Lovings dropped because Mr.

---

[88] In their summary judgment response, the Plaintiffs contended for the first time that Officer Lovings shot Medina, *see* ROA.9144 ("Medina is then hit by a bullet or bullet fragment from Lovings.")—apparently seconds before Mr. Tuttle shot Lovings paralyzing Lovings for life.

[89] ROA.6798, at lines 44:7-45:9.

[90] ROA.6798-99, at lines 45:25-46:2.

[91] ROA.6799, at lines 46:6-:25.

[92] ROA.10412-13, at lines 99:10-100:2.

[93] ROA.10413-14, at lines 100:23-101:1.

Tuttle had shot him.[94] And Officer Lovings would never stand up again because Mr. Tuttle's bullet had paralyzed him permanently.

At this point, immediately after Pardo fell from the house and Lovings dropped paralyzed on the threshold, Gallegos observed the same scene that Pardo had seen seconds earlier, "[Officer Medina] sitting back on the couch and . . . Ms. Rhogena Nicholas standing over Officer Medina."[95] But now, with Officer Lovings lying prone, paralyzed in her doorway, Ms. Nicholas is "tugging at [Officer Medina's] shotgun that is slung to his vest saying, Motherfucker, motherfucker."[96]

Only then, did Officer Gallegos do what Officer Pardo had begun to do the moment before Pardo fell out the front door: Officer Gallegos shot Ms. Nicholas.[97]

The accounts of Officer Pardo and Officer Gallegos, that Nicholas stood over Medina just before Pardo exited the house, are thus totally consistent and corroborate one another. By contrast, the Plaintiffs' lawyers' contention that Gallegos was by the street when Medina escaped is totally uncorroborated by any witness testimony (to say nothing of being contrary to both the report of the Plaintiffs' reconstructionist and the analysis of the Texas Rangers).

---

[94] *See, e.g.,* ROA.10148 (report of Plaintiffs' reconstructionist acknowledging that "Officer Lovings['s] injury is . . . consistent with having been fired by the revolver associated with D. Tuttle"); ROA.9145 (Plaintiffs' response to Officer Gallegos's motion for summary judgment acknowledging that "Lovings fell from a gunshot to the neck" and not appearing to dispute the conclusion of the Plaintiffs' expert that Mr. Tuttle fired this shot.).

[95] ROA.10415, at lines 102:10-:19.

[96] ROA.10415, at lines 102:10-:19.

[97] *See, e.g.,* ROA.10418, at lines 105:7-:13.

Under *Scott v. Harris*, the trial court erred by adopting the Plaintiffs' "Medina-had-left" story of the case because this exercise in true crime fan fiction is "blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 378. Indeed, the very video evidence upon which the Plaintiffs rely contradicts the story, as does all competent expert and fact witness testimony and analysis. The Plaintiffs failed to identify any witness or evidence placing Gallegos on the other side of the house when the shooting of Nicholas occurred, and the trial court erred in allowing the Plaintiffs to construct from whole cloth a summary judgment theory that the evidence so blatantly contradicts.

As a result, this Court should reverse the trial court and grant summary judgment against the Plaintiffs' claims arising from Ms. Nicholas's death.

> **2. Even adopting the Plaintiffs' summary judgment version of events, the district court erred in denying summary judgment because (a) the Plaintiffs' account is completely implausible and (b) the district court's identified fact dispute is immaterial because, under the Plaintiffs' theory, any violation of Ms. Nicholas's constitutional rights would hinge entirely—and impermissibly—upon Gallegos's subjective intent rather than the required objective analysis of his use of force.**

Alternatively, even wholly adopting the Plaintiffs' version of events—despite the blatantly contradictory video evidence—the district court still erred in granting summary judgment against Officer Gallegos. This is because, even under the Plaintiffs' scenario, Gallegos's use of force in firing the shot that killed Ms. Nicholas—which,

according to the Plaintiffs, first struck Mr. Tuttle—was objectively reasonable given Tuttle's active shooting of police when Gallegos fired.

When as here, the district court identifies a specific factual issue that precludes summary judgment in a qualified immunity case, this Court "review[s] whether the factual disputes identified by the district court are material to the denial of qualified immunity—that is, whether the factual disputes viewed in favor of the plaintiff make out a violation of clearly established law." *Poole v. City of Shreveport*, 13 F.4th 420, 423 (5th Cir. 2021); *see also Jimerson v. Lewis*, 94 F.4th 423, 427–28 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1220 (2025).

In denying summary judgment for Officer Gallegos on Ms. Nicholas's claims, the district court concluded that "[s]pecifically, a fact issue exists as to whether Nicholas was standing over Medina and attempting to grab his weapon at the time Gallegos shot her."[98]

Thus, in reviewing the district court's denial of summary judgment, this Court must analyze "whether Nicholas was standing over Medina and attempting to grab his weapon at the time Gallegos shot her" is question of material fact. *See Jimerson*, 94 F.4th at 427–28.

To do so, this Court must, in turn, "adopt[ ] . . . the [P]laintiff[s'] version of the facts." *See Scott*, 550 U.S. at 378; *see also Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th

---

[98] ROA.14176.

