No. 25-20132

---

IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CLIFFORD F. TUTTLE, JR., AS REPRESENTATIVE OF THE ESTATE OF
DENNIS W. TUTTLE, DECEASED; ROBERT TUTTLE; RYAN TUTTLE; JO
ANN NICHOLAS; JOHN NICHOLAS,

PLAINTIFFS-APPELLEES,

V.

FELIPE GALLEGOS,

DEFENDANT-APPELLANT.

---

JO ANN NICHOLAS, INDIVIDUALLY AND AS AN HEIR OF THE ESTATE OF
RHOGENA NICHOLAS; JOHN NICHOLAS, AS TEMPORARY
ADMINISTRATOR OF THE ESTATE OF RHOGENA NICHOLAS,

PLAINTIFFS-APPELLEES,

V.

FELIPE GALLEGOS,

DEFENDANT-APPELLANT.

---

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Honorable Alfred H. Bennett, District Judge
Nos. 4:21-cv-270 and 4:21-cv-272

THE TUTTLE AND NICHOLAS APPELLEES' BRIEF

Michael Patrick Doyle
Jeffrey I. Avery
DOYLE DENNIS AVERY LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019

Michael T. Gallagher
L. Boyd Smith, Jr.
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705

service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com
Attorneys for the Nicholas family

Facsimile:  (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
Attorneys for the Tuttle family

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Plaintiffs-Appellees | Trial and Appellate Counsel |
| --- | --- |
| Jo Ann Nicholas, Individually And As An Heir Of The Estate Of Rhogena Nicholas; John Nicholas, As Temporary Administrator Of  The Estate Of Rhogena Nicholas | Jeffrey I. Avery Michael Patrick Doyle Patrick Mason Dennis Doyle Dennis Avery LLP |
| | Charles Bourque, Jr. ST. MARTIN & BOURQUE, LLC |
| Clifford F. Tuttle, Jr.,  as Representative of the Estate of Dennis W. Tuttle, Deceased Robert Tuttle Ryan Tuttle Dennis Tuttle (plaintiffs' decedent) | Boyd Smith Michael Gallagher Pamela McLemore The Gallagher Law firm |

| Defendant-Appellant | Defendant-Appellant's Counsel |
|---|---|
| Felipe Gallegos | Rusty Hardin & Associates, LLP (trial / appellate counsel) |
| | Russell Hardin, Jr. (trial / appellate counsel) |
| | John MacVane (trial / appellate counsel) |
| | Quinones & Associates, PLLC (trial counsel) |
| | Letitia D Quinones-Hollins (trial counsel) |
| | Murphy & McKinney Law Firm, P.C. (trial counsel) |
| | Marshall Douglas Murphy (trial counsel) |
| | Jennifer Brevorka (trial counsel) |
| | Armstead Lewis (trial counsel) |
| | Rachel Lewis (trial counsel) |
| | Naomi Howard (trial counsel) |
| | Aisha Dennis (trial counsel) |

**Additional parties**

| Party | Counsel |
|---|---|
| Gerald Goines | Dwayne Day |
| Steven Bryant | David Nachtigall |
| Eric Sepolio | Melissa Azadeh (City of Houston Legal Department) |
| | Carolyn Martin (City of Houston Legal Department) |
| Manuel Salazar | Kelly Ann Dempsey (City of Houston Legal Department) |
| | Geoffrey Hoover (City of Houston Legal Department) |
| | Melissa Azadeh (City of Houston Legal Department) |
| | Carolyn Martin(City of Houston Legal Department) |

| | |
|---|---|
| Nadeem Ashraf | Bradley Morefield (City of Houston Legal Department) |
| | Michelle Taylor (City of Houston Legal Department) |
| Robert Gonzalez | Bradley Morefield (City of Houston Legal Department) |
| | Christy Martin (City of Houston Legal Department) |
| Thomas Wood | Bradley Morefield (City of Houston Legal Department) |
| | Alexander Garcia (City of Houston Legal Department) |
| Oscar Pardo | Melissa Azadeh (City of Houston Legal Department) |
| Clemente Reyna | Bradley Morefield (City of Houston Legal Department) |
| | Alexander Garcia(City of Houston Legal Department) |
| Frank Medina | Christy Martin (City of Houston Legal Department) |
| Marsha Todd | Kelly Ann Dempsey (City of Houston Legal Department) |
| Cedell Lovings | Melissa Azadeh (City of Houston Legal Department) |
| Harris County District Attorney's Office | Elizabeth Lee Stevens |
| | (Harris County District Attorney's Office) |

City of Houston, TX

Beck Redden, LLP
Alistair Dawson
Garrett Brawley
Lena Silva

Harold Al Odom, III

Arturo Michel (Houston City Attorney)

*/s/Jeffrey Avery*
Jeffrey Avery

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES.............................................................ii

TABLE OF CONTENTS .........................................................................................vi

INDEX OF AUTHORITIES...................................................................................viii

STATEMENT REGARDING ORAL ARGUMENT .................................................xii

ISSUES PRESENTED ...........................................................................................xiii

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF THE CASE ...................................................................................2

   1. Background before HPD's armed home invasion ...............................................2

   2. The approach to the house for HPD's unlawful armed home invasion.............4

   3. Gallegos murders Nicholas and lies to justify his homicide ............................8

   4. Gallegos murders Tuttle by shooting him in the back of the
      head and lies about what happened to justify his homicide...............................11

   5. Squad 15's evolving version of the armed home invasion
      and shooting at 7815 Harding Street.................................................................13

   6. Consistent with its policy and custom of turning a blind eye, HPD's Internal
      Affairs ignores critical evidence and inaccurate statement and instead
      exonerates the officers .....................................................................................16

   7. The Ranger investigation utilizes the same flawed pattern of HPD and
      ignores Gallegos's testimony regarding the sequence of events entirely.........19

   8. Key Disputed facts and missing evidence .......................................................21

SUMMARY OF THE ARGUMENT.........................................................................24

ARGUMENT ..........................................................................................................27

   I. Standard of Review and Applicable Law ........................................................27

   II. The Nicholas Plaintiffs ................................................................................. 33

1.  The Nicholas Plaintiffs have provided significant evidence to show that Medina was not in the house when Gallegos shot her .................. 33

2.  Plaintiffs have presented a chain of events that is consistent with the factual record ............................................................ 40

3.  Gallegos's conduct was objectively unreasonable when he shot and killed an unarmed woman who was not threatening him...................... 42

III. Gallegos violated the Fourth amendment right of Tuttle when he shot and killed him after he was incapacitated............................................ 46

IV. Qualified Immunity ............................................................. 53

CONCLUSION  ..................................................................... 54

CERTIFICATE OF SERVICE ................................................... 55

CERTIFICATE OF COMPLIANCE............................................ 56

## <u>INDEX OF AUTHORITIES</u>

### <u>CASES</u>

*Aguirre v. City of San Antonio*,
  995 F.3d 395 (5th Cir. 2021) ........................................................... 32

*Amador v. Vasquez*,
  961 F.3d 721 (5th Cir. 2020) ........................................................... 28

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) .................................................................. 27, 53

*Baker v. Coburn*,
  68 F.4th 240, 251 (5th Cir.  2023) ................................................... 54

*Barnes v. Felix*,
  605 U.S. 73 (2025) .................................................................. 29, 30

*Behrens v. Peltier*,
  516 U.S. 299  (1996) ..................................................................... 1

*Cantu v. Rocha*,
  77 F.3d 795 (5th Cir. 1996) ............................................................. 2

*Celanese Corp. v. Martin K. Eby Constr. Co.*,
  620 F.3d 529 (5th Cir. 2010)  ......................................... 2, 25, 42, 43

*Crane v. City of Arlington*,
  50 F.4th 453 (5th Cir. 2022)  ....................... 30, 31, 32, 33, 44, 45, 50

*Curnow v. Ridgecrest Police*,
  952 F.2d 321 (9th Cir. 1991) ....................................................... 26, 47

*Escobar v. Montee*,
  895 F.3d 387, 394 (5th Cir. 2018) ...................................................... 28

*Est. of Aguirre v. Cnty. of Riverside*,
  29 F.4th 624 (9th Cir. 2022)  ....................................................... 26, 47

*Garza v. Briones,*
    943 F.3d 740 (5th Cir. 2019) ............................................................ 28

*Geiger v. Monroe County,*
    No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198
    (N.D. Al. June 18, 2018)............................................................45, 51

*Gonzales v. Dallas County,*
    249 F.3d 406 (5th Cir. 2001) ............................................................ 1

*Good v. Curtis,*
    601 F.3d 393 (5th Cir. 2010) ........................................................ 1, 2

*Graham v. Connor,*
    490 U.S. 386 (1989)....................................................................31, 43

*Graves v. Zachary,*
    277 F. App'x 344 (5th Cir. 2008) .................................................. 54

*Harmon v. City of Arlington,*
    16 F.4th 1159 (5th Cir. 2021) ......................................................... 43

*Harris v. Roderick,*
    126 F.3d 1189 (9th Cir. 1997) ....................................................26, 47

*Johnson v. Jones,*
    515 U.S. 304 (1995) ....................................................................... 1, 24

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) ........................................................ 1, 24

*Lytle v. Bexar Cnty.,*
    560 F.3d 404 (5th Cir. 2009) ...............................................27, 51, 54

*Manis v. Lawson,*
    585 F.3d 839 (5th Cir. 2009) ........................................................... 28

*Mason v. Lafayette City-Parish Consolidated Government,*
    806 F.3d 268 (5th Cir. 2015) ........................................................... 52

*Melton v. Phillips*,
  875 F.3d 256 (5th Cir. 2017) ............................................................... 1

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ................................................................... 1, 24

*Ontiveros v. City of Rosenberg*,
  564 F.3d 379 m(5th Cir. 2009) ................................................... 28

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014) ..................................................................... 51

*Reichle v. Howards*,
  566 U.S. 658 (2012) ................................................................. 26, 53

*Releford v. Rosemon*,
  678 F. App'x 267 (5th Cir. 2017) ........................................... 27, 53

*Reyes v. City of Richmond*,
  287 F.3d 346 (5th Cir. 2002) ...................................................... 2

*Robinson v. Nolte*,
  77 F. App'x 413 (9th Cir. 2003) ............................................... 54

*Rockwell v. Brown*,
  664 F.3d 985 (5th Cir. 2011) ................................................... 28

*Roque v. Harvel*,
  993 F.3d 325 (5th Cir. 2021) ................................................ 27, 54

*Safford Unified Sch. Dist. No. 1 v. Redding*,
  557 U.S. 364 (2009) ................................................................. 53

*Saucier v. Katz*,
  533 U.S. 194 (2001) ................................................................. 53

*Snyder v. Trepagnier*,
  142 F.3d 791, 800 (5th Cir. 1998) ........................................... 54

*Tenn. v. Garner*,
    471 U.S. 1 (1985) ........................................................................... 27, 53

*Tuttle v. Sepolio*,
    68 F4th 969 (2023) ............................................................................. 54

*White v. Pauly*,
    580 U.S. 73 (2017) .............................................................................. 32

*Winfrey v. Pikett*,
    872 F.3d 640 (5th Cir. 2017) ............................................................... 2

*Winzer v. Kaufman Cnty.*,
    916 F.3d 464 (5th Cir. 2019 ................................................................ 28

## **<u>STATUTES</u>**

Texas Penal Code Section 9.31(c) ................................................................ 48

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe that oral argument is necessary.  If the Court determines that argument would be helpful, Plaintiffs requests to participate.

## **ISSUES PRESENTED**

**Issue 1 (Nicholas):**

Did the District Court correctly find that a slew of record evidence, including video, photographs, testimony, and expert conclusions, found that Officer Gallegos shot and killed Nicholas after Medina had already left the house?

**Issue 2 (Nicholas):**

Did the District Court, relying on the testimony of the officer who shot Nicholas, correctly determine that, based on the factual record, an issue of fact exists that Gallegos shot Nicholas, while she sat on a couch and was unarmed?

**Issue 3 (Nicholas):**

Did the District Court, relying on the testimony of Gallegos, correctly determine that, based on the factual record, an issue of fact exists that his conduct was objectively unreasonable to shoot an unarmed woman?

**Issue 4 (Tuttle):**

Did the District Court correctly find based on the record evidence, that Officer Gallegos shot and killed Tuttle after he was incapacitated?

**<u>Issue 5 (Qualified Immunity):</u>**

Did the District Court correctly determine that it is clearly established that: (1) an officer cannot shoot an unarmed woman who poses no threat and (2) cannot shoot a man who has been incapacitated and cannot pose a threat?

## <u>JURISDICTIONAL STATEMENT</u>

This Court lacks jurisdiction under the collateral order doctrine. Specifically, the issues in this brief are either factual disputes outside of the Court's jurisdiction or were not properly raised first before the District Court.[1] Under the collateral order doctrine, a defendant can file an interlocutory appeal of the denial of qualified immunity, but only where such an appeal involves purely legal issues.[2] In contrast, "in an interlocutory appeal [this Court] cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."[3] Put differently, "questions regarding sufficiency of the evidence are not 'separable' from the underlying merits of the case for purposes of the collateral order doctrine."[4]

To meet this standard, a defendant must assume the truth of the opposing party's version of events.[5] But Gallegos spends nearly his entire brief disputing the factual evidence presented by Plaintiffs. This alone is fatal.

Plaintiffs recognize that a legal question can exist about whether a particular

---

[1] *Johnson v. Jones*, 515 U.S. 304, 307 (1995); *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004).

[2] *Behrens v. Peltier*, 516 U.S. 299, 310-11 (1996); *Johnson*, 515 U.S. 304; *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985); *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017).

[3] *Kinney*, 367 F.3d at 347.

[4] *Id*. at 347 n. 9 (citing *Johnson*, 515 U.S. at 313-17).

[5] *See Mitchell*, 515 U.S. at 528; *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010); *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001).

dispute is material.[6] But to challenge materiality, the defendant must "'contend[] that 'taking all the plaintiff's factual allegations as true no violation of a clearly established right was shown.'"[7] Even assuming Gallegos has attempted to meet that standard on appeal, Gallegos never raised this argument at the trial court. As a result, any such argument would be waived.[8] This Court has been careful to police defendants who attempt to challenge the "materiality" of the facts on appeal. This is the precise type of case where an additional level of review should be denied. Even more so, this Court already denied an appeal at the motion to dismiss stage regarding qualified immunity.

As a result, the Court should deny jurisdiction over this appeal and remand this case.

## STATEMENT OF THE CASE

### 1. Background before HPD's armed home invasion

Three weeks before the deadly attack, the Houston Police Department first targeted 7815 Harding Street. On January 8th, Officers Morales and Blankenship-Reeves went to the house in response to an anonymous 911 call. The caller claimed that her 24-year-old daughter was inside the home doing heroin with a woman named

---

[6] *Good*, 601 F.3d at 397- 98.
[7] *Reyes v. City of Richmond*, 287 F.3d 346, 351 (5th Cir. 2002) (quoting *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir. 1996)); *Winfrey v. Pikett*, 872 F.3d 640, 643 (5th Cir. 2017) (applying Reyes to dismiss an appeal for lack of jurisdiction).
[8] *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010)(holding that "arguments not raised before the district court are waived and will not be considered on appeal.")

"Reggie." This call was objectively false, and the caller, Patricia Garcia, later pleaded guilty to federal crimes. That night, both officers made no contact with anyone in the house and did not notice any dogs or observe any activity in the residence at all.[9]

Following that evening, Blankenship-Reeves passed on a note she prepared about the call to fellow Lieutenant Marsha Todd – Blankenship-Reeves's significant other.[10] Todd then passed this tip to Officer Gerald Goines – a member of HPD's Narcotics Squad 15. Specifically, she told him she "[n]eed[ed] a favor" for a "case worked on a house," and she knew he would "do it right."[11] She then wrote "Heroin."[12]

For Goines and Squad 15, the timing of this tip was a lucky break – it gave them an opportunity to have a "picture day" in full uniforms prior to the departure of Officer Gallegos, who planned transfer to SWAT the next week.[13] By January 28, Goines had lied to a judge to secure the no-knock warrant to raid the home of unsuspecting Nicholas and Tuttle later that evening.[14] Goines committed perjury by concocting a false story that a CI had gotten drugs from Tuttle. In other words, the warrant was based solely on lying under oath. Goines was later convicted of felony

---

[9] ROA.10736 at 10:16 – 11:7; ROA.10749 at 23:4-18; ROA.10672 at 26:21 - 29:12.
[10] ROA 10702 at 146:7 – 149:1.
[11] ROA.12619 at 55:7-23; ROA.12622 - 12623 at 69:23 – 70:15.
[12] ROA.12619 at 55:7-23; ROA.12622 - 12623 at 69:23 – 70:15.
[13] ROA.10060.
[14] ROA.9540; ROA.10548 at 14:12 – 15:12.

murder.

## 2. The approach to the house for HPD's unlawful armed home invasion

As 5:00 PM approached on January 28th, Squad 15 drove to 7815 Harding in their van. None of the members of Squad 15 had body worn cameras ("BWC"). And while the officers in the perimeter – Nicole Blankinship-Reeves, Richard Morales, Samuel Garza, Valeriano Rios, and Yvette Ortiz – all had BWCs, they failed to activate their BWC as they exited their vehicles, as required by HPD policy.[15] Instead, Morales activated his BWC as Squad 15 made entry into the house – this is the first audio of the approach.[16] Rios activated his BWC after he took cover behind a truck.[17] Blankinship, Garza, and Ortiz activated their BWCs after the shooting had ended.[18] Ultimately, HPD determined that these five officers violated HPD policy by failing to properly and timely activate their BWCs.[19]

While incomplete, the available footage paints a tragic picture. As Squad 15 approaches 7815 Harding Street, they assemble a "stack" of Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Reyna, Goines, and Wood.[20] As Morales activates his BWC, a loud bang echoes – either the first gun shot or the

---

[15] The BWC at HPD has a two-minute buffer of video only. Meaning, once Morales and Rios turned on their BWC, the video buffered the prior two minutes without sound.

[16] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 27 second mark of the video; *see also* ROA.9532-9533.

[17] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 43 second mark of the video; *see also* ROA.9532-9533.

[18] ROA.9532-9533.

[19] ROA.9532-9533.

