# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
November 16, 2026
Thomas B. Plunkett, III
Clerk

No. 25-20132

Clifford F. Tuttle, Jr., *as Representative of* the Estate of Dennis W. Tuttle, *Deceased*; Robert Tuttle; Ryan Tuttle; Jo Ann Nicholas; John Nicholas,

*Plaintiffs—Appellees*,

*versus*

Felipe Gallegos,

*Defendant—Appellant*,

---

Jo Ann Nicholas, *individually and as an heir of the Estate of Rhogena Nicholas*; John Nicholas, *as temporary administrator of* the Estate of Rhogena Nicholas,

*Plaintiffs—Appellees*,

*versus*

Felipe Gallegos,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:21-CV-270, 4:21-CV-272

Before JONES, CLEMENT, and RICHMAN, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

We withdraw our prior opinion and substitute the following:

This is a high-profile qualified immunity case that involves a police officer, Felipe Gallegos, shooting and killing Dennis Tuttle and Rhogena Nicholas, after a squad of officers from the Houston Police Department ("HPD") executed a no-knock search warrant at their 7815 Harding Street residence on January 28, 2019. Plaintiffs, the estates of Tuttle and Nicholas, sued the officers and the City of Houston for several state and federal claims, including a 42 U.S.C. § 1983 claim for excessive force under the Fourth Amendment against Gallegos. Gallegos moved for summary judgment based on qualified immunity, and the district court denied the motion because it held that materially disputed facts precluded summary judgment. Gallegos appealed, arguing there were no constitutional violations, and that, even if there were, the law was not clearly established at the time of the incident.

The facts of this case are tragic. But tragic facts alone do not establish liability under the Constitution. Because Gallegos did not violate Tuttle's or Nicholas's constitutional rights, he is entitled to qualified immunity.

Accordingly, we REVERSE.

# I

## A

The following facts are undisputed.

*The Search Warrant.* This case's genesis began on January 8, 2019, when Patricia Garcia, Tuttle and Nicholas's neighbor, repeatedly called 911 and falsely claimed that her daughter was doing drugs inside Tuttle and

Nicholas's house. Garcia also claimed there were guns inside the house,[1] so HPD Officers Richard Morales and Nichole Blankenship-Reeves went to investigate the scene outside the house. Neither officer observed any criminal activity, or anyone entering or exiting the home. Blankenship-Reeves relayed a note about the house to Lieutenant Marsha Todd in the Narcotics Division. Todd then passed the tip to Squad 15 Officer Gerald Goines.

The falsehoods did not end with Garcia. To secure a no-knock warrant to search the house, Goines falsely claimed in an affidavit that, on January 27, 2019, a confidential informant purchased heroin and observed a firearm at the house. He also falsely claimed that fellow Squad 15 Officer Stephen Bryant observed the drug purchase. With the search warrant in hand, Goines and his Squad 15 supervisors, Sergeants Clemente Reyna and Thomas Wood, reviewed the warrant and the tactical execution plan. Once Wood approved the plan, he joined Squad 15 Officers Frank Medina and Gallegos on a tactical "drive-by" of the house. Goines then led the pre-raid briefing with the officers who would later help execute the search warrant. He described the property and communicated to the officers that they should expect a female resident, a male resident known to carry a gun, and an aggressive dog.

*The Raid.* After the briefing, eighteen officers were dispatched to the house to execute the search warrant. The "entry team" consisted of Squad 15 Officers Medina, Bryant, Gallegos, Goines, Cedell Lovings, Manuel Salazar, Oscar Pardo, Eric Sepolio, and Nadeem Ashraf, as well as Sergeants Reyna and Wood. Six other HPD Officers—Morales, Blankenship-Reeves, Joseph Arechiga, Samuel Garza, Valeriano Rios, and Yvette Ortiz—assisted

---

[1] Garcia pleaded guilty to one count of false information and hoaxes for making these false reports and was sentenced to forty months of imprisonment. Her sentence was affirmed by this court. *See United States v. Garcia*, No. 21-20309, 2022 WL 1014146 (5th Cir. Apr. 5, 2022) (per curiam).

with "perimeter security." While Morales, Blankenship-Reeves, Rios, Ortiz, and Garza wore body-worn cameras ("BWC"), they failed to activate them before the raid, in violation of HPD policy. They instead activated their BWC at different times during and after the raid.

On arrival, the entry team organized into a "stack" and breached the front door while announcing themselves as HPD officers. Medina, the first to enter the house, broke left after entering through the front door. According to Medina, he saw Nicholas standing to his left and told her to put her hands on her face and get down. Nicholas did not comply, and she continued to yell and "flail" her hands. Medina then heard a gunshot to his right. He also saw and shot an "angry" dog. Moments later, Medina was shot in the shoulder and fell back against a couch. There, Medina first saw Tuttle behind a wall in the dining room area. Medina then fell unconscious. Bullet fragments consistent with a .223-caliber gun were later found in Medina's wound.