Cir. 2000) ("Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under these circumstances.").[99]

As discussed below, under the Plaintiffs' version of the facts, viewed objectively from Officer Gallegos's perspective, the fact that Ms. Nicholas may not have been reaching for Officer Medina's gun is immaterial. This is because the Plaintiffs contend the bullet that killed Ms. Nicholas was fired through Mr. Tuttle's arm immediately after Mr. Tuttle shot and paralyzed Officer Lovings.[100]

Indeed, the Plaintiffs' reconstructionist opined that the bullet striking Ms. Nicholas grazed Mr. Tuttle—as he stood at the front door of the house—as depicted here:

---

[99] This rule assumes *arguendo* that the Court concludes the Plaintiffs' version of events is not blatantly contradicted by the evidence, as discussed above. *See Scott*, 550 U.S. at 378.

[100] *See* ROA.9147.



- **Fatal Gunshot to R. Nicholas:** Trajectory from Officer Gallegos firing .223 rifle to bullet recovery point

According to the Plaintiffs' reconstructionist, when Officer Gallegos fired Ms. Nicholas's fatal shot, "Tuttle was facing the front door" and "may have been partially visible to the shooter," *i.e.*, Gallegos.[102] And while Gallegos could have partially seen Mr. Tuttle, the reconstructionist also opined that "Officer Gallegos, when he fired the fatal shot . . . , could not see Rhogena Nicholas."[103] According to the Plaintiffs' reconstructionist, Gallegos's bullet also left "a graze wound along [Mr. Tuttle's] right forearm" before striking Ms. Nicholas.[104]

In responding to summary judgment, the Plaintiffs selected buffet-style from various—often conflicting—factual analyses of the incident, but they expressly adopted their reconstructionist's opinion that the bullet that killed Ms. Nicholas also hit Mr.

---

[101] ROA.10146.
[102] ROA.10136.
[103] *See* ROA.10149.
[104] ROA.10136.

Tuttle.[105] It is also undisputed—and advanced by the Plaintiffs' version of events—that, by the time Gallegos shot Ms. Nicholas, (1) Mr. Tuttle had already shot Officer Lovings in the neck paralyzing him for life,[106] and (2) Officer Medina had also been shot (and, in the Plaintiff's version evacuated from the house).[107]

It also appears to be undisputed that, when Gallegos shot Ms. Nicholas, Mr. Tuttle was still armed, and had not remotely given himself up after shooting Lovings seconds earlier. Indeed, the Plaintiffs did not contend in the trial court that *any* of the first seven shots that struck Mr. Tuttle—including the one that they contend killed Ms. Nicholas after it grazed Mr. Tuttle's arm—was unconstitutional as to Mr. Tuttle.[108]

The Plaintiffs thus do not—and cannot—dispute that the shot killing Ms. Nicholas was constitutional *to the extent Gallegos was aiming at Mr. Tuttle*, who was grazed by the bullet.[109]

Instead, the Plaintiffs contend that the shot was unconstitutional because—according to them—even though the bullet grazed Mr. Tuttle's arm, Gallegos was not

---

[105] *See* ROA.9149 (arguing that "[a]s Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house").

[106] *See, e.g.,* ROA.9147 (Plaintiffs' contention that, "[a]t that moment—after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot [(indisputably by Mr. Tuttle)]—Gallegos finally sees inside the house. At this point, he spots Ms. Nicholas [(who, incidentally, the Plaintiffs' reconstructionist opined would not have been visible from Gallegos's position)] and shoots her without warning.").

[107] *See* ROA.9144.

[108] *See, e.g.,* ROA.14176 (district court's order observing that "[t]hough Tuttle suffered nine total gunshot wounds, Plaintiffs only challenge the constitutionality of the final two shots Gallegos fired at Tuttle.").

[109] *See* ROA.14176 (district court's order observing that "[t]hough Tuttle suffered nine total gunshot wounds, Plaintiffs only challenge the constitutionality of the final two shots Gallegos fired at Tuttle.").

aiming at Mr. Tuttle, the armed assailant who had just shot and paralyzed the policeman lying in the doorway. According to the Plaintiffs' version of events, Gallegos *accidentally* hit the active shooter (Mr. Tuttle) while *aiming* at Ms. Nicholas—who Plaintiffs contend Gallegos somehow perceived as unarmed and nondangerous, even as police officers dropped like flies from her door.

Thus, according to the Plaintiffs, "As Gallegos intentionally and knowingly sh[ot] the unarmed Nicholas, the fatal bullet graze[d] Tuttle who had approached the front of the house."[110] Of course, this interpretation of the events is wildly implausible. Indeed, the Plaintiffs have engineered a scenario too bizarre for a law school hypothetical in which Gallegos had both (1) the supernatural ability to look through an armed assailant (and—according to Plaintiffs' reconstructionist—a wall) to see an innocent person sitting peacefully on a couch behind him and (2) the sociopathic inclination to shoot *literally through the armed assailant with the sole and exclusive intent to kill the innocent person* for no apparent reason other than unquenchable bloodlust.[111]

As discussed below, under the objectively viewed, undisputed facts, this theory fails to enable the Plaintiffs to avoid summary judgment for at least two reasons. First, this theory—that Gallegos unintentionally shot Mr. Tuttle while intending to shoot Ms. Nicholas—is too implausible on its face to support summary judgment, particularly

---

[110] ROA.9149.

[111] *See* ROA.9149 (arguing that "[a]s Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house").

given that it directly contradicts the reconstructionist's bullet trajectory upon which Plaintiffs rely. And second, this theory on its face focuses entirely on Gallegos's intent, which is irrelevant to the excessive force inquiry, while ignoring the objective, undisputed fact that Gallegos shot in the direction of the armed and dangerous Mr. Tuttle.