[20] ROA.13000.

breaching of the door.[21] Medina forces his way into the house first, followed by Lovings, Salazar, and Pardo – all four with guns out.[22]

Within the next eight seconds, Medina fires his shotgun at the family dog.[23] Lovings also shoots at the dog at least twice.[24] Without hearing the sound of another gunshot,[25] Medina is then hit by a bullet or bullet fragment from Lovings.[26] As Rios runs to take cover behind a blue truck in front of the house, he turns his BWC toward the front of the house. This view shows Felipe Gallegos standing to the back left of the door – as shown circled in red.[27] Lt. Wolf, the Texas Ranger who investigated the shooting, also admits Gallegos's positioning.[28]



---

[21] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:27 of the video.
[22] ROA.13028.
[23] ROA.11129 at 45:18-22; *see also* ROA at Exhibit "AC."
[24] ROA.10048-49.
[25] ROA.11130 at 46:5-6.
[26] ROA.10148.
[27] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35.
[28] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf.  Ranger Wolf specifically identified Gallegos's position).

In the next 4-5 seconds, ten to twelve shots are fired – Salazar and Lovings fire most, if not all, of those shots.[29] Specifically, Salazar testified that he fired eight to ten shots before he fell outside of the house.[30] Lovings also fired at least nine times during the attack.[31] And undisputedly, these shots occurred before Lovings fell from a gunshot to the neck.[32]

    In the middle of that sequence – approximately six seconds after Rios begins to retreat to the truck – Sepolio pulls Medina outside of the house and reaches the street. [33]



---

[29] ROA at Exhibit "AC," "Ranger Sync of BWC" at :35- 0:39.
[30] ROA.10641 at 70:22-71:10.
[31] ROA.12719 at 115:18-116:8.
[32] ROA.12729 at 116:9-23.
[33] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)

Based on their location, Sepolio grabbed and carried Medina from the house at or near the time of the series of shots by Salazar and Lovings.[34] As Rios reaches the truck, he briefly lifts his BWC toward the front of the house.[35] In this short snippet, Medina and Sepolio are behind the van, and a short sleeved, tattooed Gallegos[36] stands to the far left and away from the house.



During this time, the BWC captures four to five more shots.[37] Again, these shots are consistent with firing by Lovings and Salazar. At that same timestamp, Gallegos

---

[34] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015.

[35] ROA at Exhibit "AC," "Ranger Sync of BWC" from 0:43.

[36] This particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves at ROA.10051; (2) his mask matches the mask that Gallegos was wearing that night; ROA.10051; (3) the photo appears to show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house. Regardless the photo itself is not necessary for Plaintiff to prove that Gallegos's version of events is false.

[37] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:41-0:46.

starts to move forward from his outside location towards the house, with Medina already outside the home.[38]  In the following seconds, glass breaks and an someone – likely Lovings – screams in pain.[39]

### 3.  **Gallegos murders Nicholas and lies to justify his homicide.**

For the remaining portion of the attack, the BWC does not capture a visual of the house, and instead merely provides audio of screams and gunshots. But the available evidence still reveals the sequence of events. After Gallegos hears the "gunfire exchange going on inside the residence,"[40] – the shots fired by Lovings and Salazar – Gallegos moves to the "right of the front porch."[41] He then sees "Officer Salazar and Officer Pardo fall backwards off the front porch."[42] Per Gallegos, Lovings then drops in the doorway.[43]

At that moment – after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot – Gallegos finally sees inside the house.[44] At that point, he spots Ms. Nicholas and shoots her without warning.[45]  To justify this homicide, Gallegos swore he saw Nicholas "grabbing with both hands tugging at the shotgun" and "standing over Officer Medina tugging at his shotgun

---

[38] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:46.
[39] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:47-0:49.
[40] ROA.10412 at 99:10-16.
[41] ROA.10409 at 96:20-97:3.
[42] ROA.10412 at 99:12-17.
[43] ROA.10413 at 100:23-101:1.
[44] ROA.10415 at 102:10-25.
[45] ROA.10421-10422 at 108:3-11 and 109:7-19.

that is slung to his vest saying, Motherf****r, motherf****r."[46]  According to him, Nicholas was not "exactly squared up with" him, but "at an angle."[47]  He admits that he shot her in the "upper torso area"; but he "can't . . . pinpoint exactly where they hit, but [he] saw [his] rounds actively hit her."[48]  He further could not even identify whether the bullets struck her left side or right side.[49]  But this version from Gallegos flags two incredible inconsistencies – (1) where was Medina at the time that Gallegos shot Nicholas and (2) how did Nicholas sustain a fatal bullet wound to her right side of her body?

The answer to the first question is easy – Medina and Sepolio were already outside of the house on the street by the van. Officer Gallegos lied about Medina's location and Nicholas grabbing the gun to justify the murder.

Forensic evidence answers the second question. As confirmed by NCIS forensic investigator Maloney, Nicholas died on the north side of the couch, not in the area where Medina was located.[50]  This is important because at the time of her death, Nicholas was found with her chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[51]  She sustained at least two gunshot wounds, including wounds to her right chest and right thigh. The

---

[46] ROA.10415, 10418-10419 at 102:10-25; 105:25-106:3.
[47] ROA.10420 at 107:24-108:2.
[48] ROA.10421 at 108:12-21.
[49] ROA.10493 at 180:16-19.
[50] ROA.10148.
[51] ROA.10148.

forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[52] This injury caused Ms. Nicholas's death mere seconds after she was hit.[53]   The entrance wound on the right side of her body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos.   Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[54] Furthermore, Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[55] In other words, Gallegos shot and killed Nicholas, while she sat on the north end of the couch. And he did with Medina

---

[52] ROA.12868 at 74:14 – 78:4.
[53] ROA.12868 at 74:14 – 78:4.
[54] ROA.10148.
[55] ROA.10147-10148.

outside the home.

**4. Gallegos murders Tuttle by shooting him in the back of the head and lies about what happened to justify his homicide**

As Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house.[56] Gallegos then shoots into the side of the house. He then circles to the tree in front of the door.[57] In the next flurry of shots from Gallegos, Reyna is hit with bullet fragments and Goines is hit in the face. Both of those shots came from a .223 – meaning, Gallegos, the only officer shooting at .223 during this period, shot Reyna and Goines.

During the attack, Tuttle sustained nine total bullet wounds. First, "[h]e received shots to both his shoulder and a grazing wound to his right forearm.."[58] Following that, Mr. Tuttle "began to turn away from the door," but "[a]s he turned he received shots to both arms and hands."[59] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon."[60] Maloney and Dr. Bux's opinions are supported by photographs of Tuttle's wounds taken at the scene and at the morgue.  While graphic, these photos further make it clear – Tuttle could not have held a gun.

---

[56] ROA.10148 ("The fatal shot to her torso first grazed the arm of Dennis Tuttle")
[57] ROA.13016 ("05:28:32 Gallegos is seen taking cover behind a tree in the front yard (CH2)(Officer is in black short sleeve shirt), and Sgt. Reyna or Sgt. Wood is heard yelling "I'm hit".)
[58] ROA.10149.
[59] ROA.10149.
[60] ROA.10149.



In addition the five bullets that ripped through his body and his pre-existing right wrist injury (and wrist brace), the AR-15 shots caused catastrophic damage to his wrist.[62] The bullet ripped apart bones, tendons, ligaments, and muscle in his dominant, right wrist.[63] Combined with that, Tuttle's left arm and hand sustained gruesome, catastrophic injuries.[64] It is simply inconceivable that anyone with injuries like Tuttle's could grasp, hold, lift, raise, aim, and or fire a pistol at anyone. At a minimum, there is genuine factual evidence that Tuttle could not.

Disabled from his wounds, Tuttle then had "his back to the door[] and [is] . . . drop[ping] to the floor."[65] In the next 10-20 seconds, Lovings, who is still near the doorway, tells Gallegos he needed to take a head shot.[66] And at the top of his lungs, Gallegos yells "shut the f**k up," and shoots Tuttle in the buttocks/thigh.[67] "A single

---

[61] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[62] ROA.9673-9691.
[63] ROA.9673-9691.
[64] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[65] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[66] ROA.11213 at 46:20-23.
[67] ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23; ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up").

bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[68] A full twenty seconds later, as the unarmed Tuttle puts his body weigh on "his upper body by his elbows,"[69] Gallegos fatally shoots Tuttle "in the back of his head/neck."[70] Gallegos screams "stop moving" after that shot.[71] Tuttle then "collapses to the floor partially on his right side and remains in that position."[72]



Tuttle's gun is later found under a heater.[74] Put simply, Gallegos murdered Tuttle when he was unarmed – at that point, he was incapable of holding a gun – by shooting him in the back of the head.

## 5. Squad 15's evolving version of the armed home invasion and shooting at 7815 Harding Street

Following the unlawful home invasion, HPD's policy – indeed, the policy that

---

[68] ROA.10148.
[69] ROA.10148.
[70] ROA at Exhibit "AC," "Ranger Sync of BWC" 01:46- 01:48 (stop moving yelled); Pls. Ex. F ROA.10457 at 144:16-17 (confirming that Gallegos said "stop moving")
[71] ROA.10148; ROA.10456-10457.
[72] ROA.10148; ROA.10456-10457.
[73] ROA.10137.
[74] ROA.10140.

encourages excessive force – entitled the Squad to special investigative treatment. Combined with this review of evidence, many of the officers then reported "tunnel vision" during the events.[75] Medina – a key potential witness to the shooting of Nicholas – even claimed he was knocked unconscious during the home invasion.[76] But strangely, even though they were each entitled to review prior statements and evidence, the Gallegos's statements still included changes in his sworn testimony that contradict his prior sworn statements.   Specifically Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**."[77] Yet at his deposition: Gallegos testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself."[78] No fingerprints were taken of the gun.[79]   Similarly, in his second homicide statement, Officer Gallegos testified that after he shot Nicholas, he "observed the suspect **fall onto the couch** towards the west wall."   Yet in his deposition, Gallegos backtracked and claimed he saw her "turn and fall **towards** the couch," but he "lost visual because [he] sunk back in behind the wall."[80]

In addition to shifting testimony, the officers also could not get their stories straight with each other – even when under oath. For example, Medina testified that

---

[75] ROA.10643 at 77:18-21; ROA.11130 at 48:17-20; ROA.9896.
[76] ROA.11137 at 74:7-13.
[77] ROA.9743 ("Did she actually lay her hands on the weapon? A: No.")
[78] ROA.10415 at 102:20-103:7.
[79] ROA.10226.
[80] ROA.10423.

the first shot was to his right – logically, Lovings.[81] Salazar also confirmed that Lovings shot the dog first,[82] while Pardo testified generally that "police officers" fired first.[83] And Gallegos and Sepolio testified that they first heard a shotgun – meaning Medina took the first shot.[84]

Furthermore, the physical evidence also contradicts the officers' testimony. For example, according to Squad 15 officers, Tuttle shot at least 11-13 times during the raid. The only problem? Based on the evaluation of his revolver and the scene, Tuttle shot either three times or four times at most.[85] Expanding on that, at the outset of the shooting, Salazar testified that Tuttle shot at Medina 3-4 times.[86] Following those shots, Sepolio testified, as he was grabbing Medina, he "believe[d]" Tuttle shot "multiple times" at him – meaning, at least two additional shots.[87] Lovings is then shot by Tuttle. After Lovings hits the ground, Gallegos hears "more than one shot" from Tuttle inside the house – meaning at least two more shots.[88] Gallegos then sees Tuttle "shoot" Reyna and Goines from inside the house[89] –another two shots. And finally, according to Pardo, Tuttle actually fired multiple times at Reyna, not

---

[81] ROA.11129.
[82] ROA.9976-9977 .
[83] ROA.13077 at 39:7-11.
[84] ROA.10406 at 93:15-17; ROA.13132.
[85] ROA.10142;  ROA.13064 ("4 fired cartridge cases recovered from Tuttle's pistol")
[86] ROA.10636 at 50:11-50:24.
[87] ROA.13136 at 83:7-16.
[88] ROA.10424 at 111:17-18.
[89] ROA10522; ROA.10431 at 118:1-14.

just one – meaning at least an additional shot.[90] This testimony is inconsistent, contradictory of the evidence, and not credible.

Finally, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas and Tuttle. First, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[91] (2) the BWC showing that Medina was not in the house;[92] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[93] Similarly, while Gallegos claims that Tuttle raised a gun at him prior to the fatal shots of Tuttle, (1) the bullet trajectory shows Tuttle was struck in the back of the head – not facing Gallegos[94] – and (2) the testimony of Dr. Bux, that, "[a]t this point he was incapable of holding a weapon."[95]

## 6. **Consistent with its policy and custom of turning a blind eye, HPD's Internal Affairs ignores critical evidence and inaccurate statement and instead exonerates the officers.**

Despite these incredible contradictions and holes in the evidence, HPD and Chief Art Acevedo cleared the officers of excessive force. Why? Because this is

---

[90] ROA.9979-9980; ROA13082 at 59:18-60:2 (Pardo testified Tuttle shot multiple times, but cannot recall if it was three times).
[91] ROA.10147.
[92] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)
[93] ROA.10256.
[94] ROA.10147 ("on the floor he raises his upper body by his elbows and is fatally shot in the back of his head/neck by Officer Gallegos.")
[95] ROA.10257.

exactly the result that HPD had designed its system to reach.

IAD provided 48-hour notice to the officers. As part of that, IAD provided review of important evidence and testimony prior to any statements.[96] Even with these advantages, HPD prohibited IAD from reviewing an officer's disciplinary history – notably here, from 2011 to 2019, Gallegos had been previously reviewed for six use of force charges, including three prior shootings and three use of force claims.[97] Undisputedly, this process dramatically differed from the investigation of citizens.[98]

Even knowing this background, IAD took virtually no steps to determine if the officers were fabricating their stories – a shocking investigative tactic in light of the serious contradictions with their own testimony and physical evidence.[99] Commander Nguyen, the investigative officer, could not even remember receiving any training to prevent "fabrication or distortion of testimony in an interrogation,"[100] much less ever making a finding in his time at IAD that an officer was untruthful.[101] Even more telling, he could also not even identify a single time from 2017 to 2019 where IAD sustained an officer-involved shooting allegation.[102]   In all, Nguyen

---

[96] ROA.12548.
[97] ROA.96396.
[98] ROA.12550 at 51:7-15.
[99] ROA.12550 at 52 -56.
[100] ROA.12551 at 55:21-56:6.
[101] ROA.12551 at 56-57.
[102] ROA.12551 at 58:8-15.

could not even confirm that it would be dangerous for a police department to authorize a "culture of turning a blind eye to excessive force."[103]   Why could Commander Nguyen not answer such an easy question? Because HPD had created that exact culture.

Nguyen found the shooting in this case justified, and Art Acevedo approved this finding.  To reach this conclusion, Ngueyn exclusively relied on the officers' statements.[104] And while Nguyen testified that "any contradictory statements should be addressed and looked . . . into," the investigation never weighed or addressed any contradictory statements.[105]   Because of this failure, Nguyen, as part of the investigation, never addressed the contradictions including, (1) who shot first; (2) whether Medina was even in the house; (3) whether Nicholas was anywhere near Gallegos claimed; or (4) whether Tuttle was capable of holding a gun.[106] Nguyen, instead, ignored the contradictions, ignored the possibility of fabrication, and simply cleared the officers because of their unsupported claims.

Ultimately, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval

---

[103] ROA.12552 at 60:12-62:9.
[104] ROA.12558 at 85:13-18; 86:4-8.
[105] ROA.12546 at 34:10-18.
[106] ROA.9481-9538.

by supervisors, the Chief of Police."[107] In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force."[108]

### 7. **The Ranger investigation utilizes the same flawed pattern of HPD and ignores Gallegos's testimony regarding the sequence of events entirely.**

Following IAD's investigation, the Texas Rangers also investigated the officer involved shooting at the request of the Harris County District Attorney. But just like Nguyen, Lt. Wolf, the assigned investigator, simply assumed that the officers' statements were accurate. Wolf testified that the there was "no evidence" that the officers "were lying."[109]

Ignoring the incredible inconsistencies identified above, Wolf then created an impossible and illogical sequence of events. But in making this sequence, Wolf – likely because he realized that Medina could not have been in the house when Gallegos claimed he was – completely re-ordered the timeline of events.[110] The problem? This directly contradicts Officer Gallegos's testimony, as well as the body camera footage. And if there is "no evidence" that the officers "were lying,"[111] how can Wolf determine that Gallegos shot Nicholas prior to Lovings' being shot and

---

[107] ROA.10233.
[108] ROA.10233.
[109] ROA.12710-12711 at 81:24-82:6.
[110] ROA.13020-13041.  Specifically, at ROA.13030, Wolf determines that Gallegos shoots Nicholas, then Sepolio pulls out Medina, and only then is Lovings shot.
[111] ROA.12710 at 81:24-82:6.

Salazar and Pardo's fall, when Gallegos – under oath three separate times – claimed he shot Nicholas after those events?

To reach this conclusion, Wolf creates a story whole cloth. First, Salazar, Pardo, and Lovings all clear the door after Medina is hit[112] – an alleged finding that is not supported or even claimed by any officer. It is also inconsistent with Sepolio's testimony that he had to "push" his way through "multiple people" and "squeezed into the crowd" to get to officer Medina on the couch.[113] Wolf continues by stating that Gallegos moves from the left side of the house to the right, sees Nicholas when the door clears and shoots her.[114] Sepolio, apparently immune to any bullets, then grabs Medina and makes it to the street in a few seconds.[115] Salazar, Pardo, and Lovings then return to their prior spots and continue shooting at Tuttle, and, in contradiction to Gallegos, then fall outside the door.[116]

This conclusion not only is physically illogical and contradicts every officer's statement, but it also contradicts the BWC and the physical evidence. Again, at the outset of the unlawful home invasion, after three shots, Gallegos stands to the left of the house. Seconds later, Medina is on the street.[117] Yet Gallegos has moved further

---

[112] ROA.13029.
[113] ROA.13134 at 76:15-77:7.
[114] ROA.13030.
[115] ROA.13030.
[116] ROA.13030.
[117] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf.  Ranger Wolf specifically identified Gallegos's position).

to the left and back – not to the right side of the house where he shoots Nicholas.[118] Only after Medina is gone, Gallegos then moves to the right of the house.[119] This also explains how Tuttle's DNA is on the bullet that struck Nicholas. Meaning, after Lovings, Pardo, Salazar, and Medina are out of the house, Tuttle was able to move to the front door. But under the Ranger's timeline? Four to six police officers stood at or near the doorway who would have prevented Tuttle from reaching the door.