Lovings, the second officer to enter the house, broke right. He saw a dog running toward him and then saw a "muzzle flash."[2] He fired his M6 .223-caliber rifle at the dog "several" times. He then saw another muzzle flash from the dining room area, where he saw Tuttle standing with a gun. Tuttle and Lovings exchanged fire. Tuttle shot Lovings in the neck with a .357-caliber revolver gun, leaving Lovings paralyzed from the neck down. Lovings was unsure whether any of the bullets he fired struck Tuttle, but he observed Tuttle "flinch" and hide back behind a wall. Lovings, who lay paralyzed on the floor, saw Tuttle attempt to take his gun.

Salazar and Pardo were the third and fourth officers to enter the house. When Salazar stepped through the door, he saw Lovings shoot at the dog. He also saw Tuttle fire three or four shots toward Medina from behind

---

[2] A muzzle flash is a glimpse of light that accompanies a gunshot.

a wall, and heard Medina exclaim that he was "hit." Salazar fired his Springfield 191 .45-caliber handgun at Tuttle around ten times. Pardo, the last of the two to enter, only made it a few steps inside before he heard someone yell "dog" and the firing of multiple gunshots. Pardo heard Medina say he was "hit" and saw him lying on the couch. Pardo was then pushed out of the house with Salazar. At this point, only Medina and Lovings remained inside the house. Both of them had sustained gunshot wounds.

The following facts are disputed. Three versions are at play.

1

According to the City, Squad 15 Officers, and Robert Gonzales, Gallegos was outside the house—to the right of the front porch—during the above events. From that position, he heard several gunshots and Medina yell that he was "hit." He observed Salazar and Pardo "fall backwards off the front porch" and saw Lovings drop in the threshold of the doorway. Gallegos then acquired a visual of the inside, observing Medina unconscious on the couch. Nicholas was standing over Medina, cursing and tugging at the gun attached to Medina's vest. Nicholas's hands later tested positive for gunshot residue. After seeing Nicholas tugging at Medina's gun, Gallegos fired at Nicholas with his M6 .223-caliber rifle between one and three times. At least one of those bullets struck and killed her. Sepolio then went inside and helped extract the wounded Medina.

After the fatal shot to Nicholas, Gallegos heard more gunshots inside the house. Still located along the right side of the house, he stepped back from the door and shot through the wall toward where he believed Tuttle was positioned. Gallegos broke a window, so he could see inside the house. But all he saw was an empty bedroom. Gallegos then retreated to a tree and yelled for someone to extract Lovings. Goines went toward the front door but was struck in his face by a bullet or bullet fragments, so he, too, retreated.

Afterward, Reyna approached the front door, and Gallegos saw "two hands come out of the front door holding a revolver" pointed at Reyna. Tuttle and Reyna exchanged fire, with Reyna using his .40-caliber Glock. Bullet fragments from Tuttle's gunshots struck Reyna's face.

Gallegos saw Tuttle shoot at Reyna, so Gallegos shot Tuttle in his left hand. Reyna retreated away from the house, and Tuttle retreated inside. Gallegos moved from his position near the tree to gain a visual inside the doorway. He saw Tuttle inside the house, leaning against the front door and holding a gun to his chest with his right hand. Tuttle raised his gun toward Gallegos, and Gallegos shot at him several times. Tuttle was struck at least once in the shoulder and twice in the buttocks area. Tuttle fell to the ground, out of Gallegos's view. Pardo tried to retrieve Lovings, who was still lying paralyzed inside the doorway. Pardo also saw Tuttle sitting on the floor near Lovings with a gun in his hand, so he shot at Tuttle once and fell back to Gallegos's position.

Gallegos walked up the front porch stairs and saw Tuttle through the doorway. Tuttle was in a seated position on the floor with a gun in his right hand, resting on his thigh. Tuttle yelled at Gallegos, asking what he wanted and stating there were "no drugs." When Gallegos told Tuttle to stop moving, Tuttle "looked directly at Gallegos" and "began to raise the weapon." Gallegos raised his own weapon, and Tuttle "flinched." So, Gallegos shot Tuttle one more time, fatally striking him in his upper back and neck area. The full episode—from Squad 15's initial entry into the house to Gallegos's final shot at Tuttle—lasted eighty seconds.

2

According to Plaintiffs, the story is different. Four problems, they say, exist with the version offered by the City, Squad 15 Officers, and Gonzales.

*Problem 1:* While Medina, Lovings, Goines, and Reyna each suffered gunshot wounds during the raid, the evidence suggests that only Lovings was shot by Tuttle. Plaintiffs argue that Medina, Goines, and Reyna's injuries were consistent with .223-caliber weapons, which only the officers carried.

*Problem 2:* Gallegos shot Nicholas after Medina was extracted from the house, so Gallegos could not have seen Nicholas standing over Medina. Plaintiffs rely on BWC video, which shows Squad 15 Officers exiting a white van and moving toward the house. About seventeen seconds after their exit, the video captures a loud noise. A series of gunshots ring out ten seconds later. According to Plaintiffs, these shots were mostly fired by Salazar and Lovings, and, about two seconds later, Sepolio and Medina can be seen running from the direction of the house toward Squad 15's white van. The video then shows a flash of light in the front of the house. According to Plaintiffs, the video also portrays Medina and Sepolio behind a van and an unidentified officer—who they say is Gallegos—to the far left of the house. Five seconds later, several more gunshots are heard. Plaintiffs assert that these shots were likely fired by Salazar and Lovings. Plaintiffs also claim that, at this point, Gallegos moved toward the house and engaged Nicholas.