      **a. The Plaintiffs' theory that Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle is too implausible to support summary judgment—and impossible when viewing the summary judgment evidence upon which the Plaintiffs rely as a whole.**

The Plaintiffs' assertion that Gallegos violated Ms. Nicholas's rights by shooting through or past Mr. Tuttle with the intent to kill Ms. Nicholas is not only implausible on its face for the reasons discussed above, but impossible under the Plaintiffs' reconstructionist's bullet trajectory analysis. Indeed, if—as the reconstructionist concluded—"Gallegos, when he fired the fatal shot . . . could not see [Ms. Nicholas]"—then, necessarily, Gallegos could not have been aiming at Ms. Nicholas when he shot.

The Plaintiffs' attempt to cherry pick from inherently contradictory evidence to circumvent this obvious fact ignores the required summary judgment analysis. Indeed, "[a]lthough [this Court] examines the record in the light most favorable to the [the non-summary-judgment movant], [it] does not do so in bits and pieces, but as a whole." *See Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997). Thus, on summary

judgment, this Court "consider[s] the totality of the facts and make[s] only reasonable, justifiable inferences from that evidence." *See id.* As a result, "[t]he factual context of a party's claim may render it implausible for purposes of creating a genuine dispute of fact."

Here, the Plaintiffs cobbled together their theory of Ms. Nicholas's shooting from the inherently contradictory accounts of Gallegos and their reconstructionist. Specifically, the Plaintiffs' reconstructionist opined that the trajectory of the bullet that shot Ms. Nicholas made it impossible for Gallegos to see Ms. Nicholas when he shot.[112] While plenty of evidence contradicted this conclusion, the Plaintiffs embraced their reconstructionist's trajectory, including his conclusion that the bullet hit Mr. Tuttle on its way to striking Ms. Nicholas.[113]

To assemble their theory that Gallegos shot through Mr. Tuttle to intentionally kill Mr. Nicholas, however, the Plaintiffs relied upon Gallegos's testimony that he saw Ms. Nicholas and intentionally shot her—though the Plaintiffs rejected Gallegos's testimony that, when he shot Ms. Nicholas, Officer Medina was on the couch.[114]

But Gallegos's account totally contradicts and is completely irreconcilable with that of the Plaintiffs' reconstructionist. Gallegos said he could see Ms. Nicholas and

---

[112] ROA.10136 ("The shot [that killed Ms. Nicholas] was fired from the house and though D. Tuttle may have been partially visible to the shooter, R. Nicholas was not.").
[113] ROA.9149.
[114] ROA.9149-50.

shot her because she was reaching for Medina's gun.[115] The Plaintiffs' reconstructionist opined that Gallegos could not see Ms. Nicholas (because Gallegos shot through the wall of the house), and that Ms. Nicholas could not have been reaching for the gun.[116]

To be sure, the evidence must be viewed in the light most favorable to the Plaintiffs. But nothing permits the Plaintiffs to assemble, buffet-style, a theory of the case that extracts unrelated elements from totally contradictory accounts. Indeed, this approach violates the requirement that this Court "not [examine summary judgment evidence] in bits and pieces, but as a whole." *See Lusk*, 129 F.3d at 779.

Put simply, if the Plaintiffs adopt their reconstructionist's conclusion regarding the bullet trajectory, they cannot reject that this trajectory made it impossible for Gallegos to see Ms. Nicholas when he shot. And if Gallegos could not see Ms. Nicholas, he could not have been aiming at her when, as the Plaintiffs' reconstructionist concluded, Gallegos fired the bullet that grazed Mr. Tuttle's arm and killed Ms. Nicholas.

As a result, even if the Plaintiffs' theory on this point could survive its exclusive focus on Gallegos's subjective intent (which, as discussed below, it cannot), the very evidence upon which the Plaintiffs rely in advancing the theory also renders it impossible.

---

[115] *See, e.g.,* ROA.12991.
[116] *See* ROA.10148-49.

And another point warrants emphasis. Even assuming that Gallegos could see Ms. Nicholas when he shot her, there is no evidence whatsoever that she was acting in a manner that would dispel the natural assumption that—as multiple wounded officers emerged from her house—she posed a threat. Indeed, it is undisputed that, when Officer Pardo fell from the house the instant before the Plaintiffs contend Gallegos shot Ms. Nicholas, *he* (Pardo) was about to shoot Ms. Nicholas himself because he believed her to be the shooter who was attacking the officers.[117]

Unlike the Plaintiffs' lawyers, Officer Gallegos did not have five years to decide whether Ms. Nicholas was a threat. He did not have five seconds. Under the Plaintiffs' version of events, Gallegos saw an officer fall from the house paralyzed (presumably dead), and Gallegos shot in the direction of the person who shot the officer.

Even if, as the Plaintiffs contend, Gallegos intended to shoot Ms. Nicholas, there is no reason to conclude that he did not justifiably perceive her as a threat at that moment. To conclude otherwise would impermissibly "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *See Stroik*, 35 F.3d at 158–59 (cleaned up and quotation marks omitted). For this reason, even if, as the district court concluded, questions of fact surround whether Ms. Nicholas reached for Medina's firearm, the questions are immaterial

---

[117] ROA.6799, at lines 46:6-:25.

because they do not foreclose that Ms. Nicholas nonetheless presented a threat under the circumstances.

> **b. The Plaintiffs' theory that Gallegos intentionally shot Nicholas by shooting through (and grazing) Mr. Tuttle relies entirely on Gallegos's intent—*i.e.*, who Gallegos intended to hit when he shot—which is impermissible in the excessive force analysis.**

And even if the Plaintiffs' theory were not totally implausible, the theory is fatally flawed in its exclusive focus on Gallegos's intent rather than the objective facts. *See Graham*, 490 U.S. at 397.