The decision to re-order the sequence suggests Lt. Wolf reached these conclusions because he knew that Medina could not have been in the house when Gallegos claims he shot Nicholas. And as a result, Gallegos murdered Nicholas without any warning, much less any justification.

## 8. Key Disputed facts and missing evidence

Finally, because this case includes a large record and substantial evidence, there are many disputed issues of fact that preclude summary judgment. But for ease of reference, Plaintiffs have highlighted the following dispositive facts that are disputed:

- Tuttle shot Medina. This is disputed because Maloney has testified that Medina was shot with a .223 (meaning Lovings shot him);[120]
- Tuttle shot Goines. This is disputed because Maloney has testified that Goines was shot with a .223 (meaning Gallegos shot him)[121] and Lt.

---

[118] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43. Again, this particular individual is Gallegos as explained above.
[119] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43.
[120] ROA.10148.
[121] ROA.10148.

Wolf[122] confirmed that the bullet could not be matched based on its damage;

- Tuttle shot Reyna. This is disputed because Maloney has testified that Reyna was shot with a .223 (meaning Gallegos shot him), Lt. Wolf had no "scientific evidence" that Tuttle shot Reyna;[123]

- Nicholas was reaching for Medina's gun and posed a threat to the safety of Medina. This is contradicted by the BWC footage as explained above, Gallegos's testimony about the timeline, and Maloney's testimony that Nicholas was on the other side of the couch and hit in the other side of her body;[124]

- Nicholas was shot on the couch near where Medina had been located. Again, Maloney disputes this location;[125]

- Tuttle held a gun during the final two shots by Gallegos and posed a threat of safety to Gallegos. This is disputed by Dr. Bux and Maloney.[126]

Similarly, HPD also lost or failed to collect key evidence – evidence that could have provided important context to this unlawful home invasion.  This includes:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[127]

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in

---

[122] ROA.12755.
[123] ROA.12759 at 274:7-8.
[124] ROA.10145.
[125] ROA.10145.
[126] ROA.10146-10147; ROA.10257.
[127] ROA.9594.

Lovings rifle," and an "unknown brand of cartridges being fired through the magazine."[128]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[129] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[130] And Chief Art Acevedo ordered the perimeter officers to turn their body cameras off while still on the scene as he was questioning officers at the scene.[131]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south side of the building;[132]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[133]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[134]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating the bullet struck both victims. According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch.[135]

- HPD failed to conduct a "shooting incident reconstruction"[136]

In the underlying case, Gallegos moved for summary judgment. Based on this

evidence, the Court reviewed and rejected Gallegos's motion for summary judgment.

---

[128] ROA.13064.
[129] ROA.12755 at 259:10-260:3.
[130] ROA.9532-9533.
[131] ROA.13239.
[132] ROA.10121.
[133] ROA.10121.
[134] ROA.10121.
[135] ROA.10122.
[136] ROA.10123.

Gallegos has now appealed.

## SUMMARY OF THE ARGUMENT

The Trial Court addressed and rejected Defendant's arguments based on the factual record. Following that, Gallegos's appeal is simply a renewed fight regarding factual disputes outside of the Court's jurisdiction or regarding issues Gallegos did not properly raised before the District Court.[137] As a result, this Court lacks jurisdiction over this appeal and should decline review.[138]

If the Court chooses to delve into the facts, it will review what the District Court already found – there is a slew of factual disputes regarding what happened. Plaintiff has presented a mountain of evidence that contradicts Gallegos's testimony that Medina was in the house when he shot Nicholas.  This is not based on the BWC video alone.  Rather, it is based on the testimony of the officer, the findings of Maloney and Wolf, and the audio evidence from the video.  Put simply, Gallegos's story is implausible, and the Court was correct to reject it.

Next, Gallegos attempts to create another factual dispute – again an issue outside the jurisdiction of this Court – regarding whether "Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle." In effect, Gallegos attempts to argue that Plaintiff's expert opined that Gallegos could not see Nicholas

---

[137] *Johnson*, 515 U.S. 304; *Kinney*, 367 F.3d at 347.
[138] See *Behrens v. Peltier*, 516 U.S. 299, 310-11 (1996); *Johnson*, 515 U.S. 304; *Mitchell*, 472 U.S. at 522.

when he shot her. But at his deposition, Maloney did not make this claim. Rather he testified that he could not exclude that Gallegos saw Nicholas.[139] Maloney only claimed that he did not have a "good view" or "thorough view" of her at the time he pulled the trigger.[140] Because Gallegos repeatedly testified that he intentionally shot Nicholas and saw his bullet strike Nicholas's body,[141] Plaintiff's proffered chain of events is perfectly plausible.

Pivoting from that, Gallegos then attempts to make new arguments that he never raised before the trial court – namely, his claim that regardless of his intent, his conduct was still objectively reasonable. First, this argument was not presented to the trial court and is therefore waived.[142] But regardless, Nicholas detailed that this is simply not the case based on the factual record. Indeed, Gallegos testified that there was no other basis to shoot Nicholas besides the purported threat to Medina. And Plaintiff showed that Medina was not in the house when Gallegos shot her. Likewise, other records evidence makes it clear – Nicholas was simply not a threat. As a result, it was not objectively reasonable to shoot an unarmed women sitting on a couch.

Fourth, Gallegos also shot and killed Tuttle after he was already incapacitated.

---

[139] ROA.11952 at 135:3-21.
[140] ROA.11952 at 135:3-21.
[141] ROA.10493 at 180:11-13.
[142] *Celanese Corp*, 620 F.3d at 53.

Federal Court precedent makes it clear – "a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile."[143] And, police officers "may not kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they are armed, including in some circumstances in which the suspect has 'committed a violent crime in the immediate past.'"[144] And here, as presented in the record, at the time Gallegos killed Tuttle, he (1) no longer had a weapon;[145] (2) certainly did not raise a weapon like Gallegos claimed;[146] (3) was not facing Gallegos like he claimed;[147] and (4) Gallegos shot him in the back of the head.[148] Put simply, Tuttle did not pose an immediate threat to Gallegos or anyone. This is a violation of the Fourth Amendment.

Finally, both for Nicholas and Tuttle, their rights were clearly established at the time of the violation. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[149] There need not be "a case directly on point, but existing precedent

---

[143] *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).
[144] *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997)
[145] ROA.10146 and ROA.10257.
[146] ROA.10146.
[147] ROA.10146-10147.
[148] ROA.10146-10147.
[149] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

must have placed the statutory or constitutional question beyond debate."[150]  First, regarding Nicholas, when addressing the shooting of unarmed, non-dangerous people, there is no doubt – "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead."[151] Fourth Amendment cases "clearly establish—and did so by January 2019—that an officer may not shoot unarmed individuals who pose no threat of danger.[152]

Similarly, Tuttle had a clearly established right not to be executed after he was incapacitated. As the Fifth Circuit explained "after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force."[153] Therefore, this Court should reject the appeal.

## **ARGUMENT**

### I.    **Standard of Review and Applicable Law**

Gallegos's counsel accurately addresses the standard of review for an appeal of a denial of qualified immunity at the summary judgment stage, subject to the jurisdictional objection Plaintiffs raised above.

Under the Fourth Amendment, Nicholas and Tuttle had a constitutionally protected right to be free from unreasonable seizures, including excessive, deadly

---

[150] *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

[151] *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017).

[152] *Tenn. v. Garner,* 471 U.S. 1, 11 (1985).

[153] *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

force.[154] To prove a deprivation of that right, Nicholas and Tuttle "must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[155] Notably, excessive-force claims are "necessarily fact-intensive," so the Court must "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable."[156]

The "reasonableness inquiry is an objective one."[157] And a Court must "look at the case from the perspective of a reasonable officer on the scene, paying 'careful attention to the facts and circumstances of each particular case.'"[158] As part of this evaluation, the Fifth Circuit has held that the excessive force inquiry includes whether the officer "was in danger at the moment of the threat that resulted in the [officer's] shooting [of the victim]."[159] "So, the focus of the inquiry should be on 'the act that led [the officer] to discharge his weapon[.]'"[160]

After the briefing at the trial court, the U.S. Supreme Court issued its decision in *Barnes v. Felix* – a case addressing excessive force and overruling prior Fifth

---

[154] *Garza v. Briones*, 943 F.3d 740, 744-45 (5th Cir. 2019).
[155] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009)).
[156] *Rockwell v. Brown*, 664 F.3d 985, 991-992 (5th Cir. 2011).
[157] *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 474 (5th Cir. 2019)
[158] *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018)
[159] *Id*. at 993.
[160] *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (*quoting Manis*, 585 F.3d at 845).

Circuit precedent.[161] In *Barnes*, a police officer pulled over the plaintiff for suspected toll violations.[162] He "ordered [the plaintiff] to exit the vehicle, but [he] began to drive away."[163] The police officer then jumped onto the doorsill and fired two shots, as the car began moving.[164]  The officer fatally hit the plaintiff.[165]  In total, "[a]bout five seconds elapsed between when the car started moving and when it stopped."[166] Similarly, "[t]wo seconds passed between the moment [the officer] stepped on the doorsill and the moment he fired his first shot."[167]

At the trial level, the court granted summary judgment based on the Fifth Circuit's "moment-of-threat" rule. This Court affirmed.  Under that rule, "events 'leading up to the shooting' are 'not relevant.'"[168] This Court limited its review to the 2-seconds when the officer was "clinging to a moving car," and "[b]ecause [the officer] could then have reasonably believed his life in danger, the panel held, the shooting was lawful."[169]

This May, the U.S. Supreme Court rejected this rule.  Instead, it made it clear – "the 'totality of the circumstances' inquiry has no time limit."[170] And "[w]hile the

---

[161] *Barnes v. Felix,* 605 U.S. 73 (2025).
[162] *Id.* at 73.
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*

situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones."[171] As a result, "[p]rior events may show why a reasonable officer would perceive otherwise  ambiguous conduct as threatening, or instead as innocuous."[172]

Prior to *Barnes*, this Court recently addressed an excessive force of a deadly shooting in *Crane v. City of Arlington*.[173] In that case, the plaintiff was driving his vehicle with two passengers and a child.[174] "While Crane was stopped at a traffic light at approximately 11:38 p.m., Officer Elsie Bowden pulled up behind him."[175] As the light turned green, Bowden allegedly "saw an object being tossed from the passenger's side."[176] Claiming that it may be "a crack pipe and called for backup; Roper responded."[177] Bowden pulled over Crane, but realized that the object that was thrown out of the car was simply a candy cane.[178] Rather than simply let Crane leave, she "ran a warrant check, which found that Crane had warrants for several misdemeanors and a possible felony probation violation."[179] After an argument about

---

[171] *Id.*
[172] *Id.* at 73-74.
[173] *Crane v. City of Arlington*, 50 F.4th 453 (5th Cir. 2022).
[174] *Id.* at 459.
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179]*Id.*

the warrants, "Roper put his arm around Crane's neck."[180] "The passengers contend that when Crane, with Roper's gun pointed at him, moved his hand to turn off the car in compliance with Roper's order, Roper shot him, his head fell backwards, the engine revved and the car lurched backward, striking Bowden—by now behind the car—before moving forward and running over Bowden again and speeding off."[181] Ultimately, Roper had shot Crane four times, and he died.[182]

The family of Crane filed a 1983 lawsuit for excessive force. Roper moved for summary judgment based on qualified immunity. While the "district court acknowledged that [the passengers] presented different accounts of when the first shot occurred," it still "found that 'a reasonable jury could not believe [the passengers'] account of the shooting.'"[183] The Court dismissed the case based on qualified immunity. The family appealed.

On review, the Court reversed the District Court. The Court first reviewed the use of force factors the Supreme Court established in *Graham v. Connor*.[184] These factors are: "the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest." And while "While all factors are relevant, the "threat-

---

[180] *Id.* at 160.
[181] *Id.*
[182] *Id.*
[183] *Id.* at 461.
[184] *Id.* at 463 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

of-harm factor typically predominates the analysis when deadly force has been deployed.'"[185] Regarding this factor, the Court found it particularly persuasive that the plaintiff "was shot while unarmed with Roper's arm around his neck."[186] Combined with a that, "from his position, Roper could see if Crane was reaching for a gun, as could the other officers outside the vehicle, yet none of them—including Roper—reported a suspicion of a weapon."[187] Roper also asserted that the threat came from the car, but the Court found that this was a "question for the jury."[188] In reviewing this factor, the Court also weighed that the other officers had "deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[189]

In reviewing the remaining to factors, the Court noted that they "do not weigh as heavily upon our analysis, they yet demand attention."[190] The Court explained that deadly force is not appropriate for an "unconfirmed felony probation violation warrant and multiple confirmed misdemeanor warrants."[191] And third, the Court found that "it was not reasonable for Roper to believe that Crane was attempting to

---

[185] *Id.* (citing *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017) (per curiam)).
[186] *Id.*
[187] *Id.* at 464.
[188] *Id.*
[189] *Id.*
[190] *Id.* at 465 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 408 (5th Cir. 2021)).
[191] *Id.*

flee or that any such attempt to do so posed a threat to life."[192]  As a result, the Court reversed the trial court and remanded the case.

## II.      **The Nicholas Plaintiffs**

With that foundation, Gallegos has made three arguments regarding the Nicholas Plaintiff's excessive force claims. The Nicholas Plaintiffs address each separately.

### 1.      **The Nicholas Plaintiffs have provided significant evidence to show that Medina was not in the house when Gallegos shot her.**

As his first objection to the District Court's order, Gallegos challenges evidence that Medina was not in the house when Gallegos shot Nicholas. This is a factual finding by the Court not a legal review. As a result, this claim is not subject to jurisdiction in this Court as a collateral order.

Regardless, this argument is important because Gallegos has only ever argued to the trial court that his conduct was reasonable based on the claimed threat of Nicholas toward Medina. Gallegos also has made it clear – he aimed at Nicholas and shot her intentionally. As a result, if Medina was not in the house, Gallegos not only lacks credibility, but it also factually disputes his only claimed basis at summary judgment for killing Nicholas.

To make this argument, Gallegos misconstrues the record evidence at

---

[192] *Id.*

summary judgment. To Gallegos, Plaintiffs have predicated their timeline of events – particularly, that Gallegos shot Nicholas after Medina had left the house – only on "approximately 2 seconds of body camera footage during which an individual is visible to the far left (west) side of the house apparently on or near the street."[193] While that image certainly supports the Nicholas Plaintiffs' argument, this is not the sole factual basis for the claim. In contrast, the entirety of the record evidence, including the video, statements, testimony, physical evidence, and the conclusions of experts, all support this scenario.

First, Gallegos has testified under oath - multiple times - he did not shoot Nicholas until (1) **after** Lovings was shot and fell and (2) **after** Pardo/Salazar fall out of the house.[194] Taken as true, this testimony makes it impossible that Gallegos shot Nicholas while Medina was in the house. According to the record evidence, Lovings and Pardo shot a combined 17-19 times prior to falling out of the house, and prior to Gallegos ever firing a shot.[195] Likewise, Medina fired one shot prior to this occurring.[196] Yet by the time Medina and Sepolio had left the house, at most 12-15[197] shots have been fired. Based on the video and the officer's own testimony, Gallegos did not even fire his gun until after Medina left the house.

---

[193] Defendant's Brief at pg. 23.
[194] ROA.10413 at 100:23-101:1 (his deposition); ROA.9723 (his IAD statement).
[195] ROA.10642 at 70:22-71:10 (Salazar shot 8-10 times prior to falling); ROA.12719 at 115:18-116:8 (Lovings shot at least nine times prior to being shot and falling).
[196] ROA.9955 (IAD statement of medina
[197] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:38.3 seconds.

Second, the video shows Gallegos to the left of the door after the first 2-3 shots in the house.[198] Ranger Wolf places Gallegos in this position.[199] The audio captures the sound of guns firing between the 0.35.8 to 0.35.9 mark of the video until approximately 38.2 to 38.3 seconds. In these three seconds, approximately 10-12 shots are fired. Again, consistent with the testimony of the officers, this was Lovings and Pardo. Yet in the middle of that firing sequence – specifically, at the 36.65 mark of the video – the BWC captures the officer that Wolf identified as Gallegos to the left of the door. This is confirmed by Wolf's placement of Gallegos at the front of the house.[200] Put differently, Gallegos is on the wrong side of the house and not in a position to have shot Nicholas. To make Gallegos's timeline accurate, in 1.5 seconds, he must have (1) moved to the other side of the door, in the midst of gunfire; (2) Pardo and Salazar fell down out of the house; (3) Lovings would then is shot; (4) Gallegos gets in position and has his weapon ready; and (5) Gallegos would then have seen Nicholas over Medina and shot her multiple time. It is implausible that this could have occurred in 1.5 seconds. Indeed, according to Gallegos "seconds" had passed, alone, between "Officer Pardo and Officer Salazar exiting the house to

---

[198] ROA at Exhibit "AC," "Ranger Sync of BWC" from 0:34 to 0:36 seconds; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).
[199] ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).
[200] ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).

when [he was] able to visually see Ms. Nicholas."[201] In other words, even half of the necessary chain of events could not have occurred in the 1.5 seconds. And tellingly, by the time the BWC captures the next shot being fired after this sequence, Medina and Sepolio are outside of the house.

Combined with that, only two seconds later – specifically at the 0.40.5 mark of the video – Sepolio had already carried Medina outside of the house and had already almost reached the street.[202]  Meaning,  the timing of Medina exiting the house is also completely implausible, if not impossible, with Gallegos's version of the shooting.  According to Galleglos, in two seconds: (1) Gallegos instructed Sepolio to get Medina out of the house;[203] (2) Sepolio, who was not in the house[204] or the doorway,[205] pushed his way into the house, jumped on the couch, and grabbed Medina; and (3) Sepolio then carried Medina all the way to the street.  Sepolio's explanation of events makes this completely implausible.  According to Sepolio, he was outside the house and heard Gallegos tell him to get Medina.[206]  Sepolio then had to push his way through "multiple people."[207] And "[o]nce [he] gained access

---

[201] ROA.10491 at 178:17-22.
[202] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:40 mark.
[203] ROA.13134 at 75:14-20; ROA.10490 at 177:7-10.
[204] ROA.13134 at 76:8-77:7 (nothing that Sepolio had to "push" through officer to get access into the house).
[205] Logically, Sepolio could not have been in the doorway when Gallegos had shot through the doorway.
[206] ROA.13134 at 75:14-20.
[207] ROA.13134 at 76:8-23.

into the house, [he] forced [his] way in and squeezed into the crowd."[208] Sepolio then saw "Officer Medina on or near the far end of the couch."[209] He then "jumped up on the couch, picked him up and carried him out of the house."[210] This simply could not have occurred in two seconds.