*Problem 3:* Gallegos could not have shot Nicholas if she was standing over Medina. Nicholas had been shot once on her right thigh and once on the right side of her torso. According to Dr. Michael Maloney, Plaintiffs' scene reconstructionist expert, if Nicholas was standing over Medina while Medina was on the couch, Gallegos could not have shot Nicholas on her right side because only her left side was exposed to Gallegos.

*Problem 4:* Tuttle's injuries would have prevented him from holding or raising his weapon at Gallegos before Gallegos shot him the final two times. Maloney determined that Tuttle was shot a total of nine times, and the first seven shots inflicted wounds to "both" of Tuttle's "arms and hands."

These wounds, according to Maloney, would have rendered Tuttle "incapable of holding a weapon." So, when Gallegos shot Tuttle the final two times, Tuttle could not have raised or pointed his gun at Gallegos.

3

The third version of these events comes from Maloney, Plaintiffs' own expert. According to Maloney, Gallegos shot Nicholas "after Medina [was] shot and collapse[d] on the couch." His version, unlike Plaintiffs' version, concluded that Medina was *inside* the house when Nicholas was shot. So, Plaintiffs advance a theory—with respect to Medina's location—that differs from their own expert. Maloney's investigation further revealed that, from Gallegos's shooting position, he could not have seen Nicholas. Even still, Maloney opines that Gallegos shot Nicholas through the front door where Tuttle was standing, and the bullet was "destabilized by the doorframe," grazed Tuttle's forearm, and ultimately killed Nicholas. This conclusion was corroborated in part by the discovery of Tuttle's and Nicholas's DNA on a bullet recovered from the couch inside the house.

B

In suing the City of Houston, the Squad 15 Officers, and Gonzales, Plaintiffs asserted state law wrongful death and survival claims, and § 1983 claims flowing from unlawful search and seizure due to (1) lack of probable cause arising from obtaining the search warrant and (2) excessive force arising from the raid. Several claims have been dismissed.[3] Besides Goines, all remaining Defendants moved for summary judgment or judgment on the

[3] On January 6, 2025, the district court dismissed all of Plaintiffs' remaining claims against Sepolio, Salazar, Wood, Pardo, Medina, Reyna, Lovings, and Ashraf.

pleadings on all remaining claims against them. Relevant to this appeal, the district court denied Gallegos's motion for summary judgment.[4]

Gallegos timely appealed.

## II

Our review implicates multiple standards "corresponding to qualified immunity, summary judgment, [and] interlocutory review of [a] qualified immunity denial[]." *Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020). Since the interplay of these standards "gets tricky," we take each in turn. *Id.*

### A

The qualified-immunity doctrine shields public officials from suit for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). On a theoretical level, qualified immunity seeks to "balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph*, 981 F.3d at 328 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In practice, qualified immunity adjusts "the nature of the summary-judgment burden, how and when the burden shifts, and what it

---

[4] The district court also granted in part Gonzales's motion for judgment on the pleadings, granted Gonzales's motion for summary judgment, granted in part Bryant's motions for summary judgment, and granted the City's motions for summary judgment. Plaintiffs' remaining claims were: (1) § 1983 excessive force claims against Gallegos, as well as derivative wrongful death and survival claims; (2) § 1983 failure to intervene claims against Bryant based on lack of probable cause for the search warrant, as well as a derivative survival claim; and (3) § 1983 excessive force and lack of probable cause claims against Goines, as well as state law wrongful death and survival claims.

takes to satisfy the burden." *Id.* at 329. In determining whether a defendant is entitled to qualified immunity, courts must ask: "(1) was a statutory or constitutional right violated on the facts alleged; and (2) did the defendant's actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tucker v. City of Shreveport*, 998 F.3d 165, 172 (5th Cir. 2021). These steps may be evaluated in any order, and defendants are entitled to qualified immunity if the plaintiff fails to show either one. *Pearson*, 555 U.S. at 242. In these cases, the plaintiff bears the burden. *See Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

B

At this stage, the burden shifting changes, too. Typically, under the summary judgment standard, the party moving for summary judgment must initially show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial." *Joseph*, 981 F.3d at 329 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). To overcome the plaintiff's case, the defendant must show "that the record cannot support a win for the plaintiff—either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim." *Id.* The defendant can achieve this by introducing undisputed evidence or by "pointing out . . . an absence of evidence to support the [plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the defendant succeeds, then "the burden shifts [back] to the plaintiff to demonstrate that there *is* a

genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor." *Joseph*, 981 F.3d at 329.