Importantly, the reasonableness of the use of deadly force is a question of objective reasonableness "in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or motivation." *Ontiveros*, 564 F.3d at 382–83 (cleaned up) *quoting Graham*, 490 U.S. at 397. As a result, **"[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force**." *Graham*, 490 U.S. at 397 (emphasis added).

This well-established disregard for an officer's subjective intent brings us to the nub of the issue. Beyond being completely implausible—and impossible based upon the Plaintiffs' own expert (who opined that Gallegos could not see Ms. Nicholas[118])—the Plaintiffs' theory of Ms. Nicholas's shooting hinges entirely upon *Gallegos's intent*

---

[118] *See* ROA.10136 (Plaintiffs' reconstructionist opining that "[t]he shot [that killed Ms. Nicholas] was fired from outside of the house and though D. Tuttle may have been partially visible to the shooter, R. Nicholas was not.").

when he fired the bullet that struck the (according to the Plaintiffs) innocent Ms. Nicholas and grazed the violent, dangerous Mr. Tuttle.

That is, if Gallegos intended to shoot Mr. Tuttle—who, according to the Plaintiffs, he did in fact graze with the very bullet killed Ms. Nicholas—it is undisputed that this use of force would be constitutional. The Plaintiffs have never contended otherwise.[119] But because the Plaintiffs contend that Gallegos intended to shoot *Ms. Nicholas*, the Plaintiffs argue the force was excessive.[120]

This distinction—definitionally—results in Gallegos's *intent* determining whether he violated Ms. Nicholas's rights. This is plainly contrary to the well-established precedent making subjective intent irrelevant in excessive force cases. *See, e.g., Graham*, 490 U.S. at 397.

What's more, the objective facts surrounding the shot that the Plaintiffs contend killed Ms. Nicholas create no genuine issue of material fact for a jury to resolve:

> ➢ Objectively, it is undisputed that Officer Gallegos's use of force in shooting the bullet that Plaintiffs contend killed Ms. Nicholas occurred after Mr. Tuttle had shot Officer Lovings.[121]

---

[119] ROA.14176 (district court's order observing that "[t]hough Tuttle suffered nine total gunshot wounds, Plaintiffs only challenge the constitutionality of the final two shots Gallegos fired at Tuttle.").

[120] *See, e.g.,* 9146 (Plaintiffs' contention that "Gallegos murder[ed] Nicholas . . . ."); ROA.9149 ("As Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house.").

[121] *See, e.g.,* ROA.9147 ("At that moment—after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot [(indisputably by Mr. Tuttle)]—Gallegos finally sees inside the house. At this point, he spots Ms. Nicholas and shoots her without warning.").

➢ Objectively, it is undisputed that Officer Gallegos observed Officer Lovings fall to the ground paralyzed—or, for all Gallegos knew, dead.[122]

➢ Objectively, when Officer Gallegos fired the shot that Plaintiffs contend killed Ms. Nicholas, Gallegos also knew that Officer Medina had been shot.[123]

➢ Objectively, in this version of events, there is no evidence or contention whatsoever that, when Mr. Tuttle approached the door after shooting Officer Lovings, he was clearly incapacitated or otherwise attempting to "give himself up."[124]

➢ And, objectively, indeed indisputably (under Plaintiffs' version of events), the action that Officer Gallegos took when confronted with this situation *was to fire in Mr. Tuttle's direction*, grazing Mr. Tuttle's arm, with the bullet continuing its path to strike Ms. Nicholas.[125]

➢ Finally, objectively, the Plaintiffs have never disputed—nor could they— that the shot they contend killed Ms. Nicholas did not violate Mr. Tuttle's constitutional rights to the extent it struck him before reaching her.[126]

Under these circumstances, Gallegos's use of force in shooting in Mr. Tuttle's direction was not clearly unreasonable, even if, as Plaintiffs contend, the bullet struck Ms. Nicholas after grazing Mr. Tuttle's arm. The Plaintiffs' allegation that Gallegos intended to "murder" an innocent Ms. Nicholas when he fired this shot toward Mr.

---

[122] *See, e.g.,* ROA.9147.

[123] *See* ROA.9144 (Plaintiffs' argument that Officer Medina was shot and extracted from the house before Ms. Nicholas was shot).

[124] *See, e.g.,* M*albrough v. Stelly,* 814 Fed. App'x 798, 806 (5th Cir. 2020) (when suspect severely threatens public safety, force justified unless suspect clearly gives himself up); *See also Plumhoff v. Rickard,* 572 U.S. 765, 778 (2014) ("[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

[125] ROA.9149.

[126] *See* ROA.14176.

Tuttle is surpassed in its absurdity only by its total irrelevance under the required objective analysis.

* * *

Simply put, the Plaintiffs rightly did not challenge the constitutional reasonableness of the shot to Mr. Tuttle's arm that they contend killed Ms. Nicholas. There can be no dispute that, assuming this shot was fired under the scenario the Plaintiffs have conjured, Officer Gallegos reasonably deployed deadly force by shooting in Mr. Tuttle's direction (and hitting him) after Mr. Tuttle had indisputably shot Officer Lovings.