In contrast, Sepolio's testimony makes it clear – he entered the house before Lovings was shot and before Salazar and Pardo fell out of the house. Particularly telling, Sepolio claimed he had to "push" through officer to get into the house. In contrast, under Gallegos's claimed timeline, Sepolio would not have needed to push through any officers to get into the house because (1) Lovings, Pardo, and Salazar had all fallen and (2) Gallegos had just shot through the doorway, so it would have been unobstructed.

Third, as confirmed by Mike Maloney, the bullet that struck Nicholas contained the DNA of Dennis Tuttle.[211]  Meaning, the bullet struck Tuttle, while he was at the doorway, and then fatally struck Nicholas.[212]  It would be implausible – and inconsistent with the testimony of every officer – for Tuttle to have been in the doorway prior to Lovings, Salazar, and Pardo falling out of the house. This is because Lovings, Salazar, Pardo, Sepolio, and even Ashraf would all have been inches from

---

[208] ROA.13134 at 77:4-7.
[209] ROA.13134 at 77:11-12.
[210] ROA.13135 at 82:14-17.
[211] ROA.10122.
[212] ROA.10122.

Tuttle. Instead, this must have occurred after Lovings, Salazar, Pardo, Sepolio, and Medina left the house. As a result, Gallegos could not have shot Nicholas when Medina was in the house.

In addition, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas. Specifically, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[213] (2) the BWC showing that Medina was not in the house;[214] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[215] Instead, Nicholas died on the north side of the couch, not in the area where Medina was located. [216] This is important because at the time of her death, Nicholas was found with her chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[217] She sustained at least two gunshot wounds, including wounds to her right chest and right thigh. The forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[218]

---

[213] ROA.10147.
[214] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)
[215] ROA.10256.
[216] ROA.10148.
[217] ROA.10148.
[218] ROA.12868 at 74:14 – 78:4.

This injury caused Ms. Nicholas's death mere seconds after she was hit.[219]

Furthermore, the entrance wound on the right side of her body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos.  Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[220] Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[221]

Next, the Ranger's report also fatally contradicts' Gallegos's story. In his investigation, Wolf simply assumed that the officers' statements were accurate. Wolf then testified that the there was "no evidence" that the officers "were lying."[222] Yet Wolf – maybe because he noticed the serious inconsistency above – re-ordered the

---

[219] ROA.12868 at 74:14 – 78:4.
[220] ROA.10148.
[221] ROA.10147-10148.
[222] ROA.12710-12711 at 81:24-82:6.

chain of events so that Gallegos shot Nicholas prior to Lovings being shot and Pardo and Salazar falling out of the house. This, however, is not supported by a single officer statement or deposition. It also ignores that Gallegos could not have moved from the left side of the house to the right side of the house in the 1.5 second window, all with enough time to shoot Nichlas. And regardless, this also completely contradicts Officer Gallegos's testimony regarding the timing of when he shot Nicholas – which he claims occurred after Lovings was shot and Pardo and Salazar fell out of the house. Considering that Wolf's methodology was premised on his assumption that the officers' statements were accurate and there was "no evidence" that the officers "were lying,"[223] Wolf's conclusions are contradicted by his own method.

Finally, Gallegos's testimony includes serous contradictions and changes. Combined with the other evidence, the jury should determine whether his claims about the incident are credible. This is particularly true because he has already changed his sworn testimony by claiming that Nicholas grabbed Medina's gun.[224] As a result, he cannot claim his conduct was justified based on a threat to Medina.

## 2. **Plaintiffs have presented a chain of events that is consistent with the factual record**

---

[223] ROA.12710-12711 at 81:24-82:6.
[224] *Compare* ROA.9743 (Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**.") *with* ROA.10415 at 102:20-103:7 (Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself.").

Next, Gallegos argues that the "theory that Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle is too implausible to support summary judgment." This is incorrect.

At its core, Defendants appear to argue there is a conflict between Mike Maloney's opinion and Officer Gallegos's testimony that he saw Nicholas and intentionally shot her. But Gallegos ignores the actual record from Maloney. Maloney has not opined on the intent or state of mind of Gallegos. But Maloney did testify about the line of vision of Gallegos – specifically that he did not have a "good view" or "thorough view" of her at the time he pulled the trigger.[225]  He further testified that he "can't exclude" that Gallegos saw Nicholas.[226] Combined with this, Gallegos has repeatedly admitted that he intentionally shot Nicholas.[227] As a result, whether he had a "good view" or "thorough view" of her at the time he pulled the trigger, there is no dispute that Gallegos aimed at Nicholas and shot her.  Indeed, Gallegos testified that he saw his bullet strike Nicholas's body.[228]

While ignoring Maloney's testimony, Gallegos then pivots to an argument he never raised to the trial court. Specifically, he argues that there is no evidence whatsoever that Nicholas "was acting in a manner that would dispel the natural

---

[225] ROA.11952 at 135:3-21.
[226] ROA.11952 at 135:3-21.
[227] ROA.10493 at 180:11-15.
[228] ROA.10493 at 180:11-13.

assumption that—as multiple wounded officers emerged from her house—she posed a threat." This argument should be rejected because it was not raised and is therefore waived.[229] Regardless, this argument also requires the Court to ignore the rest of the factual evidence necessary for this finding. Meaning, if Medina was not in the house, then Gallegos has repeatedly committed perjury about what happened in the house. That lack of credibility alone is enough to rebut any objective claim that he acted reasonably in shooting Nicholas, even if Medina was not there. This further ignores that Gallegos testified his "only reason" to determine that Ms. Nicholas was a threat was "the fact that if she could get ahold of his shotgun and shoot or finish or kill Officer Medina, I had to stop that before it happened."[230]

As a result, the testimony of Gallegos establishes that Ms. Nicholas was not a threat to anyone, absent his claim that she posed a threat to Medina. Plaintiff has sufficiently rebutted that she posed a threat to Medina. Therefore, Ms. Nicholas was not a threat to anyone when Gallegos intentionally shot her.

### 3. **Gallegos's conduct was objectively unreasonable when he shot and killed an unarmed woman who was not threatening him.**

Finally, Gallegos asserts another claim that he never made to the trial court – regardless of his intent, his conduct was still objectively reasonable. Again, this

---

[229] *Celanese Corp.,* 620 F.3d at 531.
[230] ROA.10493 at 180:8-10.

argument was not presented to the trial court and is therefore waived.[231]

Regardless, Plaintiff's argument is not solely based on the intent of Gallegos. Rather, this evidence is based on a thorough evaluation of the *Graham* factors. First, regarding "the most important . . . factor in determining the objective reasonableness of an officer's use of force" – whether she posed "an immediate threat to the safety of the officers or others," at the time Gallegos shot her,[232] Gallegos can only point to a lie to justify his shooting: his claim that she posed a threat to Medina. This factor "typically predominates the analysis when deadly force has been deployed."[233]

Importantly, by the time that Gallegos saw Nicholas, Medina was not in the house, and Nicholas sat on the far south end of the couch. The only threat that Gallegos has alleged? The made-up story that Nicholas reached for Medina's gun. Specifically, Gallegos claimed his "only reason" for shooting Nicholas was "that if she could get ahold of his shotgun and shoot or finish or kill Officer Medina, I had to stop that before it happened."[234] Yet besides this fabrication, Gallegos has not identified any legitimate sign of threat that Nicholas could have shown. In contrast, Nicholas was on the back of the couch and unarmed.[235] This is not a threat that can justify deadly force. Combined with that, just like *Crane*, here, "officers deliberately,

---

[231]  *Celanese Corp.,* 620 F.3d at 531.
[232]  *Graham*, 490 U.S. at 396.
[233]  *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021).
[234]  ROA.10493 at 180:8-10.
[235]  ROA.10148 – 10149; ROA at Exhibit "AC," "Ranger Sync of BWC."

and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[236]  Specifically, Medina, the officer who confronted Nicholas, confirmed – he "didn't see the need for deadly force" based on the actions he saw.[237]

Similarly, there is no evidence that Nicholas "was actively resisting or trying to evade arrest by flight."[238] Indeed, at best, Nicholas was in "shock" or "surprised."[239] As Officer Ashraf explained – "[t]hat's the typical reaction when we conduct a search warrant, shock."[240] At the initial interaction, Officer Medina made it clear – he "didn't see the need for deadly force."[241] Furthermore, at the time Gallegos shot her – the pertinent time for this evaluation – there is absolutely no evidence that Nicholas was resisting or evading. While, here, Nicholas was certainly screaming, that does not justify the use of deadly force. After all, she was the victim of an unlawful home invasion in which officers wrongfully broke down the door of her home and began shooting.

Third the "severity of the crime" factor also does not justify shooting Nicholas. The warrant was admittedly fraudulent.  Nicholas had not committed any crime. This factor strongly favors Nicholas. But regardless, even if the warrant was

---

[236] *Crane*, 50 F.4th at 464.
[237] ROA.11144 at 104:19-25.
[238] ROA.11144 at 104:19-25.
[239] ROA.11039 at 44:15-16.
[240] ROA.11039 at 44:15-16.
[241] ROA.11144 at 104:19-25.

legitimate, drug related crimes do not justify shooting Nicholas. Instead, at the time that Gallegos shot her, (1) Gallegos gave her no warning,[242] (2) she was unarmed, (3) she was not threatening Medina,[243] and (4) she was shot through all four chambers of her heart. As a result, "[a] jury could reasonably find that the degree of force the officers used was not justifiable under the circumstances."[244]

In addition to the *Graham* factors, serious credibility issues regarding the testimony of Gallegos and other officers "is crucial to the determination of whether a reasonable officer in [Gallegos's] position could have reasonably believed that [Nicholas] posed a threat of serious harm."[245] This includes:

- Gallegos's change in sworn testimony that Nicholas did not touch Medina's weapon to his new claim Nicholas grabbed the gun;[246]

- The inconsistency between Gallegos's testimony that he shot and killed Nicholas after Lovings, Pardo, and Salazar fell, in contrast to the Ranger's conclusions that it occurred prior to that;[247]

- The video evidence showing Gallegos away from the door to the left of the house and not in his shooting position prior to Medina reaching the street;[248]

- Gallegos's inability to identify where the bullets struck Rhogena Nicholas

---

[242] ROA.10421 at 108:3-11; 109:7-19.
[243] ROA10147-10148; Moreover, Plaintiff has previously detailed that Medina was not in the house.
[244] *Crane*, 50 F.4th at 465.
[245] *See e.g. Geiger v. Monroe County,* No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19. (N.D. Al. June 18, 2018).
[246] *Compare* ROA.9743 (Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**.") *with* ROA.10415 at 102:20-103:7 (Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself.").
[247] *Compare* ROA.13029-13030 (stating Gallegos shot Nichols prior to Lovings, Salazar, and Pardo's fall) *with* ROA.10415 at 102:10-25 and at ROA.10421 (Gallegos shot Nicholas)
[248] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43.

and the inconsistency between his story and trajectory of the fatal bullet;[249] and

- The forensic evidence that Nicholas was struck and killed, while on the north side of the couch, not near Medina's prior location.[250]

Put simply, there are substantial factual contradictions that show Nicholas was unarmed and not threatening. Yet Gallegos shot and killed her.

## III.   Gallegos violated the Fourth amendment right of Tuttle when he shot and killed him after he was incapacitated.

Next, Gallegos also challenges that he engaged in excessive force against Tuttle. At the trial Court, Tuttle focused on the final two shots from Gallegos that caused his death. The first, to his buttocks through his chest to his chin.[251] The second is directly to the back of his head.[252]

As a threshold matter, simply because Tuttle had a gun does not justify excessive force – particularly because (1) Police officers fired their guns first at dogs (and struck another police officer),[253] and (2) at the time that Gallegos shot him in the back of the head, Tuttle did not have a weapon.[254] Federal Court precedent makes it clear – "a police officer may not use deadly force against a non-threatening

---

[249] *Compare* ROA.10148-10149 (Maloney stating "were she over him attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position") *with* ROA.10420  (Gallegos claims Nicholas was "squared up" with him and pulling at the shotgun, yet she is struck in the right side through her left side.)

[250] ROA.10148-10149.

[251] ROA.10148-10150.

[252] ROA.10147.

[253]  Every witness but Lovings, claims that the Police shot first.  In addition, the first human struck was Medina.  And Maloney determined that Medina was hit by an officer. ROA.10148.

[254] ROA.10147- ROA.10149.

individual, even if the individual is armed, and even if the situation is volatile."[255] Indeed, police officers "may not kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they are armed, including in some circumstances in which the suspect has 'committed a violent crime in the immediate past."[256]

A closer look at the *Graham* factors shows that the Court correctly denied summary judgment. First, there is a mountain of evidence that Tuttle did not pose a threat to Gallegos when he executed him.  Tuttle sustained seven bullet wounds prior to the final two shots.[257]  He received shots to both his shoulder and a grazing wound to his right forearm.[258] Following that, Mr. Tuttle "received shots to both arms and hands."[259] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon." [260] Tuttle then had "his back to the door[] and [is] beginning to drop to the floor." As Gallegos yells "shut the f**k up," he shoots  Tuttle in the buttocks/thigh" and the "bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[261] Twenty seconds later, Gallegos then yells "stop moving" and in that same moment

---

[255] *Est. of Aguirre*, 29 F.4th 624, 629; *Curnow*, 952 F.2d 321, 325.
[256] *Harris*, 126 F.3d 1189, 1203-04.
[257] ROA.10146-10150.
[258] ROA.10146-10150.
[259] ROA.10146-10150.
[260] ROA.10146-10150  and ROA.10257.
[261] ROA.10146-10147; ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23;
ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up")

he fatally shoots Tuttle "in the back of his head/neck."[262] Based on these facts, Tuttle (1) no longer had a weapon;[263] (2) certainly did not raise a weapon like Gallegos claimed;[264] (3) was not facing Gallegos like he claimed;[265] and (4) Gallegos shot him in the back of the head.[266] Tuttle did not pose an immediate threat to Gallegos or anyone.

Again, the "severity of the crime" factor also does not justify shooting Tuttle. The warrant was admittedly fraudulent. Combined with that, the first bullets – namely, the shooting of his dog and the shooting of Medina – were fired by HPD officers Medina and Lovings. And under Texas Penal Code 9.31(c), Tuttle was entitled to defend himself and his wife from the illegal entry and excessive force by HPD. This section states:

> The use of force to resist an arrest or search is justified: (1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.[267]

In other words, even when Tuttle shot Lovings – whether it was the 20th bullet fired or the 4th bullet fired – Tuttle did not commit a crime. Rather, Tuttle instead was

---

[262] ROA.10146-10147.
[263] ROA.10146 and ROA.10257.
[264] ROA.10146.
[265] ROA.10146-10147.
[266] ROA.10146-10147.
[267] Texas Penal Code Section 9.31(c).

defending his family from unlawful search and excessive deadly force. Therefore, even viewing the totality of the unlawful home invasion, the severity of the crime factor supports in favor of Tuttle. But certainly, when limited to the final two shots, Tuttle – who had not committed any unlawful act – could not have posed any lethal threat because he could not have held a weapon.

Furthermore, Gallegos assumes – despite no evidence – that Tuttle and Nicholas knew that the group storming their house were police officers. The record contradicts this. First, it was dark in the house. Pardo described it as: "black" inside, the "residence was just dark," and it wasn't lit up, it was dark in there."[268] Sepolio also recalls that "it was real dark."[269] The officers wore dark military style uniforms with dark lettering.[270] As stated under oath by Lieutenant Billy Milan: "entry into the home would be made without any…announcements to the occupants (and) it is reasonably foreseeable that the homeowners would be surprised (and) could be concerned that a burglary was taking place…"[271] Furthermore, the BWC footage does not capture any officer announcing themselves.[272]

As a result, this evidence contradicts that the officers ever announced themselves, much less that Tuttle or Nicholas heard or appreciated it under the

---

[268] ROA.10131, 10133.
[269] ROA.9845.
[270] ROA.9771-9780.
[271] ROA.9615-9516.
[272] ROA at Exhibit "AC," "Ranger Sync of BWC."

terrifying circumstances. Ranger Wolf describes the concept of "auditory exclusion" which occurs in critical incidents.[273] In critical incidents an officer is not going to hear things like commands because "the auditory side of their brain shuts down."[274] Particularly at the summary judgment stage, a juror could certainly conclude that Tuttle and Nicholas would suffer the same auditory deficit. In short, there is ample evidence that Tuttle thought he and his wife were being attacked by criminals and he fired justifiably in self-defense.

Third, at the time that Gallegos shot Tuttle in the back of the head and thigh/buttocks, he was not actively resisting or trying to evade arrest by flight.[275] Again, Tuttle was on the ground, he could not have held a gun, and facing the floor.[276] Gallegos gave him no warnings or commands besides yelling "shut the f**k up."[277] With this record, in that moment, Tuttle could not have resisted or evaded arrest.

To avoid this evidence, Gallegos asserts three arguments. Each fail to show that deadly force was justified. First, Gallegos claims that Tuttle had shot officers, waived his gun, and threatened to shoot officers.  This, however, ignores the testimony of Maloney and Bux that makes it clear – Tuttle could not have held a

---

[273] ROA.12719 at 115:23 -116:3.
[274] ROA.12719 at 115:23 -116:3.
[275] *Crane*, 50 F4th. At 463.
[276] ROA.10146-10150.
[277] ROA.10457 at 144:4-14.

gun, much less threaten an officer with a gun prior to the final two shots.[278] And the relevant review is based on the time period that Gallegos shot him – not alleged conduct prior to the shoot. Gallegos was not entitled to execute Tuttle when he was incapacitated.

Second, Gallegos's testimony is filled with contradictions and lies. Indeed, this is important because this evidence is "crucial to the determination of whether a reasonable officer in [his] position could have reasonably believed that [the plaintiff] posed a threat of serious harm."[279] Particularly, in this case, where Gallegos lied about Nicholas grabbing the gun, Medina being in the house, Nicholas's position, and Tuttle pointing a gun at him, once Dr. Bux confirmed Tuttle could not have held a weapon.