Qualified immunity modifies that typical burden-shifting framework. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam). When a public official makes "a good-faith assertion of qualified immunity," the burden shifts back to the "plaintiff to show that the defense is not available." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (cleaned up). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)). "The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury," which is the "same" as "if the plaintiff did not face qualified immunity." *Joseph*, 981 F.3d at 330. Thus, "the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Id.*

### C

If an official unsuccessfully moves for summary judgment based on qualified immunity, the denial of qualified immunity, "to the extent that it turns on an issue of law, falls within the ambit of a final decision" under the collateral-order doctrine "notwithstanding the absence of a final judgment." *Wertenbroch v. Hardeman*, 178 F.4th 186, 189 (5th Cir. 2026) (cleaned up). Thus, we review the denial de novo. *Maldonado v. Rodriguez*, 932 F.3d 388, 390 (5th Cir. 2019) (citation omitted). Yet our jurisdiction is limited. We may not "review a district court's determination that a genuine factual dispute *exists*," but we "may review *de novo* the *materiality* of disputed facts to the qualified immunity determination." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (first and third emphases added). At this point, "all facts in

evidence are viewed in the light most favorable to the non-movants." *Maldonado*, 932 F.3d at 390.

III

Four issues exist on appeal.

A

The first issue is whether we have jurisdiction to review fact disputes.

Plaintiffs argue that we lack jurisdiction under the collateral-order doctrine to review certain fact disputes, including the video that allegedly provides evidence that Medina was not inside the house when Gallegos shot Nicholas. Gallegos disagrees, arguing that we have jurisdiction under *Scott v. Harris*, 550 U.S. 372 (2007), which provides "an exception" to our "general inability to review the existence of fact disputes" when the video blatantly contradicts Plaintiffs' version. *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021). Gallegos spills much ink explaining *Scott*'s application and force here. Plaintiffs, by contrast, never mention *Scott* at all.

While we are generally limited to determining whether a fact dispute is material, *Terry*, 609 F.3d at 761, we may assess the *genuineness* of evidence, such as the video, to evaluate whether Plaintiffs' story is "blatantly contradicted" and "utterly discredited" by this record, *Scott*, 550 U.S. at 380–81. But because that analysis would not assist in adjudicating this case, we only review the materiality of the fact disputes the district court identified.

B

The second issue is whether the district court erred in concluding that the video and Gallegos's inconsistent statements created a genuine issue of material fact about Medina's location when Nicholas was shot. Here, the court need only reach the district court's materiality finding.

1

Facts are "material" for the purposes of summary judgment only if they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Thus, "substantive law will identify which facts are material." *Id.* Based on those material facts, summary judgment must be awarded "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

When reviewing a denial of qualified immunity at summary judgment, we review "whether the factual disputes identified by the district court are material to the denial of qualified immunity—that is, whether the factual disputes viewed in favor of the plaintiff make out a violation of clearly established law." *Poole*, 13 F.4th at 423 (citing *Amador v. Vasquez*, 961 F.3d 721, 726 (5th Cir. 2020)).

2

The district court found that whether Medina was inside the house or not was a material fact. For the purposes of the qualified immunity analysis here, that was error.

In placing so much emphasis on Medina's location, the district court failed to consider Lovings's location in the doorway. It is undisputed that Lovings—hit by gunfire moments earlier—was laying in the doorway. That doorway is directly next to the couch where Gallegos claims Medina fell after Medina was shot. According to Maloney, the distance between Medina's position on one side of the L-shaped couch and Nicholas was eight feet. The report does not provide an estimation of the distance between Nicholas and Lovings.

These are the circumstances under which Gallegos fired the rounds that hit Nicholas. The fact that only one wounded officer (Lovings)—instead of two (Lovings and Medina)—was in close proximity of a suspect in the middle of a firefight does not affect the ultimate outcome. In this specific context, Medina's presence is immaterial because it does not "affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248; *see also McClain v. Delgado*, 132 F.4th 362, 365–66 (5th Cir. 2025) (per curiam) (reversing summary judgment when several fact disputes about the underlying claim were "immaterial" to the grant of qualified immunity).

While the court has some reservations about Plaintiffs' version of events in light of the record, we nevertheless accept Plaintiffs' contention that Medina had been taken outside. So, for the purposes of our analysis, we proceed under the assumption that Medina is outside the house when Gallegos shot Nicholas. This, however, does not alter the undisputed fact that Lovings remained in the threshold of the doorway, a very short distance from Nicholas.

C

The third issue is whether the district court erred in denying Gallegos's motion for summary judgment based on qualified immunity as to Nicholas's claims.

To answer that question, we must review the third fact dispute identified by the district court: Whether Nicholas was standing over Medina and reaching for Medina's gun on the couch. Maloney's investigation determined that Nicholas "was not over the body of Officer Medina, as reported by several officers, where he had collapsed on the couch." Rather, Nicholas "was physically removed by at least [eight] feet from his location." According to Maloney, were Nicholas over Medina "attempting to gain control of his shotgun," only "her left side would have been exposed to

Gallegos['s] shooting position." Thus, "she could not have been shot on her right side." This conclusion was based on the house layout, location of the couch, and Gallegos's position when he shot Nicholas. Gallegos told IAD that Nicholas was "standing directly over and facing Officer Medina," yelling profanities at him, before she "appeared to be lunging or reaching towards" Medina's gun. He later testified that Nicholas "was grabbing with both hands [and] tugging at the shotgun." The district court deemed this fact dispute material because there is no constitutional violation where an officer uses deadly force on a suspect that appears to be reaching for a weapon.