The Plaintiffs make no argument—nor could they—that this constitutional response to Mr. Tuttle became objectively unconstitutional simply because the bullet's continued travel struck Ms. Nicholas. As a result, no genuine issue of fact exists as to whether Officer Gallegos's use of force in firing the bullet that Plaintiffs contend killed Ms. Nicholas was constitutionally reasonable, and Gallegos is therefore entitled to summary judgment.

### 3. The Plaintiffs also failed to establish that Officer Gallegos was not entitled to qualified immunity.

"A good-faith qualified immunity defense alters the usual summary judgment burden of proof." *See Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019). Specifically, "[a]lthough [this Court] [still] view[s] the evidence in the light most favorable to the nonmoving party, the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *See id.*

In particular, "[p]laintiffs have the burden to demonstrate that the law was 'clearly established'"—*i.e.*, that, as of the date of the incident, "any reasonable officer would have known that the Constitution" proscribed the conduct at issue. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020).

This burden is further complicated in the excessive force context because "[it] focuses not on the general standard—when may an officer use deadly force against a suspect?—but on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force?" *See Ontiveros*, 564 F.3d at 383, n.1. What's more, "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Id.* Finally, it is well-established that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987), *quoting Malley v. Briggs*, 475 U.S. 335, 340 (1986).

The Plaintiffs have failed to meet the burden of establishing that the law was clearly established as of the date of the incident with respect to the specific factual scenario confronting Gallegos. Specifically, in contending that the law was clearly established as to Gallegos's firing at Tuttle, with (according to Plaintiffs) the intent to kill Nicholas, the Plaintiffs identified only two unpublished cases, *Releford v. Rosemon*, 678 Fed. App'x 267 (5th Cir. 2017) and the report and recommendation of a magistrate judge in a case called *Estate of Baker by & through Baker v. Castro*.[127]

As an initial matter, when this Court has addressed a particular area of the law, only published opinions of this Court or opinions of the Supreme Court can clearly establish the law for purposes of qualified immunity. *See, e.g., Cooper v. Brown*, 844 F.3d 517, 525 n.8 (5th Cir. 2016) (unpublished opinion "d[id] not constitute clearly establish[ ] [the] law for purposes of [qualified immunity]"); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 686 (5th Cir. 2017) (for the law to be clearly established, this Court "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity").

Thus, the Plaintiffs failed to meet their qualified immunity burden entirely by not identifying controlling authority that clearly established the law.

---

[127] No. CV H-15-3495, 2018 WL 4762984, at *10 (S.D. Tex. Aug. 31, 2018), report and recommendation adopted, No. CV H-15-3495, 2018 WL 4762958 (S.D. Tex. Oct. 2, 2018).

But, even more importantly, neither of the cases that the Plaintiffs relied upon to satisfy the "clearly established" prong remotely resemble the facts of this case. Neither of these cases, for example, involved an armed assailant shooting a police officer seconds before another officer returned fire—as indisputably occurred in this case.[128] Instead, *Releford*, involved an unarmed man, who according to summary judgment declarations was "compliant in all respects" during an officer encounter outside of his home, but who the officer nonetheless shot and killed. *See Releford*, 678 Fed. App'x at 268.

Of course, neither Mr. Tuttle nor Ms. Nicholas was compliant in this case. Indeed, Officer Pardo testified without contradiction that, rather than complying, Ms. Nicholas stood over the wounded Officer Medina, inches away from him, screaming.[129] This occurred, by all accounts, less than a minute before Mr. Tuttle shot Lovings in the neck, immediately after which Plaintiffs contend Gallegos shot Ms. Nicholas.

And both *Estate of Baker v. Castro*, 2018 WL 4762984, at *10, and *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)—the sole case upon which the district court relied in finding clearly established law[130]—involved fleeing suspects. Indeed, the officer in *Tennessee v.*

---

[128] *See, e.g.,* ROA.10148 (report of Plaintiffs' reconstructionist that "Officer Lovings['s] injury is . . . consistent with having been fired by the revolver associated with D. Tuttle"); ROA.9147 (description of Plaintiffs' version of events in response to summary judgment admitting that Gallegos shot Ms. Nicholas "after Lovings was shot").

[129] *See* ROA.6798, at lines 44:14-:22.

[130] *See* ROA.14181.

*Garner* admitted that the only reason he shot the suspect was to prevent the nondangerous person from escaping. *See Garner*, 471 U.S. at 3.

But, in this case, neither Ms. Nicholas nor Mr. Tuttle was fleeing. Instead, under the Plaintiffs' version of events, Mr. Tuttle was armed and shooting, and nothing suggests Ms. Nicholas was attempting to flee or surrender—or that she appeared to Officer Gallegos to be doing so—when she was shot.

Thus, both the Plaintiffs and the district court failed to identify any authority remotely addressing the scenario that Gallegos faced in this case. Because "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity," *Ontiveros*, 564 F.3d at 383, n.1, Officer Gallegos is entitled to qualified immunity and summary judgment here.

**B.    The district court erred in denying Officer Gallegos's motion for summary judgment against Mr. Tuttle's claims.**

As in the case of Ms. Nicholas, Officer Gallegos is entitled to summary judgment on both prongs of qualified immunity with respect to his use of force against Mr. Tuttle.

**1.    Even under the Plaintiffs' version of events, Officer Gallegos's use of force did not violate Mr. Tuttle's constitutional rights.**

As with Ms. Nicholas, the district court's identification of specific factual issues precluding summary judgment for Mr. Tuttle requires, on this interlocutory appeal, for this Court to "review whether the factual disputes identified by the district court are material to the denial of qualified immunity—that is, whether the factual disputes

viewed in favor of the plaintiff make out a violation of clearly established law." *See Poole*, 13 F.4th at 423.