Third, Gallegos argues that Tuttle – at that point, unable to hold a gun, laying on the ground with severe wounds and not facing Gallegos – was still a threat. This claim simply ignores that Tuttle had been incapacitated by the shots. And the Fifth Circuit has made it clear – "a passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."[280]

This case is particularly similar to the Fifth Circuit's decision in *Mason v.*

---

[278] ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23; ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up").

[279] *Geiger*, No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19.

[280] *Lytle*, 560 F.3d 404, 413; *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

*Lafayette City-Parish Consolidated Government.*[281] In that case, officers responded to an armed robbery at an apartment.[282] During a standoff, an officer unleashed a dog on the suspect, after he saw a gun. The officer then alleged that the suspect reached for a gun when the dog attacked him.[283] The officers shot him five times.[284] After those shots, the suspect lay incapacitated on the ground. After claiming he saw additional movement reaching for the gun, an officer shot him two more times.[285] The suspect's girlfriend disputed this: testifying that  he only lifted his head and put it back down.[286] Similarly, the plaintiff's expert testified that it would have been painful and ineffective for the suspect to move his arm.[287] Based on this, the Fifth Circuit denied the officer's claimed qualified immunity based on those factual disputes.

Just like *Mason*, Tuttle – a disabled United States Navy veteran – was incapacitated after the first 7 shots.[288] He had a prior injury and already had a bandaged hand before he was shot repeatedly.[289] Gallegos's testimony is contradicted by the ballistic evidence showing that Tuttle was shot in the back of the

---

[281] 806 F.3d 268 (5th Cir. 2015).
[282] *Id.* at 271.
[283] *Id.* at 274.
[284] *Id.*
[285] *Id.*
[286] *Id.*
[287] *Id.* at 277.
[288] ROA.10146.
[289] ROA.10438-10439 at 125:23-126:2 (confirming his hand was previously bandaged before the shooting).

head and not facing him. Exactly like *Mason*, factual issues preclude summary judgment on this excessive force claim.

## IV.     <u>Qualified immunity</u>

Finally, Defendant also challenges that the right of Tuttle and Nicholas were clearly established at the time of the shooting. Under the second prong of the qualified immunity test, the Court must determine whether the constitutional right was clearly established within the specific context of the case.[290] "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[291] This does not mean that the very conduct in question has been previously held unconstitutional.[292] There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[293]

First, regarding Nicholas, when addressing the shooting of unarmed, non-dangerous people, there is no doubt – "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead."[294] Fourth Amendment cases "clearly establish—and did so by January 2019—that an officer may not shoot unarmed individuals who pose no threat of danger.[295] Indeed, this circuit has already denied

---

[290] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).
[291] *Reichle*, 566 U.S. 658, 664.
[292] *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009).
[293] *Ashcroft*, 563 U.S. 731, 741.
[294] *Releford*, 678 F. App'x 267, 268.
[295] *Garner*, 471 U.S. at 11.

qualified immunity related to the same facts as pleaded in her complaint.[296]  Based on the facts, as presented by Nicholas, Gallegos shot her, when she was not a threat and was simply sitting on a couch.  This alone is enough to show that her right was clearly established.

Second, as explained in more detail above regarding the excessive force deprivations, Tuttle had a clearly established right not to be executed after he was incapacitated. As the Fifth Circuit explained "after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force."[297] Indeed a slew of cases address and hold that Tuttle's right was clearly established and Gallegos's conduct was unlawful.[298] In other words, Defendant attempts to distinguish these cases by pointing to the chain of events prior to Tuttle's incapacitation. But that is of no moment for this analysis because the right is clearly established, once a person is incapacitated and unable to be a threat.

## CONCLUSION

---

[296] *Tuttle v. Sepolio*, 68 F4th 969, 974 (2023).

[297] *Roque*, 993 F.3d 325, 336 (citing *Lytle*, 560 F.3d 404, 413).

[298] *Graves v. Zachary,* 277 F. App'x 344, 348 (5th Cir. 2008) ("Merely having a gun in one's hand does not mean per se that one is dangerous.");  *Roque*, 993 F.3d 325, 336; *Lytle*, 560 F.3d 404, 413); *Baker v. Coburn,* 68 F.4th 240, 251 (5th Cir.  2023)(finding that, an officer who continued to shoot at a suspect's vehicle as it drove away, after the immediate threat had ceased, could support a finding that the use of force was unreasonable); *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (holding that "the jury needed to determine what sequence of events occurred, and, in particular, whether Snyder had a gun—or, if he did not actually have a gun, whether Trepagnier reasonably believed he did."); *Robinson v. Nolte*, 77 F. App'x 413, 414 (9th Cir. 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had a gun in his lap).

For all the reasons identified in this objection, Plaintiffs request that court reject jurisdiction over this appeal and remand this case to the Trial Court.

*/s/ Jeffrey Avery*

Michael Patrick Doyle
Patrick M. Dennis
Jeffrey I. Avery
Patrick Doyle
DOYLE DENNIS AVERY LLP
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Email: service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com
Attorneys for the Nicholas family

Michael T. Gallagher
L. Boyd Smith, Jr.
Pamela R. McLemore
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705
Facsimile:  (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
pamm@gld-law.com

Attorneys for the Tuttle family

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Rule 32(a)(7)(B), because excluding the parts of the document exempted by Rule 32(f), it contains 12,988 words. This document complies with the typeface and style requirements of Rules 32(a)(5)-(6) because it has been prepared in a proportionally-spaced, Times New Roman typeface, using Microsoft Word in 14-point size text.

## **CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 14th day of October, 2025 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.

*/s/ Jeffrey I. Avery*
Jeffrey Avery

## JURISDICTIONAL STATEMENT

This Court lacks jurisdiction under the collateral order doctrine. Specifically, the issues in this brief are either factual disputes outside of the Court's jurisdiction or were not properly raised first before the District Court.[1] Under the collateral order doctrine, a defendant can file an interlocutory appeal of the denial of qualified immunity, but only where such an appeal involves purely legal issues.[2] In contrast, "in an interlocutory appeal [this Court] cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."[3] Put differently, "questions regarding sufficiency of the evidence are not 'separable' from the underlying merits of the case for purposes of the collateral order doctrine."[4]

To meet this standard, a defendant must assume the truth of the opposing party's version of events.[5] But Gallegos spends nearly his entire brief disputing the factual evidence presented by Plaintiffs. This alone is fatal.

Plaintiffs recognize that a legal question can exist about whether a particular

---

[1] *Johnson v. Jones*, 515 U.S. 304, 307 (1995); *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004).

[2] *Behrens v. Peltier*, 516 U.S. 299, 310-11 (1996); *Johnson*, 515 U.S. 304; *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985); *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017).

[3] *Kinney*, 367 F.3d at 347.

[4] *Id*. at 347 n. 9 (citing *Johnson*, 515 U.S. at 313-17).

[5] *See Mitchell*, 515 U.S. at 528; *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010); *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001).

dispute is material.[6] But to challenge materiality, the defendant must "'contend[] that 'taking all the plaintiff's factual allegations as true no violation of a clearly established right was shown.'"[7] Even assuming Gallegos has attempted to meet that standard on appeal, Gallegos never raised this argument at the trial court.  As a result, any such argument would be waived.[8]  This Court has been careful to police defendants who attempt to challenge the "materiality" of the facts on appeal. This is the precise type of case where an additional level of review should be denied. Even more so, this Court already denied an appeal at the motion to dismiss stage regarding qualified immunity.

        As a result, the Court should deny jurisdiction over this appeal and remand this case.

## STATEMENT OF THE CASE

### 1.  Background before HPD's armed home invasion

        Three weeks before the deadly attack, the Houston Police Department first targeted 7815 Harding Street. On January 8th, Officers Morales and Blankenship-Reeves went to the house in response to an anonymous 911 call. The caller claimed that her 24-year-old daughter was inside the home doing heroin with a woman named

---

[6] *Good*, 601 F.3d at 397- 98.

[7] *Reyes v. City of Richmond*, 287 F.3d 346, 351 (5th Cir. 2002) (quoting *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir. 1996)); *Winfrey v. Pikett*, 872 F.3d 640, 643 (5th Cir. 2017) (applying Reyes to dismiss an appeal for lack of jurisdiction).

[8] *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010)(holding that "arguments not raised before the district court are waived and will not be considered on appeal.")

"Reggie." This call was objectively false, and the caller, Patricia Garcia, later pleaded guilty to federal crimes. That night, both officers made no contact with anyone in the house and did not notice any dogs or observe any activity in the residence at all.[9]

Following that evening, Blankenship-Reeves passed on a note she prepared about the call to fellow Lieutenant Marsha Todd – Blankenship-Reeves's significant other.[10] Todd then passed this tip to Officer Gerald Goines – a member of HPD's Narcotics Squad 15. Specifically, she told him she "[n]eed[ed] a favor" for a "case worked on a house," and she knew he would "do it right."[11] She then wrote "Heroin."[12]

For Goines and Squad 15, the timing of this tip was a lucky break – it gave them an opportunity to have a "picture day" in full uniforms prior to the departure of Officer Gallegos, who planned transfer to SWAT the next week.[13] By January 28, Goines had lied to a judge to secure the no-knock warrant to raid the home of unsuspecting Nicholas and Tuttle later that evening.[14] Goines committed perjury by concocting a false story that a CI had gotten drugs from Tuttle. In other words, the warrant was based solely on lying under oath. Goines was later convicted of felony

---

[9] ROA.10736 at 10:16 – 11:7; ROA.10749 at 23:4-18; ROA.10672 at 26:21 - 29:12.
[10] ROA 10702 at 146:7 – 149:1.
[11] ROA.12619 at 55:7-23; ROA.12622 - 12623 at 69:23 – 70:15.
[12] ROA.12619 at 55:7-23; ROA.12622 - 12623 at 69:23 – 70:15.
[13] ROA.10060.
[14] ROA.9540; ROA.10548 at 14:12 – 15:12.

murder.

## 2. __The approach to the house for HPD's unlawful armed home invasion__

As 5:00 PM approached on January 28th, Squad 15 drove to 7815 Harding in their van. None of the members of Squad 15 had body worn cameras ("BWC"). And while the officers in the perimeter – Nicole Blankinship-Reeves, Richard Morales, Samuel Garza, Valeriano Rios, and Yvette Ortiz – all had BWCs, they failed to activate their BWC as they exited their vehicles, as required by HPD policy.[15] Instead, Morales activated his BWC as Squad 15 made entry into the house – this is the first audio of the approach.[16] Rios activated his BWC after he took cover behind a truck.[17] Blankinship, Garza, and Ortiz activated their BWCs after the shooting had ended.[18] Ultimately, HPD determined that these five officers violated HPD policy by failing to properly and timely activate their BWCs.[19]

While incomplete, the available footage paints a tragic picture. As Squad 15 approaches 7815 Harding Street, they assemble a "stack" of Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Reyna, Goines, and Wood.[20] As Morales activates his BWC, a loud bang echoes – either the first gun shot or the

---

[15] The BWC at HPD has a two-minute buffer of video only. Meaning, once Morales and Rios turned on their BWC, the video buffered the prior two minutes without sound.
[16] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 27 second mark of the video; *see also* ROA.9532-9533.
[17] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 43 second mark of the video; *see also* ROA.9532-9533.
[18] ROA.9532-9533.
[19] ROA.9532-9533.
[20] ROA.13000.

breaching of the door.[21] Medina forces his way into the house first, followed by Lovings, Salazar, and Pardo – all four with guns out.[22]

Within the next eight seconds, Medina fires his shotgun at the family dog.[23] Lovings also shoots at the dog at least twice.[24] Without hearing the sound of another gunshot,[25] Medina is then hit by a bullet or bullet fragment from Lovings.[26] As Rios runs to take cover behind a blue truck in front of the house, he turns his BWC toward the front of the house. This view shows Felipe Gallegos standing to the back left of the door – as shown circled in red.[27] Lt. Wolf, the Texas Ranger who investigated the shooting, also admits Gallegos's positioning.[28]



---

[21] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:27 of the video.
[22] ROA.13028.
[23] ROA.11129 at 45:18-22; *see also* ROA at Exhibit "AC."
[24] ROA.10048-49.
[25] ROA.11130 at 46:5-6.
[26] ROA.10148.
[27] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35.
[28] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf.  Ranger Wolf specifically identified Gallegos's position).

In the next 4-5 seconds, ten to twelve shots are fired – Salazar and Lovings fire most, if not all, of those shots.[29] Specifically, Salazar testified that he fired eight to ten shots before he fell outside of the house.[30] Lovings also fired at least nine times during the attack.[31] And undisputedly, these shots occurred before Lovings fell from a gunshot to the neck.[32]

In the middle of that sequence – approximately six seconds after Rios begins to retreat to the truck – Sepolio pulls Medina outside of the house and reaches the street. [33]



---

[29] ROA at Exhibit "AC," "Ranger Sync of BWC" at :35- 0:39.
[30] ROA.10641 at 70:22-71:10.
[31] ROA.12719 at 115:18-116:8.
[32] ROA.12729 at 116:9-23.
[33] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)

Based on their location, Sepolio grabbed and carried Medina from the house at or near the time of the series of shots by Salazar and Lovings.[34] As Rios reaches the truck, he briefly lifts his BWC toward the front of the house.[35] In this short snippet, Medina and Sepolio are behind the van, and a short sleeved, tattooed Gallegos[36] stands to the far left and away from the house.



During this time, the BWC captures four to five more shots.[37] Again, these shots are consistent with firing by Lovings and Salazar. At that same timestamp, Gallegos

---

[34] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015.
[35] ROA at Exhibit "AC," "Ranger Sync of BWC" from 0:43.
[36] This particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves at ROA.10051; (2) his mask matches the mask that Gallegos was wearing that night; ROA.10051; (3) the photo appears to show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house. Regardless the photo itself is not necessary for Plaintiff to prove that Gallegos's version of events is false.
[37] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:41-0:46.

7

starts to move forward from his outside location towards the house, with Medina already outside the home.[38]  In the following seconds, glass breaks and an someone – likely Lovings – screams in pain.[39]

### 3.  <u>Gallegos murders Nicholas and lies to justify his homicide.</u>

For the remaining portion of the attack, the BWC does not capture a visual of the house, and instead merely provides audio of screams and gunshots. But the available evidence still reveals the sequence of events. After Gallegos hears the "gunfire exchange going on inside the residence,"[40] – the shots fired by Lovings and Salazar – Gallegos moves to the "right of the front porch."[41] He then sees "Officer Salazar and Officer Pardo fall backwards off the front porch."[42] Per Gallegos, Lovings then drops in the doorway.[43]

At that moment – after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot – Gallegos finally sees inside the house.[44] At that point, he spots Ms. Nicholas and shoots her without warning.[45]  To justify this homicide, Gallegos swore he saw Nicholas "grabbing with both hands tugging at the shotgun" and "standing over Officer Medina tugging at his shotgun

---

[38] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:46.
[39] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:47-0:49.
[40] ROA.10412 at 99:10-16.
[41] ROA.10409 at 96:20-97:3.
[42] ROA.10412 at 99:12-17.
[43] ROA.10413 at 100:23-101:1.
[44] ROA.10415 at 102:10-25.
[45] ROA.10421-10422 at 108:3-11 and 109:7-19.

that is slung to his vest saying, Motherf****r, motherf****r."[46]  According to him, Nicholas was not "exactly squared up with" him, but "at an angle."[47]  He admits that he shot her in the "upper torso area"; but he "can't . . . pinpoint exactly where they hit, but [he] saw [his] rounds actively hit her."[48]  He further could not even identify whether the bullets struck her left side or right side.[49]  But this version from Gallegos flags two incredible inconsistencies – (1) where was Medina at the time that Gallegos shot Nicholas and (2) how did Nicholas sustain a fatal bullet wound to her right side of her body?

The answer to the first question is easy – Medina and Sepolio were already outside of the house on the street by the van. Officer Gallegos lied about Medina's location and Nicholas grabbing the gun to justify the murder.

Forensic evidence answers the second question. As confirmed by NCIS forensic investigator Maloney, Nicholas died on the north side of the couch, not in the area where Medina was located. [50] This is important because at the time of her death, Nicholas was found with her chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[51] She sustained at least two gunshot wounds, including wounds to her right chest and right thigh. The

---

[46] ROA.10415, 10418-10419 at 102:10-25; 105:25-106:3.
[47] ROA.10420 at 107:24-108:2.
[48] ROA.10421 at 108:12-21.
[49] ROA.10493 at 180:16-19.
[50] ROA.10148.
[51] ROA.10148.

forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[52] This injury caused Ms. Nicholas's death mere seconds after she was hit.[53] The entrance wound on the right side of her body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos. Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[54] Furthermore, Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[55] In other words, Gallegos shot and killed Nicholas, while she sat on the north end of the couch. And he did with Medina

---

[52] ROA.12868 at 74:14 – 78:4.
[53] ROA.12868 at 74:14 – 78:4.
[54] ROA.10148.
[55] ROA.10147-10148.

outside the home.

**4. Gallegos murders Tuttle by shooting him in the back of the head and lies about what happened to justify his homicide**

As Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house.[56] Gallegos then shoots into the side of the house. He then circles to the tree in front of the door.[57] In the next flurry of shots from Gallegos, Reyna is hit with bullet fragments and Goines is hit in the face. Both of those shots came from a .223 – meaning, Gallegos, the only officer shooting at .223 during this period, shot Reyna and Goines.

During the attack, Tuttle sustained nine total bullet wounds. First, "[h]e received shots to both his shoulder and a grazing wound to his right forearm.."[58] Following that, Mr. Tuttle "began to turn away from the door," but "[a]s he turned he received shots to both arms and hands."[59] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon."[60] Maloney and Dr. Bux's opinions are supported by photographs of Tuttle's wounds taken at the scene and at the morgue. While graphic, these photos further make it clear – Tuttle could not have held a gun.

---

[56] ROA.10148 ("The fatal shot to her torso first grazed the arm of Dennis Tuttle")
[57] ROA.13016 ("05:28:32 Gallegos is seen taking cover behind a tree in the front yard (CH2)(Officer is in black short sleeve shirt), and Sgt. Reyna or Sgt. Wood is heard yelling "I'm hit".)
[58] ROA.10149.
[59] ROA.10149.
[60] ROA.10149.