At this stage, we must construe this conflicting evidence in favor of Plaintiffs. As already noted, we proceed under the Plaintiffs' version of events because the BWC does not provide enough information for the court to determine that the Plaintiffs' version of events is *blatantly* contradicted. Thus, Nicholas is not reaching for Medina's gun as Medina is not in the home. But Plaintiffs do not dispute that Lovings remains in the threshold of the doorway, feet away from Nicholas. In our analysis, we consider these facts together in their context—in this case, an intense and dangerous firefight that left multiple officers injured.

We therefore proceed under the following factual baseline for purposes of our analysis: Medina, who had been shot, was outside the house when Gallegos shot Nicholas. Further, Nicholas was not standing over Medina and reaching for his weapon while Medina was lying injured on the couch, but Lovings remained wounded in the doorway. In our analysis, we consider these facts together in their context—in this case, an intense and dangerous firefight that left multiple officers injured.

1

Turning to the constitutional analysis, we must consider, viewing the facts in the light most favorable to Nicholas, whether Gallegos's actions

violated her Fourth Amendment rights. The Fourth Amendment fashions a "right to be free from excessive force during a seizure," and that right is clearly established. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); U.S. CONST. amend. IV. "To establish a claim of excessive force under the Fourth Amendment," plaintiffs must show an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

As to the third element, we consider three factors when determining whether force was excessive or unreasonable: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The test used to determine whether a use of force was reasonable under the Fourth Amendment 'is not capable of precise definition or mechanical application.'" *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham*, 490 U.S. at 396). Instead, it "requires careful attention to the facts and circumstances of each particular case" to assess "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 396–97. To determine reasonableness, courts must assess actions from the objective view "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (citation omitted). At this stage, while all disputed facts are construed in the light most favorable to nonmovants, courts "evaluating the reasonableness

of an officer's use of force [must consider] how a reasonable officer would have perceived those facts." *Tucker*, 998 F.3d at 171–72 (citing *Griggs v. Brewer*, 841 F.3d 308, 313–14 (5th Cir. 2016)). In other words, qualified immunity requires courts to "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam).

In the specific context of an officer employing deadly force, such force is excessive and unreasonable "unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). "The threat-of-harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021). And when assessing the force used in a particular case, our reasonableness determination must be holistically made in the context of *all* the relevant circumstances, "including facts and events leading up to the climactic moment." *Barnes v. Felix*, 605 U.S. 73, 76 (2025).[5]

Our "calculus of reasonableness must" necessarily allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

[5] When the district court rendered its decision, the Supreme Court had granted certiorari in *Barnes v. Felix*, 91 F.4th 393 (5th Cir. 2024), *cert. granted*, 145 S. Ct. 118 (2024), to examine the propriety of the moment-of-threat doctrine. In analyzing the threat Nicholas posed to the officers, our law at the time required "that the threat be examined only at the moment deadly force is used," *Crane v. City of Arlington*, 50 F.4th 453, 466 (5th Cir. 2022), and "[a]ny prior events leading up to the shooting . . . were simply not relevant," *Barnes*, 605 U.S. at 78 (cleaned up). Thus, that doctrine is no longer good law.

amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The Supreme Court cautions us to avoid "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

2

As to excessive force, Gallegos argues that Plaintiffs' theory that Gallegos intentionally shot Nicholas by accidentally shooting through Tuttle is "too implausible" to support summary judgment—and "impossible" given the evidence, including Maloney's bullet trajectory analysis. Gallegos also contends that Plaintiffs' theory is premised on his subjective intent. Thus, Gallegos asserts, the shot that killed Nicholas was constitutional "*to the extent Gallegos was aiming at Mr. Tuttle*, who was grazed by the bullet."

Plaintiffs challenge that theory, arguing that Gallegos's conduct was "objectively unreasonable when he shot and killed an unarmed woman who was not threatening him." Without citation to the record, they contend that Gallegos forfeited his argument that, "regardless of his intent, his conduct was still objectively reasonable." Presumably, Plaintiffs' assertion refers to Gallegos's argument that the fatal shot to Nicholas was constitutional to the extent that an objectively reasonable officer was aiming at Tuttle. But they do not give any airtime to this point. Even still, Plaintiffs argue that Nicholas did not pose an immediate threat of physical harm because she "was on the back of the couch and unarmed." For these reasons, they argue, Gallegos used objectively unreasonable force in shooting Nicholas inside the house.

Before analyzing the merits of this excessive-force claim, we need to briefly engage with Plaintiffs' secondary and tertiary arguments before us.