Specifically, with respect to the two final shots that Gallegos fired at Mr. Tuttle, the district court determined that "a factual dispute [existed] as to whether Gallegos violated Tuttle's constitutional rights by shooting him after he was already incapacitated."[131]

Given the district court's identification of a fact issue, this Court's analysis "assume[s] [the] plaintiff's version of the facts is true, then determine[s] whether those facts suffice for a claim of excessive force under the[ ] circumstances." *Wagner*, 227 F.3d at 320.

Of course, the analysis of the Plaintiffs' version of events must start from the well-established proposition that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety[—as the officers in this case indisputably were—]the officers need not stop shooting until the threat has ended." *See Plumhoff*, 572 U.S. at 777.

According to the Plaintiffs' version of events, after Mr. Tuttle shot Officer Lovings, and Gallegos shot Ms. Nicholas, Gallegos then "sh[o]t into the side of the house."[132] Plaintiffs contend that Gallegos then retreated from the house and "circled

---

[131] *See* ROA.14179-80 (cleaned up).
[132] *See* ROA.9149.

to [a] tree in front of the door."[133] From there, the Plaintiffs contend that "[i]n the next flurry of shots from Gallegos, Reyna [was] hit with bullet fragments and Goines was hit in the face."[134]

The parties dispute exactly how Sargeant Reyna and Officer Goines were shot—the Plaintiffs say they were wounded by shrapnel from Gallegos,[135] and Gallegos testified that it appeared to him that Tuttle shot them.[136]

Nonetheless, it is undisputed (or at least appears to be) that Gallegos did not intentionally shoot Goines and Reyna. Thus, objectively speaking—even under Plaintiffs' version of events—after Officer Gallegos observed Mr. Tuttle shoot Officer Lovings, Gallegos observed both Goines and Reyna sustain gunshot wounds to the face as they approached the front door of the house.[137]

In addition, under Plaintiffs' version of events, when Goines and Reyna sustained these injuries, "Tuttle . . . had approached the front door of the house."[138] Gallegos also testified that he observed Mr. Tuttle at the front door when Goines and Reyna were shot—though Gallegos specifically testified that he saw Tuttle shoot Reyna in the face and that Tuttle appeared to have shot Goines as well.[139]

---

[133] ROA.9149.
[134] ROA.9149.
[135] *See* ROA.9149; ROA.10148.
[136] *See* ROA.10431, at lines 118:1-:14.
[137] *Compare* ROA.9149 (Plaintiffs' account of Gallegos inadvertently wounding Goines and Reyna with a flurry of shots fired from behind a tree in the front yard) *with* ROA.10431, at lines 118:1-:14 (Gallegos's testimony of witnessing the injuries sustained by Reyna and Goines).
[138] ROA.9149.
[139] *See* ROA.10431, at lines 118:1-:14.

In any event, the Plaintiffs' version elides the details of exactly what Plaintiffs contend Gallegos observed. But Gallegos testified without contradiction—and the Plaintiffs do not appear to dispute—that as Goines approached the front door, presumably to extract the paralyzed Lovings—Gallegos observed that "as soon as [Goines] g[ot] to the front door, he g[ot] struck by a round in the jaw and dropped to the ground."[140] Gallegos then observed Goines "try to crawl back, half of his jaw or face . . . hanging off, bleeding profusely."[141]

Gallegos next observed Sergeant Reyna "attempt to go up to the front door to grab Officer Lovings," who lay paralyzed on the threshold.[142] Gallegos testified that "[a]s Sargeant Reyna [wa]s going up to the front door . . . [Gallegos] s[aw] two hands come out the front door holding a revolver, and . . . shoot[ ] Sargeant Reyna in the face."[143] According to Gallegos, at that moment, Gallegos shot Mr. Tuttle in the hand.[144] (If true, this likely saved the lives of Reyna and Lovings, as Tuttle would have otherwise continued firing.)

Thus, objectively under the undisputed facts, and even in the Plaintiffs' version of events, by the time Officer Gallegos fired the final two shots at Mr. Tuttle, Gallegos had observed:

---

[140] ROA.10431, at lines 118:2-:5.
[141] ROA.10431, at lines 118:6-:9.
[142] ROA.10431, at lines 118:6-:14.
[143] ROA.10431, at lines 118:6-:14.
[144] *See* ROA.10431, at lines 118:6-:14.

> ➤ Officer Medina emerging from the house, shot;[145]

> ➤ Officer Lovings being shot by Mt. Tuttle and dropping, paralyzed, at the front door and remaining there;[146]

> ➤ Mr. Tuttle coming to the front door of the house holding a revolver;[147]

> ➤ Officer Goines being shot the face as he attempted to retrieve the paralyzed Lovings;[148] and

> ➤ Sargeant Reyna being shot the face as he attempted to retrieve the paralyzed Lovings.[149]

It is also undisputed, even under the Plaintiffs' version, that all of these events, from the officers breaching the door to Goines and Reyna being shot in the face, took less than 60 seconds.[150]

In his deposition, Gallegos described his thought process at this moment, as he observed the fallen Lovings laying paralyzed at mouth of the fatal funnel that—as it objectively appeared to Gallegos—the armed man at the front door had created:

---

[145] *See* ROA.9144-46. The Plaintiffs contended on summary judgment that Lovings shot Medina, *see* ROA.9144, and their reconstructionist opined that Gallegos shot Medina, *see* ROA.10148, but no one contends that Gallegos had any reason to doubt (or did not believe) that an occupant of the house, *i.e.*, Mr. Tuttle, had shot Medina.