In addition the five bullets that ripped through his body and his pre-existing right wrist injury (and wrist brace), the AR-15 shots caused catastrophic damage to his wrist.[62] The bullet ripped apart bones, tendons, ligaments, and muscle in his dominant, right wrist.[63] Combined with that, Tuttle's left arm and hand sustained gruesome, catastrophic injuries.[64] It is simply inconceivable that anyone with injuries like Tuttle's could grasp, hold, lift, raise, aim, and or fire a pistol at anyone. At a minimum, there is genuine factual evidence that Tuttle could not.

Disabled from his wounds, Tuttle then had "his back to the door[] and [is] . . . drop[ping] to the floor."[65] In the next 10-20 seconds, Lovings, who is still near the doorway, tells Gallegos he needed to take a head shot.[66] And at the top of his lungs, Gallegos yells "shut the f**k up," and shoots Tuttle in the buttocks/thigh.[67] "A single

---

[61] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[62] ROA.9673-9691.
[63] ROA.9673-9691.
[64] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[65] ROA.9637-9650; ROA. 9652-9671; ROA.9673-9691.
[66] ROA.11213 at 46:20-23.
[67] ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23; ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up").

12

bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[68] A full twenty seconds later, as the unarmed Tuttle puts his body weigh on "his upper body by his elbows,"[69] Gallegos fatally shoots Tuttle "in the back of his head/neck."[70] Gallegos screams "stop moving" after that shot.[71] Tuttle then "collapses to the floor partially on his right side and remains in that position."[72]


[73]

Tuttle's gun is later found under a heater.[74] Put simply, Gallegos murdered Tuttle when he was unarmed – at that point, he was incapable of holding a gun – by shooting him in the back of the head.

### 5. Squad 15's evolving version of the armed home invasion and shooting at 7815 Harding Street

Following the unlawful home invasion, HPD's policy – indeed, the policy that

---

[68] ROA.10148.
[69] ROA.10148.
[70] ROA at Exhibit "AC," "Ranger Sync of BWC" 01:46- 01:48 (stop moving yelled); Pls. Ex. F ROA.10457 at 144:16-17 (confirming that Gallegos said "stop moving")
[71] ROA.10148; ROA.10456-10457.
[72] ROA.10148; ROA.10456-10457.
[73] ROA.10137.
[74] ROA.10140.

encourages excessive force – entitled the Squad to special investigative treatment. Combined with this review of evidence, many of the officers then reported "tunnel vision" during the events.[75] Medina – a key potential witness to the shooting of Nicholas – even claimed he was knocked unconscious during the home invasion.[76] But strangely, even though they were each entitled to review prior statements and evidence, the Gallegos's statements still included changes in his sworn testimony that contradict his prior sworn statements.   Specifically Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**."[77] Yet at his deposition: Gallegos testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself."[78] No fingerprints were taken of the gun.[79]   Similarly, in his second homicide statement, Officer Gallegos testified that after he shot Nicholas, he "observed the suspect **fall onto the couch** towards the west wall."   Yet in his deposition, Gallegos backtracked and claimed he saw her "turn and fall **towards** the couch," but he "lost visual because [he] sunk back in behind the wall."[80]

    In addition to shifting testimony, the officers also could not get their stories straight with each other – even when under oath. For example, Medina testified that

---

[75] ROA.10643 at 77:18-21; ROA.11130 at 48:17-20; ROA.9896.
[76] ROA.11137 at 74:7-13.
[77] ROA.9743 ("Did she actually lay her hands on the weapon? A: No.")
[78] ROA.10415 at 102:20-103:7.
[79] ROA.10226.
[80] ROA.10423.

the first shot was to his right – logically, Lovings.[81] Salazar also confirmed that Lovings shot the dog first,[82] while Pardo testified generally that "police officers" fired first.[83] And Gallegos and Sepolio testified that they first heard a shotgun – meaning Medina took the first shot.[84]

Furthermore, the physical evidence also contradicts the officers' testimony. For example, according to Squad 15 officers, Tuttle shot at least 11-13 times during the raid. The only problem? Based on the evaluation of his revolver and the scene, Tuttle shot either three times or four times at most.[85] Expanding on that, at the outset of the shooting, Salazar testified that Tuttle shot at Medina 3-4 times.[86] Following those shots, Sepolio testified, as he was grabbing Medina, he "believe[d]" Tuttle shot "multiple times" at him – meaning, at least two additional shots.[87] Lovings is then shot by Tuttle. After Lovings hits the ground, Gallegos hears "more than one shot" from Tuttle inside the house – meaning at least two more shots.[88] Gallegos then sees Tuttle "shoot" Reyna and Goines from inside the house[89] –another two shots. And finally, according to Pardo, Tuttle actually fired multiple times at Reyna, not

---

[81] ROA.11129.

[82] ROA.9976-9977 .

[83] ROA.13077 at 39:7-11.

[84] ROA.10406 at 93:15-17; ROA.13132.

[85] ROA.10142;  ROA.13064 ("4 fired cartridge cases recovered from Tuttle's pistol")

[86] ROA.10636 at 50:11-50:24.

[87] ROA.13136 at 83:7-16.

[88] ROA.10424 at 111:17-18.

[89] ROA10522; ROA.10431 at 118:1-14.

just one – meaning at least an additional shot.[90] This testimony is inconsistent, contradictory of the evidence, and not credible.

Finally, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas and Tuttle. First, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[91] (2) the BWC showing that Medina was not in the house;[92] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[93] Similarly, while Gallegos claims that Tuttle raised a gun at him prior to the fatal shots of Tuttle, (1) the bullet trajectory shows Tuttle was struck in the back of the head – not facing Gallegos[94] – and (2) the testimony of Dr. Bux, that, "[a]t this point he was incapable of holding a weapon."[95]

**6.** **Consistent with its policy and custom of turning a blind eye, HPD's Internal Affairs ignores critical evidence and inaccurate statement and instead exonerates the officers.**

Despite these incredible contradictions and holes in the evidence, HPD and Chief Art Acevedo cleared the officers of excessive force. Why? Because this is

---

[90] ROA.9979-9980; ROA13082 at 59:18-60:2 (Pardo testified Tuttle shot multiple times, but cannot recall if it was three times).
[91] ROA.10147.
[92] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)
[93] ROA.10256.
[94] ROA.10147 ("on the floor he raises his upper body by his elbows and is fatally shot in the back of his head/neck by Officer Gallegos.")
[95] ROA.10257.

exactly the result that HPD had designed its system to reach.

IAD provided 48-hour notice to the officers. As part of that, IAD provided review of important evidence and testimony prior to any statements.[96] Even with these advantages, HPD prohibited IAD from reviewing an officer's disciplinary history – notably here, from 2011 to 2019, Gallegos had been previously reviewed for six use of force charges, including three prior shootings and three use of force claims.[97] Undisputedly, this process dramatically differed from the investigation of citizens.[98]

Even knowing this background, IAD took virtually no steps to determine if the officers were fabricating their stories – a shocking investigative tactic in light of the serious contradictions with their own testimony and physical evidence.[99] Commander Nguyen, the investigative officer, could not even remember receiving any training to prevent "fabrication or distortion of testimony in an interrogation,"[100] much less ever making a finding in his time at IAD that an officer was untruthful.[101] Even more telling, he could also not even identify a single time from 2017 to 2019 where IAD sustained an officer-involved shooting allegation.[102]   In all, Nguyen

---

[96] ROA.12548.
[97] ROA.96396.
[98] ROA.12550 at 51:7-15.
[99] ROA.12550 at 52 -56.
[100] ROA.12551 at 55:21-56:6.
[101] ROA.12551 at 56-57.
[102] ROA.12551 at 58:8-15.

could not even confirm that it would be dangerous for a police department to authorize a "culture of turning a blind eye to excessive force."[103]    Why could Commander Nguyen not answer such an easy question? Because HPD had created that exact culture.

Nguyen found the shooting in this case justified, and Art Acevedo approved this finding.  To reach this conclusion, Ngueyn exclusively relied on the officers' statements.[104] And while Nguyen testified that "any contradictory statements should be addressed and looked . . . into," the investigation never weighed or addressed any contradictory statements.[105]    Because of this failure, Nguyen, as part of the investigation, never addressed the contradictions including, (1) who shot first; (2) whether Medina was even in the house; (3) whether Nicholas was anywhere near Gallegos claimed; or (4) whether Tuttle was capable of holding a gun.[106] Nguyen, instead, ignored the contradictions, ignored the possibility of fabrication, and simply cleared the officers because of their unsupported claims.

Ultimately, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval

---

[103] ROA.12552 at 60:12-62:9.
[104] ROA.12558 at 85:13-18; 86:4-8.
[105] ROA.12546 at 34:10-18.
[106] ROA.9481-9538.

by supervisors, the Chief of Police."[107] In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force."[108]

**7.  The Ranger investigation utilizes the same flawed pattern of HPD and ignores Gallegos's testimony regarding the sequence of events entirely.**

Following IAD's investigation, the Texas Rangers also investigated the officer involved shooting at the request of the Harris County District Attorney. But just like Nguyen, Lt. Wolf, the assigned investigator, simply assumed that the officers' statements were accurate. Wolf testified that the there was "no evidence" that the officers "were lying."[109]

Ignoring the incredible inconsistencies identified above, Wolf then created an impossible and illogical sequence of events. But in making this sequence, Wolf – likely because he realized that Medina could not have been in the house when Gallegos claimed he was – completely re-ordered the timeline of events.[110] The problem? This directly contradicts Officer Gallegos's testimony, as well as the body camera footage. And if there is "no evidence" that the officers "were lying,"[111] how can Wolf determine that Gallegos shot Nicholas prior to Lovings' being shot and

---

[107] ROA.10233.
[108] ROA.10233.
[109] ROA.12710-12711 at 81:24-82:6.
[110] ROA.13020-13041.  Specifically, at ROA.13030, Wolf determines that Gallegos shoots Nicholas, then Sepolio pulls out Medina, and only then is Lovings shot.
[111] ROA.12710 at 81:24-82:6.

Salazar and Pardo's fall, when Gallegos – under oath three separate times – claimed he shot Nicholas after those events?

To reach this conclusion, Wolf creates a story whole cloth. First, Salazar, Pardo, and Lovings all clear the door after Medina is hit[112] – an alleged finding that is not supported or even claimed by any officer. It is also inconsistent with Sepolio's testimony that he had to "push" his way through "multiple people" and "squeezed into the crowd" to get to officer Medina on the couch.[113] Wolf continues by stating that Gallegos moves from the left side of the house to the right, sees Nicholas when the door clears and shoots her.[114] Sepolio, apparently immune to any bullets, then grabs Medina and makes it to the street in a few seconds.[115] Salazar, Pardo, and Lovings then return to their prior spots and continue shooting at Tuttle, and, in contradiction to Gallegos, then fall outside the door.[116]

This conclusion not only is physically illogical and contradicts every officer's statement, but it also contradicts the BWC and the physical evidence. Again, at the outset of the unlawful home invasion, after three shots, Gallegos stands to the left of the house. Seconds later, Medina is on the street.[117] Yet Gallegos has moved further

---

[112] ROA.13029.
[113] ROA.13134 at 76:15-77:7.
[114] ROA.13030.
[115] ROA.13030.
[116] ROA.13030.
[117] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:30-0:35; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf.  Ranger Wolf specifically identified Gallegos's position).

to the left and back – not to the right side of the house where he shoots Nicholas.[118] Only after Medina is gone, Gallegos then moves to the right of the house.[119] This also explains how Tuttle's DNA is on the bullet that struck Nicholas. Meaning, after Lovings, Pardo, Salazar, and Medina are out of the house, Tuttle was able to move to the front door.  But under the Ranger's timeline? Four to six police officers stood at or near the doorway who would have prevented Tuttle from reaching the door.

The decision to re-order the sequence suggests Lt. Wolf reached these conclusions because he knew that Medina could not have been in the house when Gallegos claims he shot Nicholas.  And as a result, Gallegos murdered Nicholas without any warning, much less any justification.

## 8.  <u>Key Disputed facts and missing evidence</u>

Finally, because this case includes a large record and substantial evidence, there are many disputed issues of fact that preclude summary judgment. But for ease of reference, Plaintiffs have highlighted the following dispositive facts that are disputed:

- Tuttle shot Medina. This is disputed because Maloney has testified that Medina was shot with a .223 (meaning Lovings shot him);[120]
- Tuttle shot Goines. This is disputed because Maloney has testified that Goines was shot with a .223 (meaning Gallegos shot him)[121] and Lt.

---

[118] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43. Again, this particular individual is Gallegos as explained above.
[119] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43.
[120] ROA.10148.
[121] ROA.10148.

Wolf[122] confirmed that the bullet could not be matched based on its damage;

- Tuttle shot Reyna. This is disputed because Maloney has testified that Reyna was shot with a .223 (meaning Gallegos shot him), Lt. Wolf had no "scientific evidence" that Tuttle shot Reyna;[123]

- Nicholas was reaching for Medina's gun and posed a threat to the safety of Medina. This is contradicted by the BWC footage as explained above, Gallegos's testimony about the timeline, and Maloney's testimony that Nicholas was on the other side of the couch and hit in the other side of her body;[124]

- Nicholas was shot on the couch near where Medina had been located. Again, Maloney disputes this location;[125]

- Tuttle held a gun during the final two shots by Gallegos and posed a threat of safety to Gallegos. This is disputed by Dr. Bux and Maloney.[126]

Similarly, HPD also lost or failed to collect key evidence – evidence that could have provided important context to this unlawful home invasion.  This includes:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[127]

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in

---

[122] ROA.12755.
[123] ROA.12759 at 274:7-8.
[124] ROA.10145.
[125] ROA.10145.
[126] ROA.10146-10147; ROA.10257.
[127] ROA.9594.

Lovings rifle," and an "unknown brand of cartridges being fired through the magazine."[128]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[129] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[130] And Chief Art Acevedo ordered the perimeter officers to turn their body cameras off while still on the scene as he was questioning officers at the scene.[131]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south side of the building;[132]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[133]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[134]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating the bullet struck both victims. According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch.[135]

- HPD failed to conduct a "shooting incident reconstruction"[136]

In the underlying case, Gallegos moved for summary judgment. Based on this

evidence, the Court reviewed and rejected Gallegos's motion for summary judgment.

---

[128] ROA.13064.
[129] ROA.12755 at 259:10-260:3.
[130] ROA.9532-9533.
[131] ROA.13239.
[132] ROA.10121.
[133] ROA.10121.
[134] ROA.10121.
[135] ROA.10122.
[136] ROA.10123.

Gallegos has now appealed.

## SUMMARY OF THE ARGUMENT

The Trial Court addressed and rejected Defendant's arguments based on the factual record. Following that, Gallegos's appeal is simply a renewed fight regarding factual disputes outside of the Court's jurisdiction or regarding issues Gallegos did not properly raised before the District Court.[137] As a result, this Court lacks jurisdiction over this appeal and should decline review.[138]

If the Court chooses to delve into the facts, it will review what the District Court already found – there is a slew of factual disputes regarding what happened. Plaintiff has presented a mountain of evidence that contradicts Gallegos's testimony that Medina was in the house when he shot Nicholas. This is not based on the BWC video alone. Rather, it is based on the testimony of the officer, the findings of Maloney and Wolf, and the audio evidence from the video. Put simply, Gallegos's story is implausible, and the Court was correct to reject it.

Next, Gallegos attempts to create another factual dispute – again an issue outside the jurisdiction of this Court – regarding whether "Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle." In effect, Gallegos attempts to argue that Plaintiff's expert opined that Gallegos could not see Nicholas

---

[137] *Johnson*, 515 U.S. 304; *Kinney*, 367 F.3d at 347.
[138] See *Behrens v. Peltier*, 516 U.S. 299, 310-11 (1996); *Johnson*, 515 U.S. 304; *Mitchell*, 472 U.S. at 522.

when he shot her. But at his deposition, Maloney did not make this claim. Rather he testified that he could not exclude that Gallegos saw Nicholas.[139] Maloney only claimed that he did not have a "good view" or "thorough view" of her at the time he pulled the trigger.[140] Because Gallegos repeatedly testified that he intentionally shot Nicholas and saw his bullet strike Nicholas's body,[141] Plaintiff's proffered chain of events is perfectly plausible.

Pivoting from that, Gallegos then attempts to make new arguments that he never raised before the trial court – namely, his claim that regardless of his intent, his conduct was still objectively reasonable. First, this argument was not presented to the trial court and is therefore waived.[142] But regardless, Nicholas detailed that this is simply not the case based on the factual record. Indeed, Gallegos testified that there was no other basis to shoot Nicholas besides the purported threat to Medina. And Plaintiff showed that Medina was not in the house when Gallegos shot her. Likewise, other records evidence makes it clear – Nicholas was simply not a threat. As a result, it was not objectively reasonable to shoot an unarmed women sitting on a couch.

Fourth, Gallegos also shot and killed Tuttle after he was already incapacitated.

---

[139] ROA.11952 at 135:3-21.
[140] ROA.11952 at 135:3-21.
[141] ROA.10493 at 180:11-13.
[142] *Celanese Corp*, 620 F.3d at 53.

Federal Court precedent makes it clear – "a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile."[143] And, police officers "may not kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they are armed, including in some circumstances in which the suspect has 'committed a violent crime in the immediate past.'"[144] And here, as presented in the record, at the time Gallegos killed Tuttle, he (1) no longer had a weapon;[145] (2) certainly did not raise a weapon like Gallegos claimed;[146] (3) was not facing Gallegos like he claimed;[147] and (4) Gallegos shot him in the back of the head.[148] Put simply, Tuttle did not pose an immediate threat to Gallegos or anyone. This is a violation of the Fourth Amendment.

Finally, both for Nicholas and Tuttle, their rights were clearly established at the time of the violation. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[149] There need not be "a case directly on point, but existing precedent

---

[143] *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).
[144] *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997)
[145] ROA.10146 and ROA.10257.
[146] ROA.10146.
[147] ROA.10146-10147.
[148] ROA.10146-10147.
[149] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

must have placed the statutory or constitutional question beyond debate."[150]  First, regarding Nicholas, when addressing the shooting of unarmed, non-dangerous people, there is no doubt – "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead."[151] Fourth Amendment cases "clearly establish—and did so by January 2019—that an officer may not shoot unarmed individuals who pose no threat of danger.[152]

Similarly, Tuttle had a clearly established right not to be executed after he was incapacitated. As the Fifth Circuit explained "after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force."[153] Therefore, this Court should reject the appeal.