To begin, Gallegos did not forfeit his argument that shooting Nicholas was objectively reasonable. Forfeiture aside, Gallegos cannot escape his deposition testimony that he shot at Nicholas—not Tuttle. Of course, a

question remains as to whether Gallegos could see Nicholas through the fatal funnel of the house. Yet we must only assess materially disputed facts, not their genuineness, *Terry*, 609 F.3d at 761, unless the record blatantly contradicts them. In any event, the visual question is not materially disputed.

Gallegos attempts to wave-off his own testimony by arguing that Plaintiffs' theory is impossible and implausible. But no help is available. It is quite possible—indeed *plausible*—that Gallegos intended to shoot Nicholas, according to his deposition, and accidentally hit Tuttle. For example, Maloney testified that Gallegos "fired and the bullet grazed [Tuttle's] arm and hit" Nicholas. Yet Maloney could not determine what Gallegos "was aiming at" because "[t]hat would be beyond the scope of the reconstruction." When asked if there was evidence to contradict testimony that Gallegos fired at Tuttle's hand, Maloney concluded, "[t]hat would be . . . a pretty bad shot because he hit the house instead of his hand." Moreover, there is no evidence—other than the bullet that struck Nicholas also grazed Tuttle—suggesting Gallegos intended to shoot Tuttle instead of Nicholas.

To cure that unforgiving evidence in the record, Gallegos next presses that, under an objectively reasonable officer standard, his testimony is irrelevant because it is subjective. Of course, the "intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Roque*, 993 F.3d at 333 (citation omitted). But we also cannot ignore his testimony. By construing his admission that he intended to shoot Nicholas, we are not swapping an objective test for a subjective one. We are evaluating the *fact*, construed in Plaintiffs' favor, that Gallegos intended to shoot Nicholas, not the reasons *why* he pulled the trigger.

Gallegos's testimony helps frame the proper question: Whether an objectively reasonable officer in Gallegos's shoes would have shot Nicholas.

3

Now, back to the analysis.

Nicholas was fatally shot, so Plaintiffs have clearly shown an injury (element one). *See Deville*, 567 F.3d at 167. At issue, then, is whether Gallegos's shots were excessive (element two) and objectively unreasonable (element three). *See id.* These inquiries are often "intertwined." *Poole*, 691 F.3d at 628. Because Gallegos used deadly force, "the answer to these intertwined questions depends on whether [Nicholas] posed a threat of serious physical harm." *Roque*, 993 F.3d at 333; *see also Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (when deadly force is involved, our analysis is "constrained" to whether suspect posed a threat of harm).

*First*, context.

We begin with the backdrop of the shooting. The situation inside the house was tense, uncertain, and rapidly evolving given that multiple officers were involved in an active gunfight and several had been shot inside the house. The events that transpired also took place over the course of eighty seconds. As we account for all relevant circumstances, including the "events leading up to the climactic moment," *Barnes*, 605 U.S. at 76, we reaffirm that context matters—especially when that context is undeniably dangerous.

Let us start with what an objectively reasonable officer in Gallegos's shoes would have known here. He would have known that, once Bryant breached the door, the first three officers entered the house, and someone yelled, "Houston Police, search warrant, Houston Police search warrant!" Since Gallegos was in the back of the stack, he "could not see anything while the door was breached and officers made entry."[6] Gallegos later heard

[6] For additional context, at that point, Medina noticed Nicholas standing to his left and told her to put her hands on her face and get down. Nicholas did not comply, and she

Medina yell out that he had been shot. Afterward, Gallegos could hear a gunfire exchange inside the house but could not tell—from his vantage outside the house—who was firing. He also watched Salazar and Pardo "fall backwards off the front porch, off the landing." The shooting continued apace inside the house, and Gallegos observed Lovings "drop in the doorway" or the "threshold of the doorway" of the house. At that point, Gallegos testified that he could "finally see . . . into the residence."

In short, an officer in Gallegos's position would have known that the circumstances were "tense, uncertain, and rapidly evolving," so we must account "for the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396–97.

*Second*, Nicholas's actions.

While context is key, so is the suspect's conduct. An objectively reasonable officer in Gallegos's shoes would have also perceived Nicholas's actions—when placed in this known dangerous situation—as posing a threat of harm to the officers. Once Gallegos assumed a position on the right side of the front door in which he could see Nicholas on the couch, which abutted the doorway where Lovings lay injured. According to Maloney, Nicholas was mere feet away from the doorway—and Lovings.

An objectively reasonable officer would have been justified in making a split-second decision to use deadly force against Nicholas given her close proximity to a wounded officer under these tense, uncertain, and rapidly evolving circumstances. Upon the initial entry in the house, Gallegos heard officers announce their presence as HPD executing a search warrant. And

---

continued to yell and "flail" her hands. Later, after Pardo made it a few steps inside the house, he saw Nicholas standing over Medina, yelling. While these are undisputed facts, the record does not establish they were known or perceived by Gallegos.

before shooting Nicholas, Gallegos observed that Medina and Lovings had been shot during an active gunfight inside the house and that Salazar and Pardo had rolled off the front porch. At that point, Gallegos did not know who fired the shots because he was outside. But after Lovings fell to the ground, he saw Nicholas on the couch.