[146] ROA.9147.

[147] ROA.10431 (Gallegos's testimony regarding seeing Tuttle's revolver point out the front door).

[148] ROA.9149. Again, though Plaintiffs contend that the shrapnel causing Goines and Reyna's injuries came from Gallegos's fire, Plaintiffs do not, and cannot, argue that Gallegos lacked objective information that would reasonably lead him to believe an occupant of the house shot Goines and Reyna—for example, the fact that (1) Tuttle had shot Lovings and appeared to have shot Medina and (2) Tuttle was standing mere feet away from Goines and Reyna, holding a revolver, when these men both sustained gunshot wounds to the face.

[149] ROA.9149.

[150] *Compare* ROA.13005 (Rangers' report noting that entire gunfight lasted 1 minute and 20 seconds) *with* ROA.9150 (Plaintiffs' version of events that the final shot came "[a] full twenty seconds" after the penultimate shot.).

[A]t this point, the only thing I can think about is four of my guys are shot, there's nobody else around me, one of my—one of my guy[s] is in the doorway, I'm [not] sure if he's dead or alive. And then, of course, the thought of the moment I step out from behind the tree, I'm not knowing what to expect, so I think about my family, I think about my wife, I think about my kids.

And all of this is playing through [my] mind whenever I have to make a decision, and I told myself if I—if I don't step out from behind this tree and help my guys out, I'm going to consider myself a coward. So I have—I had to do what I had to do and I finally stepped out from behind the tree . . . .[151]

According to the Plaintiffs' version, Mr. Tuttle was, at this point, "disabled from his wounds"—but was still moving.[152] And importantly, there is no contention or evidence that, at this point—or ever—Mr. Tuttle yelled "I surrender" or took any action whatsoever indicating a willingness to give up the fight.

According to Plaintiffs, when Gallegos emerged from behind the tree, Mr. Tuttle was inside the house, "had his back to the door and is dropping to the floor."[153] In the Plaintiffs' version, Lovings—from his position paralyzed at the front door—told Gallegos that he "need[ed] to take a head shot."[154] Gallegos yelled "shut the f[uc]k up" and then shot Tuttle in the buttocks/thigh.[155]

After this shot—even under the Plaintiffs' version—Tuttle did not stop moving or in any way indicate an intent to give himself up. Instead, under Plaintiffs' version of

---

[151] ROA.10437.
[152] ROA.9150.
[153] ROA.9150 (cleaned up).
[154] ROA.9150.
[155] ROA.9150.

events, Mr. Tuttle next "put his body weigh[t] on his upper body by his elbows,"[156] or as Plaintiffs' reconstructionist described the movement, "[o]nce on the floor[,] [Mr. Tuttle] *raised his upper body by his elbows*."[157]

According to the Plaintiffs' version, only then, in response to this movement by Mr. Tuttle, did Officer Gallegos fire the final, fatal shot and "scream[ ], 'stop moving' after that shot."[158]

For the first time that day, Mr. Tuttle complied with law enforcement instructions. He was dead.

Given these undisputed, objective facts, as viewed from Officer Gallegos's perspective, *See Graham*, 490 U.S. at 396–97, the factual dispute identified by the district court of whether Mr. Tuttle was, in fact, "incapacitated" when Gallegos fired these final two shot is immaterial.[159]

Indeed, even the Plaintiffs' version of events lacks an objective basis for Officer Gallegos to conclude that Mr. Tuttle had given himself up. *See, e.g. Plumhoff*, 572 U.S. at 777. To the contrary, until the final shot, Mr. Tuttle who had objectively, from Gallegos's perspective, demonstrated extraordinary proficiency and willingness to shoot police officers, continued to move. Given the enormous threat that Mr. Tuttle's conduct had created, Officer Gallegos was justified in believing that, as long as Mr.

---

[156] ROA.9150.
[157] ROA.10147 (emphasis added).
[158] ROA.9150; ROA.10147.
[159] *See* ROA.14179-80.

Tuttle continued moving—which Tuttle undisputedly did until his death—Tuttle would attempt to further injure officers. In this situation, the fact that Mr. Tuttle may, in fact, have been actually incapacitated, in no way enabled Officer Gallegos to conclude that Mr. Tuttle no longer posed a threat. Mr. Tuttle's actual capacity to shoot was immaterial.

In addition, the district court's identification of a fact question as to whether Mr. Tuttle was *actually* incapacitated fails to necessarily raise a fact issue as to the material question of whether Officer Gallegos *knew* that Mr. Tuttle was incapacitated. To the contrary, this Court cannot infer or attribute to Officer Gallegos "the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396–97. Given Mr. Tuttle's extraordinary actions in apparently shooting four uniformed police officers—two of them in the face as they attempted to rescue a fallen comrade from Tuttle's doorstep—Officer Gallegos reasonably believed that, as long as Mr. Tuttle was moving, he would attempt to kill police officers. And it is undisputed that Tuttle continued moving—even attempting to raise himself up—until the final, fatal shot.[160]

Under these circumstances, Officer Gallegos's use of force was not clearly excessive, the fact issue identified by the district court relating to Mr. Tuttle's capacity was immaterial, and the district court erred in denying Officer Gallegos's motion for summary judgment.

> 2. **Officer Gallegos is entitled to qualified immunity because the Plaintiffs failed to establish that he violated clearly established law.**

---

[160] ROA.9150; ROA.10147.