## ARGUMENT

## I.   Standard of Review and Applicable Law

Gallegos's counsel accurately addresses the standard of review for an appeal of a denial of qualified immunity at the summary judgment stage, subject to the jurisdictional objection Plaintiffs raised above.

Under the Fourth Amendment, Nicholas and Tuttle had a constitutionally protected right to be free from unreasonable seizures, including excessive, deadly

---

[150] *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

[151] *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017).

[152] *Tenn. v. Garner,* 471 U.S. 1, 11 (1985).

[153] *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

force.[154] To prove a deprivation of that right, Nicholas and Tuttle "must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[155] Notably, excessive-force claims are "necessarily fact-intensive," so the Court must "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable."[156]

The "reasonableness inquiry is an objective one."[157] And a Court must "look at the case from the perspective of a reasonable officer on the scene, paying 'careful attention to the facts and circumstances of each particular case.'"[158] As part of this evaluation, the Fifth Circuit has held that the excessive force inquiry includes whether the officer "was in danger at the moment of the threat that resulted in the [officer's] shooting [of the victim]."[159] "So, the focus of the inquiry should be on 'the act that led [the officer] to discharge his weapon[.]'"[160]

After the briefing at the trial court, the U.S. Supreme Court issued its decision in *Barnes v. Felix* – a case addressing excessive force and overruling prior Fifth

---

[154] *Garza v. Briones*, 943 F.3d 740, 744-45 (5th Cir. 2019).
[155] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009)).
[156] *Rockwell v. Brown*, 664 F.3d 985, 991-992 (5th Cir. 2011).
[157] *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 474 (5th Cir. 2019)
[158] *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018)
[159] *Id*. at 993.
[160] *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (*quoting Manis*, 585 F.3d at 845).

Circuit precedent.[161] In *Barnes*, a police officer pulled over the plaintiff for suspected toll violations.[162] He "ordered [the plaintiff] to exit the vehicle, but [he] began to drive away."[163] The police officer then jumped onto the doorsill and fired two shots, as the car began moving.[164]  The officer fatally hit the plaintiff.[165]  In total, "[a]bout five seconds elapsed between when the car started moving and when it stopped."[166] Similarly, "[t]wo seconds passed between the moment [the officer] stepped on the doorsill and the moment he fired his first shot."[167]

At the trial level, the court granted summary judgment based on the Fifth Circuit's "moment-of-threat" rule. This Court affirmed.  Under that rule, "events 'leading up to the shooting' are 'not relevant.'"[168] This Court limited its review to the 2-seconds when the officer was "clinging to a moving car," and "[b]ecause [the officer] could then have reasonably believed his life in danger, the panel held, the shooting was lawful."[169]

This May, the U.S. Supreme Court rejected this rule.  Instead, it made it clear – "the 'totality of the circumstances' inquiry has no time limit."[170] And "[w]hile the

---

[161] *Barnes v. Felix,* 605 U.S. 73 (2025).
[162] *Id.* at 73.
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*

situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones."[171] As a result, "[p]rior events may show why a reasonable officer would perceive otherwise  ambiguous conduct as threatening, or instead as innocuous."[172]

Prior to *Barnes*, this Court recently addressed an excessive force of a deadly shooting in *Crane v. City of Arlington*.[173] In that case, the plaintiff was driving his vehicle with two passengers and a child.[174] "While Crane was stopped at a traffic light at approximately 11:38 p.m., Officer Elsie Bowden pulled up behind him."[175] As the light turned green, Bowden allegedly "saw an object being tossed from the passenger's side."[176] Claiming that it may be "a crack pipe and called for backup; Roper responded."[177] Bowden pulled over Crane, but realized that the object that was thrown out of the car was simply a candy cane.[178] Rather than simply let Crane leave, she "ran a warrant check, which found that Crane had warrants for several misdemeanors and a possible felony probation violation."[179] After an argument about

---

[171] *Id.*
[172] *Id.* at 73-74.
[173] *Crane v. City of Arlington*, 50 F.4th 453 (5th Cir. 2022).
[174] *Id.* at 459.
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.*

the warrants, "Roper put his arm around Crane's neck."[180] "The passengers contend that when Crane, with Roper's gun pointed at him, moved his hand to turn off the car in compliance with Roper's order, Roper shot him, his head fell backwards, the engine revved and the car lurched backward, striking Bowden—by now behind the car—before moving forward and running over Bowden again and speeding off."[181] Ultimately, Roper had shot Crane four times, and he died.[182]

The family of Crane filed a 1983 lawsuit for excessive force. Roper moved for summary judgment based on qualified immunity. While the "district court acknowledged that [the passengers] presented different accounts of when the first shot occurred," it still "found that 'a reasonable jury could not believe [the passengers'] account of the shooting.'"[183] The Court dismissed the case based on qualified immunity. The family appealed.

On review, the Court reversed the District Court. The Court first reviewed the use of force factors the Supreme Court established in *Graham v. Connor*.[184] These factors are: "the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest." And while "While all factors are relevant, the "threat-

---

[180] *Id.* at 160.
[181] *Id.*
[182] *Id.*
[183] *Id.* at 461.
[184] *Id.* at 463 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

of-harm factor typically predominates the analysis when deadly force has been deployed.'"[185] Regarding this factor, the Court found it particularly persuasive that the plaintiff "was shot while unarmed with Roper's arm around his neck."[186] Combined with a that, "from his position, Roper could see if Crane was reaching for a gun, as could the other officers outside the vehicle, yet none of them—including Roper—reported a suspicion of a weapon."[187] Roper also asserted that the threat came from the car, but the Court found that this was a "question for the jury."[188] In reviewing this factor, the Court also weighed that the other officers had "deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[189]

In reviewing the remaining to factors, the Court noted that they "do not weigh as heavily upon our analysis, they yet demand attention."[190] The Court explained that deadly force is not appropriate for an "unconfirmed felony probation violation warrant and multiple confirmed misdemeanor warrants."[191] And third, the Court found that "it was not reasonable for Roper to believe that Crane was attempting to

---

[185] *Id.* (citing *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017) (per curiam)).

[186] *Id.*

[187] *Id.* at 464.

[188] *Id.*

[189] *Id.*

[190] *Id.* at 465 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 408 (5th Cir. 2021)).

[191] *Id.*

flee or that any such attempt to do so posed a threat to life."[192]  As a result, the Court reversed the trial court and remanded the case.

## II.    **The Nicholas Plaintiffs**

With that foundation, Gallegos has made three arguments regarding the Nicholas Plaintiff's excessive force claims. The Nicholas Plaintiffs address each separately.

### 1.    **The Nicholas Plaintiffs have provided significant evidence to show that Medina was not in the house when Gallegos shot her.**

As his first objection to the District Court's order, Gallegos challenges evidence that Medina was not in the house when Gallegos shot Nicholas. This is a factual finding by the Court not a legal review. As a result, this claim is not subject to jurisdiction in this Court as a collateral order.

Regardless, this argument is important because Gallegos has only ever argued to the trial court that his conduct was reasonable based on the claimed threat of Nicholas toward Medina. Gallegos also has made it clear – he aimed at Nicholas and shot her intentionally. As a result, if Medina was not in the house, Gallegos not only lacks credibility, but it also factually disputes his only claimed basis at summary judgment for killing Nicholas.

To make this argument, Gallegos misconstrues the record evidence at

---

[192] *Id.*

summary judgment. To Gallegos, Plaintiffs have predicated their timeline of events – particularly, that Gallegos shot Nicholas after Medina had left the house – only on "approximately 2 seconds of body camera footage during which an individual is visible to the far left (west) side of the house apparently on or near the street."[193] While that image certainly supports the Nicholas Plaintiffs' argument, this is not the sole factual basis for the claim. In contrast, the entirety of the record evidence, including the video, statements, testimony, physical evidence, and the conclusions of experts, all support this scenario.

First, Gallegos has testified under oath - multiple times - he did not shoot Nicholas until (1) **after** Lovings was shot and fell and (2) **after** Pardo/Salazar fall out of the house.[194] Taken as true, this testimony makes it impossible that Gallegos shot Nicholas while Medina was in the house. According to the record evidence, Lovings and Pardo shot a combined 17-19 times prior to falling out of the house, and prior to Gallegos ever firing a shot.[195] Likewise, Medina fired one shot prior to this occurring.[196] Yet by the time Medina and Sepolio had left the house, at most 12-15[197] shots have been fired. Based on the video and the officer's own testimony, Gallegos did not even fire his gun until after Medina left the house.

---

[193] Defendant's Brief at pg. 23.
[194] ROA.10413 at 100:23-101:1 (his deposition); ROA.9723 (his IAD statement).
[195] ROA.10642 at 70:22-71:10 (Salazar shot 8-10 times prior to falling); ROA.12719 at 115:18-116:8 (Lovings shot at least nine times prior to being shot and falling).
[196] ROA.9955 (IAD statement of medina
[197] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:38.3 seconds.

Second, the video shows Gallegos to the left of the door after the first 2-3 shots in the house.[198] Ranger Wolf places Gallegos in this position.[199] The audio captures the sound of guns firing between the 0.35.8 to 0.35.9 mark of the video until approximately 38.2 to 38.3 seconds. In these three seconds, approximately 10-12 shots are fired. Again, consistent with the testimony of the officers, this was Lovings and Pardo. Yet in the middle of that firing sequence – specifically, at the 36.65 mark of the video – the BWC captures the officer that Wolf identified as Gallegos to the left of the door. This is confirmed by Wolf's placement of Gallegos at the front of the house.[200] Put differently, Gallegos is on the wrong side of the house and not in a position to have shot Nicholas. To make Gallegos's timeline accurate, in 1.5 seconds, he must have (1) moved to the other side of the door, in the midst of gunfire; (2) Pardo and Salazar fell down out of the house; (3) Lovings would then is shot; (4) Gallegos gets in position and has his weapon ready; and (5) Gallegos would then have seen Nicholas over Medina and shot her multiple time. It is implausible that this could have occurred in 1.5 seconds. Indeed, according to Gallegos "seconds" had passed, alone, between "Officer Pardo and Officer Salazar exiting the house to

---

[198] ROA at Exhibit "AC," "Ranger Sync of BWC" from 0:34 to 0:36 seconds; *see also* ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).
[199] ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).
[200] ROA.13026 (PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos's position).

when [he was] able to visually see Ms. Nicholas."[201] In other words, even half of the necessary chain of events could not have occurred in the 1.5 seconds. And tellingly, by the time the BWC captures the next shot being fired after this sequence, Medina and Sepolio are outside of the house.

Combined with that, only two seconds later – specifically at the 0.40.5 mark of the video – Sepolio had already carried Medina outside of the house and had already almost reached the street.[202]   Meaning,  the timing of Medina exiting the house is also completely implausible, if not impossible, with Gallegos's version of the shooting.   According to Galleglos, in two seconds: (1) Gallegos instructed Sepolio to get Medina out of the house;[203] (2) Sepolio, who was not in the house[204] or the doorway,[205] pushed his way into the house, jumped on the couch, and grabbed Medina; and (3) Sepolio then carried Medina all the way to the street.   Sepolio's explanation of events makes this completely implausible.   According to Sepolio, he was outside the house and heard Gallegos tell him to get Medina.[206]   Sepolio then had to push his way through "multiple people."[207] And "[o]nce [he] gained access

---

[201] ROA.10491 at 178:17-22.
[202] ROA at Exhibit "AC," "Ranger Sync of BWC" at the 0:40 mark.
[203] ROA.13134 at 75:14-20; ROA.10490 at 177:7-10.
[204] ROA.13134 at 76:8-77:7 (nothing that Sepolio had to "push" through officer to get access into the house).
[205] Logically, Sepolio could not have been in the doorway when Gallegos had shot through the doorway.
[206] ROA.13134 at 75:14-20.
[207] ROA.13134 at 76:8-23.

into the house, [he] forced [his] way in and squeezed into the crowd."[208] Sepolio then saw "Officer Medina on or near the far end of the couch."[209] He then "jumped up on the couch, picked him up and carried him out of the house."[210] This simply could not have occurred in two seconds.

In contrast, Sepolio's testimony makes it clear – he entered the house before Lovings was shot and before Salazar and Pardo fell out of the house. Particularly telling, Sepolio claimed he had to "push" through officer to get into the house. In contrast, under Gallegos's claimed timeline, Sepolio would not have needed to push through any officers to get into the house because (1) Lovings, Pardo, and Salazar had all fallen and (2) Gallegos had just shot through the doorway, so it would have been unobstructed.

Third, as confirmed by Mike Maloney, the bullet that struck Nicholas contained the DNA of Dennis Tuttle.[211] Meaning, the bullet struck Tuttle, while he was at the doorway, and then fatally struck Nicholas.[212] It would be implausible – and inconsistent with the testimony of every officer – for Tuttle to have been in the doorway prior to Lovings, Salazar, and Pardo falling out of the house. This is because Lovings, Salazar, Pardo, Sepolio, and even Ashraf would all have been inches from

---

[208] ROA.13134 at 77:4-7.
[209] ROA.13134 at 77:11-12.
[210] ROA.13135 at 82:14-17.
[211] ROA.10122.
[212] ROA.10122.

Tuttle. Instead, this must have occurred after Lovings, Salazar, Pardo, Sepolio, and Medina left the house. As a result, Gallegos could not have shot Nicholas when Medina was in the house.

In addition, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas. Specifically, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[213] (2) the BWC showing that Medina was not in the house;[214] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[215] Instead, Nicholas died on the north side of the couch, not in the area where Medina was located. [216] This is important because at the time of her death, Nicholas was found with her chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[217] She sustained at least two gunshot wounds, including wounds to her right chest and right thigh. The forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[218]

---

[213] ROA.10147.
[214] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:40 (in the top right corner video); *see also* ROA.13014-13015 (Ranger Wolf's findings confirming that this is Sepolio and Medina.)
[215] ROA.10256.
[216] ROA.10148.
[217] ROA.10148.
[218] ROA.12868 at 74:14 – 78:4.

This injury caused Ms. Nicholas's death mere seconds after she was hit.[219]

Furthermore, the entrance wound on the right side of her body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos. Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[220] Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[221]

Next, the Ranger's report also fatally contradicts' Gallegos's story. In his investigation, Wolf simply assumed that the officers' statements were accurate. Wolf then testified that the there was "no evidence" that the officers "were lying."[222] Yet Wolf – maybe because he noticed the serious inconsistency above – re-ordered the

---

[219] ROA.12868 at 74:14 – 78:4.
[220] ROA.10148.
[221] ROA.10147-10148.
[222] ROA.12710-12711 at 81:24-82:6.

chain of events so that Gallegos shot Nicholas prior to Lovings being shot and Pardo and Salazar falling out of the house. This, however, is not supported by a single officer statement or deposition. It also ignores that Gallegos could not have moved from the left side of the house to the right side of the house in the 1.5 second window, all with enough time to shoot Nichlas. And regardless, this also completely contradicts Officer Gallegos's testimony regarding the timing of when he shot Nicholas – which he claims occurred after Lovings was shot and Pardo and Salazar fell out of the house. Considering that Wolf's methodology was premised on his assumption that the officers' statements were accurate and there was "no evidence" that the officers "were lying,"[223] Wolf's conclusions are contradicted by his own method.

Finally, Gallegos's testimony includes serous contradictions and changes. Combined with the other evidence, the jury should determine whether his claims about the incident are credible. This is particularly true because he has already changed his sworn testimony by claiming that Nicholas grabbed Medina's gun.[224] As a result, he cannot claim his conduct was justified based on a threat to Medina.

## 2. **Plaintiffs have presented a chain of events that is consistent with the factual record**

---

[223] ROA.12710-12711 at 81:24-82:6.

[224] *Compare* ROA.9743 (Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**.") *with* ROA.10415 at 102:20-103:7 (Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself.").

Next, Gallegos argues that the "theory that Gallegos intentionally shot Ms. Nicholas by accidentally shooting through Mr. Tuttle is too implausible to support summary judgment." This is incorrect.

At its core, Defendants appear to argue there is a conflict between Mike Maloney's opinion and Officer Gallegos's testimony that he saw Nicholas and intentionally shot her. But Gallegos ignores the actual record from Maloney. Maloney has not opined on the intent or state of mind of Gallegos. But Maloney did testify about the line of vision of Gallegos – specifically that he did not have a "good view" or "thorough view" of her at the time he pulled the trigger.[225] He further testified that he "can't exclude" that Gallegos saw Nicholas.[226] Combined with this, Gallegos has repeatedly admitted that he intentionally shot Nicholas.[227] As a result, whether he had a "good view" or "thorough view" of her at the time he pulled the trigger, there is no dispute that Gallegos aimed at Nicholas and shot her. Indeed, Gallegos testified that he saw his bullet strike Nicholas's body.[228]

While ignoring Maloney's testimony, Gallegos then pivots to an argument he never raised to the trial court. Specifically, he argues that there is no evidence whatsoever that Nicholas "was acting in a manner that would dispel the natural

---

[225] ROA.11952 at 135:3-21.
[226] ROA.11952 at 135:3-21.
[227] ROA.10493 at 180:11-15.
[228] ROA.10493 at 180:11-13.

assumption that—as multiple wounded officers emerged from her house—she posed a threat." This argument should be rejected because it was not raised and is therefore waived.[229] Regardless, this argument also requires the Court to ignore the rest of the factual evidence necessary for this finding. Meaning, if Medina was not in the house, then Gallegos has repeatedly committed perjury about what happened in the house. That lack of credibility alone is enough to rebut any objective claim that he acted reasonably in shooting Nicholas, even if Medina was not there. This further ignores that Gallegos testified his "only reason" to determine that Ms. Nicholas was a threat was "the fact that if she could get ahold of his shotgun and shoot or finish or kill Officer Medina, I had to stop that before it happened."[230]

As a result, the testimony of Gallegos establishes that Ms. Nicholas was not a threat to anyone, absent his claim that she posed a threat to Medina. Plaintiff has sufficiently rebutted that she posed a threat to Medina. Therefore, Ms. Nicholas was not a threat to anyone when Gallegos intentionally shot her.