Plaintiffs argue that Nicholas posed no threat because she was unarmed and not standing over Medina who was already outside the house. Even if Medina was outside, Nicholas was still only feet away from Lovings. While in isolation that may suggest she was not a threat, as a whole and viewed in this context, an objectively reasonable officer would have perceived them differently. A reasonable officer under these dangerous circumstances would have been *uncertain* about Nicholas's role in the gunfire: Was she the shooter who injured Medina or Lovings, did she assist the person who did, or was she an innocent bystander? A reasonable officer would have perceived that Nicholas's proximity to Lovings, who was lying injured in the doorway, heightened the threat of harm because of her proximity to him and his weapon. After all, Nicholas was aware that HPD officers were there to execute a warrant; the officers announced this information when they entered the house. Under these circumstances, an officer in Gallegos's shoes would have been constitutionally justified in making the split-second decision and deploying deadly force against Nicholas.

Much authority exists in this circuit for the uncontroverted legal proposition that no constitutional violation exists when an officer deploys deadly force on an unarmed suspect who made movements perceived as reaching for a weapon. *See, e.g.*, *Manis*, 585 F.3d at 847 (officer entitled to qualified immunity for shooting unarmed man who allegedly reached for something under front seat of his vehicle); *Ontiveros*, 564 F.3d at 381, 385 (officer entitled to qualified immunity for shooting an unarmed man who reached into a boot for what the officers believed could be a weapon); *Reese*

*v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (officer entitled to qualified immunity for shooting an unarmed man who reached down twice in his car after officers told him to raise his hands); *Young v. City of Killeen*, 775 F.2d 1349, 1351–53 (5th Cir. 1985) (officer entitled to qualified immunity for shooting an unarmed man who allegedly reached toward car floorboard).

One may say, for example, that the threat Nicholas posed pales in comparison to the plaintiffs in the cases above. Perhaps so. But everything must be placed in context. None of the above cases involved a gunfight where *multiple officers had been shot*, including one who was wounded within *feet* of a suspect who was aware that officers were executing a search warrant. This scene was far more tense, uncertain, and rapidly evolving. It required a split-second judgment call—one that we, respectfully, will not second-guess. *See Ryburn*, 565 U.S. at 477. Gallegos was not required to be right in his assessment and response to the perceived threat. He was required to be reasonable. *See Manis*, 585 F.3d at 843.

Thus, an objectively reasonable officer would have been justified in deploying deadly force against Nicholas. Because there is no constitutional violation, Gallegos is entitled to qualified immunity on this claim.

## D

The fourth and final issue is whether the district court erred in denying qualified immunity for Gallegos as to Tuttle's claims.

While Tuttle suffered nine total gunshot wounds, Plaintiffs only challenge the constitutionality of the final two shots—one to his buttocks area and the fatal shot that struck his neck and upper back area. As to both shots, Gallegos testified that Tuttle was holding a gun or raised his weapon. Plaintiffs say that Tuttle's seven gunshot wounds, including to both his hands and arms, would have rendered him incapable of handling a gun. The district court held that, with respect to the final two shots, summary judgment was

improper as to whether Gallegos violated Tuttle's constitutional rights because there is a material fact dispute regarding whether Tuttle's hands and arms were incapacitated such that he could not use a gun.

Given this conflict, we must construe the evidence in favor of Plaintiffs and assume that Tuttle was incapable of holding a gun.

1

An officer's use of "deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis*, 585 F.3d at 843. The Supreme Court also instructs that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). But that general rule does not apply if a defendant "had initiated a second round of shots after an initial round had clearly incapacitated" the plaintiff, or if the plaintiff "had clearly given himself up." *Id.* So, when assessing whether an officer's use of force is objectively reasonable, courts must assess "only the facts that were *knowable* to the defendant officers." *White*, 580 U.S. at 77 (emphasis added).

2

Gallegos argues that the final two shots were not objectively unreasonable under the Fourth Amendment. For starters, Tuttle did not yell "I surrender" or take any actions "indicating a willingness to give up the fight." His actions, according to Gallegos, also took place during a tense, uncertain, and rapidly evolving scenario in which Gallegos saw that multiple officers had been shot. He also argues that the fact issue identified by the

district court relating to Tuttle's actual capacity was immaterial because it does not address whether Gallegos knew that Tuttle was incapacitated.

Plaintiffs continue to press their incapacity theory, analogizing this case to *Mason v. Lafayette City-Parish Consolidated Government*, where we denied qualified immunity based on fact disputes about whether the plaintiff was incapacitated and therefore could not pose a threat. 806 F.3d 268, 277–78 (5th Cir. 2015). In *Mason*, we held that "a reasonable jury could conclude that [the plaintiff] lay incapacitated on the ground and did not move in a threatening manner before [the officer] fired the final two shots." *Id.* at 277. Plaintiffs prop up *Mason* to argue that fact issues similarly preclude summary judgment on this claim.