As an initial matter, it cannot be overstated that this case presented a truly unique scenario representing that apex of what could be considered a suspect presenting a "severe threat to public safety." *See Plumhoff*, 572 U.S. at 777. Mr. Tuttle indisputably shot one uniformed officer who entered his house to serve a search warrant.[161] As discussed above, from Officer Gallegos's perspective, it appeared that Tuttle had shot three others.

Simply put, it was objectively obvious to Officer Gallegos from Mr. Tuttle's actions—for example, shooting Officer Lovings in the neck, then pointing his revolver out the front door to kill Sargeant Reyna—that Mr. Tuttle was not in a "giving up" kind of mood on this particular day.

Tuttle was, instead, by all objective appearances, in a kill-as-many-cops-as-possible kind of mood. There is no contention or evidence that, from the moment police entered the house until the moment Mr. Tuttle died, Mr. Tuttle ever indicated any willingness to surrender or otherwise comply with the police.

To the contrary, Mr. Tuttle's behavior—as observed by Officer Gallegos—demonstrated a profound desire to kill police. And it objectively appears that only God's grace (and Officer Gallegos) prevented Mr. Tuttle from doing so. The objective facts demonstrating Mr. Tuttle's determination to, and apparent proficiency in, shooting

---

[161] ROA.10148 (Plaintiffs' reconstructionist report, agreeing that "one round [shot by Tuttle] is confirmed to have struck Officer Lovings").

police include Mr. Tuttle undisputedly shooting and paralyzing Officer Lovings, and apparently transforming the house's front door into a death funnel where Goines and Reyna sustained gunshot wounds to the face as Mr. Tuttle stood at the front door.

The cases relied upon by both the Plaintiffs and the district court to clearly establish the law do not remotely resemble the factual scenario here. Specifically, in concluding that the law was clearly established, the district court and the Plaintiffs relied upon:

> ➢ *Roque v. Harvel*, 993 F.3d 325, 330 (5th Cir. 2021);
>
> ➢ *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 407 (5th Cir. 2009);
>
> ➢ *Plumhoff v. Rickard*, 572 U.S. 765 (2014);
>
> ➢ *Graves v. Zachary*, 277 Fed. App'x 344, 346 (5th Cir. 2008); and
>
> ➢ *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 273 (5th Cir. 2015).

Putting aside that *Graves*, 277 Fed. App'x at 334, is unpublished and therefore cannot clearly establish the law for purposes of qualified immunity,[162] none of these cases involves a suspect who even discharged a firearm—let alone a suspect who indisputably shot one police officer and appeared to have shot three others seconds all within seconds of being neutralized with deadly force.

Indeed, none of these cases would have remotely informed Officer Gallegos that, before interpreting Tuttle's final movements as threatening, the United States

---

[162] *See, e.g., Cooper*, 844 F.3d at 525 n.8 (noting that an unpublished opinion "d[id] not constitute clearly establish[ ] [the] law for purposes of [qualified immunity]").

Constitution required Gallegos to make a medical assessment of Tuttle's specific ability to wield and operate a firearm at that moment.

To the contrary, if in this case, this Court were to hold that the Constitution required to Gallegos make such a split-second determination, this holding would be not only novel, but contrary to this Court's longstanding prohibition on "allow[ing] the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *See Stroik*, 35 F.3d at 158–59 (cleaned up and quotation marks omitted).

Indeed, such a ruling—if adopted in this case—would impose a superhuman standard of discernment and discretion on police the likes of which neither this Court nor the Supreme Court has ever recognized. Because no such law is currently clearly established—and neither the Plaintiffs nor the district court identified any case establishing such a rule—Officer Gallegos is entitled to qualified immunity.

## Conclusion

The district court erred in denying Officer Gallegos's motion for summary judgment. This Court should reverse and hold that Officer Gallegos is entitled to all summary judgment, that the Plaintiffs should take nothing, and grant such other and further relief as the Court deems appropriate.[163]

---

[163] The district court concluded that the Plaintiffs' state-law claims for wrongful death and survival were brought under section 1983. *See* ROA.14182-83. Because Officer Gallegos is entitled to summary judgment on the section 1983 claims for the reasons discussed above, he is therefore entitled to summary judgment on the state-law claims as well.

SUBMITTED BY:

 /s/ John MacVane
RUSSELL HARDIN, JR.
JOHN MACVANE
RUSTY HARDIN & ASSOCIATES, L.L.P.
  1401 McKinney Street, Suite 2250
  5 Houston Center
  Houston, Texas 77010
(713) 652-9000 Phone
RHardin@RustyHardin.com
JMacVane@RustyHardin.com

*Counsel for Defendant-Appellant*


## CERTIFICATE OF SERVICE

I certify that on September 2, 2025, the foregoing document was served on all counsel of record using the Court's electronic filing system

 /s/ John MacVane
John MacVane

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(7)(B) because, excluding the parts of the document exempted by F<small>ED</small>. R. A<small>PP</small>. P. 32(f) and 5th C<small>IR</small>. R. 32.1, this document contains 12,803 words, according to the software's word count feature.

2.      This document complies with the typeface requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(5), and 5th C<small>IR</small>. R. 32.1 and the type-style requirements of F<small>ED</small>. R. A<small>PP</small>. P. 32(a)(6) because:

3.      This document has been prepared in a proportionally spaced typeface using Microsoft® Word for Office 365 in 14 point Garamound type style.


 /s/ John MacVane
John MacVane