### 3. **Gallegos's conduct was objectively unreasonable when he shot and killed an unarmed woman who was not threatening him.**

Finally, Gallegos asserts another claim that he never made to the trial court – regardless of his intent, his conduct was still objectively reasonable. Again, this

---

[229] *Celanese Corp.,* 620 F.3d at 531.
[230] ROA.10493 at 180:8-10.

argument was not presented to the trial court and is therefore waived.[231]

Regardless, Plaintiff's argument is not solely based on the intent of Gallegos. Rather, this evidence is based on a thorough evaluation of the *Graham* factors. First, regarding "the most important . . . factor in determining the objective reasonableness of an officer's use of force" – whether she posed "an immediate threat to the safety of the officers or others," at the time Gallegos shot her,[232] Gallegos can only point to a lie to justify his shooting: his claim that she posed a threat to Medina. This factor "typically predominates the analysis when deadly force has been deployed."[233]

Importantly, by the time that Gallegos saw Nicholas, Medina was not in the house, and Nicholas sat on the far south end of the couch. The only threat that Gallegos has alleged? The made-up story that Nicholas reached for Medina's gun. Specifically, Gallegos claimed his "only reason" for shooting Nicholas was "that if she could get ahold of his shotgun and shoot or finish or kill Officer Medina, I had to stop that before it happened."[234] Yet besides this fabrication, Gallegos has not identified any legitimate sign of threat that Nicholas could have shown. In contrast, Nicholas was on the back of the couch and unarmed.[235] This is not a threat that can justify deadly force. Combined with that, just like *Crane*, here, "officers deliberately,

---

[231] *Celanese Corp.,* 620 F.3d at 531.

[232] *Graham*, 490 U.S. at 396.

[233] *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021).

[234] ROA.10493 at 180:8-10.

[235] ROA.10148 – 10149; ROA at Exhibit "AC," "Ranger Sync of BWC."

and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[236]  Specifically, Medina, the officer who confronted Nicholas, confirmed – he "didn't see the need for deadly force" based on the actions he saw.[237]

Similarly, there is no evidence that Nicholas "was actively resisting or trying to evade arrest by flight."[238] Indeed, at best, Nicholas was in "shock" or "surprised."[239] As Officer Ashraf explained – "[t]hat's the typical reaction when we conduct a search warrant, shock."[240] At the initial interaction, Officer Medina made it clear – he "didn't see the need for deadly force."[241] Furthermore, at the time Gallegos shot her – the pertinent time for this evaluation – there is absolutely no evidence that Nicholas was resisting or evading. While, here, Nicholas was certainly screaming, that does not justify the use of deadly force. After all, she was the victim of an unlawful home invasion in which officers wrongfully broke down the door of her home and began shooting.

Third the "severity of the crime" factor also does not justify shooting Nicholas. The warrant was admittedly fraudulent.  Nicholas had not committed any crime. This factor strongly favors Nicholas. But regardless, even if the warrant was

---

[236] *Crane*, 50 F.4th at 464.
[237] ROA.11144 at 104:19-25.
[238] ROA.11144 at 104:19-25.
[239] ROA.11039 at 44:15-16.
[240] ROA.11039 at 44:15-16.
[241] ROA.11144 at 104:19-25.

legitimate, drug related crimes do not justify shooting Nicholas. Instead, at the time that Gallegos shot her, (1) Gallegos gave her no warning,[242] (2) she was unarmed, (3) she was not threatening Medina,[243] and (4) she was shot through all four chambers of her heart.  As a result, "[a] jury could reasonably find that the degree of force the officers used was not justifiable under the circumstances."[244]

In addition to the *Graham* factors, serious credibility issues regarding the testimony of Gallegos and other officers "is crucial to the determination of whether a reasonable officer in [Gallegos's] position could have reasonably believed that [Nicholas] posed a threat of serious harm."[245] This includes:

- Gallegos's change in sworn testimony that Nicholas did not touch Medina's weapon to his new claim Nicholas grabbed the gun;[246]

- The inconsistency between Gallegos's testimony that he shot and killed Nicholas after Lovings, Pardo, and Salazar fell, in contrast to the Ranger's conclusions that it occurred prior to that;[247]

- The video evidence showing Gallegos away from the door to the left of the house and not in his shooting position prior to Medina reaching the street;[248]

- Gallegos's inability to identify where the bullets struck Rhogena Nicholas

---

[242] ROA.10421 at 108:3-11; 109:7-19.
[243] ROA10147-10148; Moreover, Plaintiff has previously detailed that Medina was not in the house.
[244] *Crane*, 50 F.4th at 465.
[245] *See e.g. Geiger v. Monroe County,* No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19. (N.D. Al. June 18, 2018).
[246] *Compare* ROA.9743 (Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**.") *with* ROA.10415 at 102:20-103:7 (Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself.").
[247] *Compare* ROA.13029-13030 (stating Gallegos shot Nichols prior to Lovings, Salazar, and Pardo's fall) *with* ROA.10415 at 102:10-25 and at ROA.10421 (Gallegos shot Nicholas)
[248] ROA at Exhibit "AC," "Ranger Sync of BWC" at 0:43.

and the inconsistency between his story and trajectory of the fatal bullet;[249] and

- The forensic evidence that Nicholas was struck and killed, while on the north side of the couch, not near Medina's prior location.[250]

Put simply, there are substantial factual contradictions that show Nicholas was unarmed and not threatening. Yet Gallegos shot and killed her.

## III. <u>Gallegos violated the Fourth amendment right of Tuttle when he shot and killed him after he was incapacitated.</u>

Next, Gallegos also challenges that he engaged in excessive force against Tuttle. At the trial Court, Tuttle focused on the final two shots from Gallegos that caused his death. The first, to his buttocks through his chest to his chin.[251] The second is directly to the back of his head.[252]

As a threshold matter, simply because Tuttle had a gun does not justify excessive force – particularly because (1) Police officers fired their guns first at dogs (and struck another police officer),[253] and (2) at the time that Gallegos shot him in the back of the head, Tuttle did not have a weapon.[254] Federal Court precedent makes it clear – "a police officer may not use deadly force against a non-threatening

---

[249] *Compare* ROA.10148-10149 (Maloney stating "were she over him attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position") *with* ROA.10420 (Gallegos claims Nicholas was "squared up" with him and pulling at the shotgun, yet she is struck in the right side through her left side.)

[250] ROA.10148-10149.

[251] ROA.10148-10150.

[252] ROA.10147.

[253] Every witness but Lovings, claims that the Police shot first. In addition, the first human struck was Medina. And Maloney determined that Medina was hit by an officer. ROA.10148.

[254] ROA.10147- ROA.10149.

individual, even if the individual is armed, and even if the situation is volatile."[255] Indeed, police officers "may not kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they are armed, including in some circumstances in which the suspect has 'committed a violent crime in the immediate past."[256]

A closer look at the *Graham* factors shows that the Court correctly denied summary judgment. First, there is a mountain of evidence that Tuttle did not pose a threat to Gallegos when he executed him. Tuttle sustained seven bullet wounds prior to the final two shots.[257] He received shots to both his shoulder and a grazing wound to his right forearm.[258] Following that, Mr. Tuttle "received shots to both arms and hands."[259] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon." [260] Tuttle then had "his back to the door[] and [is] beginning to drop to the floor." As Gallegos yells "shut the f**k up," he shoots  Tuttle in the buttocks/thigh" and the "bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[261] Twenty seconds later, Gallegos then yells "stop moving" and in that same moment

---

[255] *Est. of Aguirre*, 29 F.4th 624, 629; *Curnow*, 952 F.2d 321, 325.
[256] *Harris*, 126 F.3d 1189, 1203-04.
[257] ROA.10146-10150.
[258] ROA.10146-10150.
[259] ROA.10146-10150.
[260] ROA.10146-10150  and ROA.10257.
[261] ROA.10146-10147; ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23; ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up")

he fatally shoots Tuttle "in the back of his head/neck."[262] Based on these facts, Tuttle

(1) no longer had a weapon;[263] (2) certainly did not raise a weapon like Gallegos

claimed;[264] (3) was not facing Gallegos like he claimed;[265] and (4) Gallegos shot him

in the back of the head.[266] Tuttle did not pose an immediate threat to Gallegos or

anyone.

Again, the "severity of the crime" factor also does not justify shooting Tuttle.

The warrant was admittedly fraudulent. Combined with that, the first bullets –

namely, the shooting of his dog and the shooting of Medina – were fired by HPD

officers Medina and Lovings. And under Texas Penal Code 9.31(c), Tuttle was

entitled to defend himself and his wife from the illegal entry and excessive force by

HPD. This section states:

> The use of force to resist an arrest or search is justified: (1) if, before
> the actor offers any resistance, the peace officer (or person acting at his
> direction) uses or attempts to use greater force than necessary to make
> the arrest or search; and (2) when and to the degree the actor reasonably
> believes the force is immediately necessary to protect himself against
> the peace officer's (or other person's) use or attempted use of greater
> force than necessary.[267]

In other words, even when Tuttle shot Lovings – whether it was the 20th bullet fired

or the 4th bullet fired – Tuttle did not commit a crime. Rather, Tuttle instead was

---

[262] ROA.10146-10147.
[263] ROA.10146 and ROA.10257.
[264] ROA.10146.
[265] ROA.10146-10147.
[266] ROA.10146-10147.
[267] Texas Penal Code Section 9.31(c).

defending his family from unlawful search and excessive deadly force. Therefore, even viewing the totality of the unlawful home invasion, the severity of the crime factor supports in favor of Tuttle. But certainly, when limited to the final two shots, Tuttle – who had not committed any unlawful act – could not have posed any lethal threat because he could not have held a weapon.

Furthermore, Gallegos assumes – despite no evidence – that Tuttle and Nicholas knew that the group storming their house were police officers. The record contradicts this. First, it was dark in the house. Pardo described it as: "black" inside, the "residence was just dark," and it wasn't lit up, it was dark in there."[268] Sepolio also recalls that "it was real dark."[269] The officers wore dark military style uniforms with dark lettering.[270] As stated under oath by Lieutenant Billy Milan: "entry into the home would be made without any…announcements to the occupants (and) it is reasonably foreseeable that the homeowners would be surprised (and) could be concerned that a burglary was taking place…"[271] Furthermore, the BWC footage does not capture any officer announcing themselves.[272]

As a result, this evidence contradicts that the officers ever announced themselves, much less that Tuttle or Nicholas heard or appreciated it under the

---

[268] ROA.10131, 10133.
[269] ROA.9845.
[270] ROA.9771-9780.
[271] ROA.9615-9516.
[272] ROA at Exhibit "AC," "Ranger Sync of BWC."

terrifying circumstances. Ranger Wolf describes the concept of "auditory exclusion" which occurs in critical incidents.[273] In critical incidents an officer is not going to hear things like commands because "the auditory side of their brain shuts down."[274] Particularly at the summary judgment stage, a juror could certainly conclude that Tuttle and Nicholas would suffer the same auditory deficit. In short, there is ample evidence that Tuttle thought he and his wife were being attacked by criminals and he fired justifiably in self-defense.

Third, at the time that Gallegos shot Tuttle in the back of the head and thigh/buttocks, he was not actively resisting or trying to evade arrest by flight.[275] Again, Tuttle was on the ground, he could not have held a gun, and facing the floor.[276] Gallegos gave him no warnings or commands besides yelling "shut the f**k up."[277] With this record, in that moment, Tuttle could not have resisted or evaded arrest.

To avoid this evidence, Gallegos asserts three arguments. Each fail to show that deadly force was justified. First, Gallegos claims that Tuttle had shot officers, waived his gun, and threatened to shoot officers.  This, however, ignores the testimony of Maloney and Bux that makes it clear – Tuttle could not have held a

---

[273] ROA.12719 at 115:23 -116:3.
[274] ROA.12719 at 115:23 -116:3.
[275] *Crane*, 50 F4th. At 463.
[276] ROA.10146-10150.
[277] ROA.10457 at 144:4-14.

gun, much less threaten an officer with a gun prior to the final two shots.[278] And the relevant review is based on the time period that Gallegos shot him – not alleged conduct prior to the shoot.  Gallegos was not entitled to execute Tuttle when he was incapacitated.

Second, Gallegos's testimony is filled with contradictions and lies. Indeed, this is important because this evidence is "crucial to the determination of whether a reasonable officer in [his] position could have reasonably believed that [the plaintiff] posed a threat of serious harm."[279] Particularly, in this case, where Gallegos lied about Nicholas grabbing the gun, Medina being in the house, Nicholas's position, and Tuttle pointing a gun at him, once Dr. Bux confirmed Tuttle could not have held a weapon.

Third, Gallegos argues that Tuttle – at that point, unable to hold a gun, laying on the ground with severe wounds and not facing Gallegos – was still a threat. This claim simply ignores that Tuttle had been incapacitated by the shots. And the Fifth Circuit has made it clear – "a passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."[280]

This case is particularly similar to the Fifth Circuit's decision in *Mason v.*

---

[278] ROA at Exhibit "AC," "Ranger Sync of BWC" at 1:20- -1:23; ROA.10457 at 144:13-14 (confirming that Gallegos said "shut the f**k up").
[279] *Geiger*, No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19.
[280] *Lytle*, 560 F.3d 404, 413; *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

*Lafayette City-Parish Consolidated Government.*[281] In that case, officers responded to an armed robbery at an apartment.[282] During a standoff, an officer unleashed a dog on the suspect, after he saw a gun. The officer then alleged that the suspect reached for a gun when the dog attacked him.[283] The officers shot him five times.[284] After those shots, the suspect lay incapacitated on the ground. After claiming he saw additional movement reaching for the gun, an officer shot him two more times.[285] The suspect's girlfriend disputed this: testifying that he only lifted his head and put it back down.[286] Similarly, the plaintiff's expert testified that it would have been painful and ineffective for the suspect to move his arm.[287] Based on this, the Fifth Circuit denied the officer's claimed qualified immunity based on those factual disputes.

Just like *Mason*, Tuttle – a disabled United States Navy veteran – was incapacitated after the first 7 shots.[288] He had a prior injury and already had a bandaged hand before he was shot repeatedly.[289] Gallegos's testimony is contradicted by the ballistic evidence showing that Tuttle was shot in the back of the

---

[281] 806 F.3d 268 (5th Cir. 2015).
[282] *Id.* at 271.
[283] *Id.* at 274.
[284] *Id.*
[285] *Id.*
[286] *Id.*
[287] *Id.* at 277.
[288] ROA.10146.
[289] ROA.10438-10439 at 125:23-126:2 (confirming his hand was previously bandaged before the shooting).

head and not facing him. Exactly like *Mason*, factual issues preclude summary judgment on this excessive force claim.

## IV.  <u>Qualified immunity</u>

Finally, Defendant also challenges that the right of Tuttle and Nicholas were clearly established at the time of the shooting. Under the second prong of the qualified immunity test, the Court must determine whether the constitutional right was clearly established within the specific context of the case.[290] "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[291] This does not mean that the very conduct in question has been previously held unconstitutional.[292] There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[293]

First, regarding Nicholas, when addressing the shooting of unarmed, non-dangerous people, there is no doubt – "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead."[294] Fourth Amendment cases "clearly establish—and did so by January 2019—that an officer may not shoot unarmed individuals who pose no threat of danger.[295] Indeed, this circuit has already denied

---

[290] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).
[291] *Reichle*, 566 U.S. 658, 664.
[292] *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009).
[293] *Ashcroft,* 563 U.S. 731, 741.
[294] *Releford*, 678 F. App'x 267, 268.
[295] *Garner,* 471 U.S. at 11.

qualified immunity related to the same facts as pleaded in her complaint.[296]  Based on the facts, as presented by Nicholas, Gallegos shot her, when she was not a threat and was simply sitting on a couch.  This alone is enough to show that her right was clearly established.

Second, as explained in more detail above regarding the excessive force deprivations, Tuttle had a clearly established right not to be executed after he was incapacitated. As the Fifth Circuit explained "after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force."[297] Indeed a slew of cases address and hold that Tuttle's right was clearly established and Gallegos's conduct was unlawful.[298] In other words, Defendant attempts to distinguish these cases by pointing to the chain of events prior to Tuttle's incapacitation. But that is of no moment for this analysis because the right is clearly established, once a person is incapacitated and unable to be a threat.

## CONCLUSION

---

[296] *Tuttle v. Sepolio*, 68 F4th 969, 974 (2023).

[297] *Roque*, 993 F.3d 325, 336 (citing *Lytle*, 560 F.3d 404, 413).

[298] *Graves v. Zachary,* 277 F. App'x 344, 348 (5th Cir. 2008) ("Merely having a gun in one's hand does not mean per se that one is dangerous.");  *Roque*, 993 F.3d 325, 336; *Lytle*, 560 F.3d 404, 413); *Baker v. Coburn,* 68 F.4th 240, 251 (5th Cir.  2023)(finding that, an officer who continued to shoot at a suspect's vehicle as it drove away, after the immediate threat had ceased, could support a finding that the use of force was unreasonable); *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (holding that "the jury needed to determine what sequence of events occurred, and, in particular, whether Snyder had a gun—or, if he did not actually have a gun, whether Trepagnier reasonably believed he did."); *Robinson v. Nolte*, 77 F. App'x 413, 414 (9th Cir. 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had a gun in his lap).

For all the reasons identified in this objection, Plaintiffs request that court reject jurisdiction over this appeal and remand this case to the Trial Court.

*/s/ Jeffrey Avery*

Michael Patrick Doyle
Patrick M. Dennis
Jeffrey I. Avery
Patrick Doyle
DOYLE DENNIS AVERY LLP
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Email: service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com
Attorneys for the Nicholas family

Michael T. Gallagher
L. Boyd Smith, Jr.
Pamela R. McLemore
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705
Facsimile:  (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
pamm@gld-law.com

Attorneys for the Tuttle family

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Rule 32(a)(7)(B), because excluding the parts of the document exempted by Rule 32(f), it contains 12,988 words. This document complies with the typeface and style requirements of Rules 32(a)(5)-(6) because it has been prepared in a proportionally-spaced, Times New Roman typeface, using Microsoft Word in 14-point size text.

<u>*/s/ Jeffrey I. Avery*</u>
Jeffrey Avery

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 14th day of October, 2025 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.

<u>*/s/ Jeffrey I. Avery*</u>
Jeffrey Avery