3

Tuttle was fatally shot, so the first element is met. *See Deville*, 567 F.3d at 167. So, our key inquiry is whether Gallegos's shots were excessive and objectively unreasonable. *See id.* Because these inquiries are "intertwined," *Poole*, 691 F.3d at 628, the answer will turn on whether Tuttle "posed a threat of serious physical harm" to the officers, *Roque*, 993 F.3d at 333.

Even if Tuttle's hands and arms were incapacitated such that he could not use a gun, there is no evidence that Gallegos would have known that fact. According to Plaintiffs, when Gallegos emerged from behind the tree, Tuttle was inside the house and "had *his back to the door* and [dropped] to the floor." Lovings, who was on the floor, also allegedly told Gallegos that he "need[ed] to take a head shot." Gallegos yelled, "Shut the f*** up," and then shot Tuttle in the buttocks area. Maloney similarly characterized the facts: "*With his back to the door*, and beginning to drop to the floor, [Tuttle] was shot in the buttocks/thigh."

For this reason, an objectively reasonable officer in Gallegos's position would not have *known* that Tuttle lacked the capacity to use a gun

because Tuttle was not facing him, so a reasonable officer could not have reasonably *perceived* that Tuttle was no longer dangerous to the officers.

Moreover, after being shot in the buttocks area, Tuttle continued to move his body. According to Maloney, "[o]nce on the floor," Tuttle put "his body weigh[t] on his upper body by his elbows" to "raise[] his upper body" and was "fatally shot in the back of his head/neck." These movements did not reasonably suggest that Tuttle "had clearly given himself up." *Plumhoff*, 572 U.S. at 777. On the contrary, the record indicates Tuttle was unwilling to surrender his fight. While a reasonable officer "need not stop shooting until the threat has ended," nothing in the record suggests that Tuttle gave up. *Id.*

Finally, before shooting Tuttle, Gallegos observed that Medina and Lovings had been shot by someone inside the house. According to Plaintiffs, Gallegos then retreated from the house and "circle[d] to [a] tree in front of the door." From that position, Plaintiffs press that "[i]n the next flurry of shots from Gallegos, Reyna [was] hit with bullet fragments and Goines [was] hit in the face." The parties have different stories as to who shot Reyna and Goines. Even so, as Goines approached the front door, Gallegos observed that he was "struck by a round in his jaw and dropped to the ground." He next saw Reyna "attempt to go up to the front door to grab Officer Lovings," where Gallegos then saw "two hands come out of the front door holding a revolver." When Goines and Reyna suffered facial injuries, according to Plaintiffs, Tuttle "had approached the front of the house." Gallegos testified that he saw Tuttle at the front door when Goines and Reyna were shot.

A reasonable officer in Gallegos's position would have indisputably known that four officers—Medina, Lovings, Goines, and Reyna—had been shot in the moments leading up to his final shots at Tuttle. While there are disputes about *who* shot Medina, Goines, and Reyna, an objectively reasonable officer would not have known the answer to that question under

these "tense, uncertain, and rapidly evolving" circumstances, which must necessarily allow for "the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396–97. In turn, we must not second-guess Gallegos's "assessment, made on the scene, of the danger presented by a particular situation" involving Tuttle. *Ryburn*, 565 U.S. at 477.

At bottom, Gallegos's decision to shoot Tuttle was objectively reasonable based on the overall dangerous context, Tuttle's placement away from the door, and Tuttle's continued movement after sustaining gunshot wounds. "Ample precedent supports the reasonableness of using deadly force against an active shooter." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 240 (5th Cir. 2025); *see also Harmon*, 16 F.4th at 1163. While there may be a genuine issue as to whether Tuttle was incapacitated and therefore incapable of using a gun when Gallegos shot him, *see Mason*, 806 F.3d at 277, the record establishes that Gallegos would not have been able to know that fact because Tuttle's back was to the door, *see White*, 580 U.S. at 76, so a reasonable officer could not have reasonably perceived that Tuttle was no longer a dangerous threat to the officers, *Tucker*, 998 F.3d at 171–72.

The safety and comfort of our chambers invite a temptation to second-guess police officers and to reimagine, with the benefit of hindsight, how an officer should have responded here. We resist that temptation, as we must not "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994). The Fourth Amendment's excessive force jurisprudence does not require police officers to diagnose a suspect's medical condition during an active gunfight in which officers had been shot.

Thus, an objectively reasonable officer would have been justified in deploying deadly force against Tuttle. Because there is no constitutional violation, Gallegos is entitled to qualified immunity on this claim.

## IV

The events underlying the 7815 Harding Street raid are harrowing. Lies were told. People were shot. Lives were taken. Yet while these events are tragic, they do not establish liability under the Constitution. Gallegos acted like an objectively reasonable officer during a tense, uncertain, and rapidly evolving gunfight on January 28, 2019. We do not second-guess his training and judgment, which required split-second decisions during this shootout. For these reasons, we REVERSE the district court's denial of summary judgment and hold that Gallegos is entitled to qualified immunity.